## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## KANSAS CITY DIVISION

| | | |
|---|---|---|
| CRAIG PARKER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:16-cv-02554-JAR-JPO |
| | ) | |
| v. | ) | |
| | ) | |
| SUN LIFE ASSURANCE COMPANY | ) | |
| OF CANADA et al. | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT SUN LIFE ASSURANCE COMPANY OF CANADA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**I.      NATURE OF MATTER AND INTRODUCTION**

In this lawsuit, Plaintiff Craig Parker ("Plaintiff") seeks long term disability benefits under an employee welfare benefit plan, afforded by Garmin International, Inc. ("Garmin"), to its eligible employees, including Plaintiff.  Garmin's long term disability benefits are fully funded by group insurance policy No. 231948-001 ("Group Policy"), issued by Sun Life Assurance Company of Canada ("Sun Life"), who also serves as the Plan's claims review fiduciary. The Policy is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 *et seq.* ("ERISA").

Sun Life was granted express discretionary authority to determine benefit eligibility as well as construe the terms of the Group Policy.  As such, this court reviews this matter under an arbitrary and capricious standard of review.  The issue before the Court is whether Sun Life's determination that Plaintiff did not satisfy his burden of proof relative to benefit eligibility under the Group Policy was reasonable, and thus, not arbitrary and capricious.

Plaintiff left his employment as an Engineering Team Leader with Garmin in April 2014 and in October 2014, applied for disability benefits with Sun Life.  The Group Policy defines total disability during the elimination period and the first 24 months as the inability to perform the material and substantial duties of the claimant's own occupation. Sun Life approved Plaintiff's claim on March 3, 2015 subject to ongoing proof of total disability. Based on updated medical records from Plaintiff's treating physician Dr. Brown dated April 21, 2015, indicating that Plaintiff had improved and was capable of medium exertion level function, Sun Life suspended further benefits on March 31, 2015 pending clarification of continued benefit eligibility.  Based on a subsequent psychiatric consultant's opinion relative to the behavioral component of Plaintiff's claim as well as another independent physician review of Plaintiff's records, Sun Life was unable to reinstate Plaintiff's claim after March 31, 2015.  Given opinions obtained from an independent physician specialized in internal, preventive and occupational medicine as well as from an independent neuropsychologist, Sun Life upheld its determination upon Plaintiff's request for reconsideration.

Sun Life's decision to deny Plaintiff additional benefits should be affirmed because the medical and vocational evidence gathered by Sun Life during its review of Plaintiff's claim does not support that Plaintiff is unable to perform the material duties of his own occupation from a physical or psychiatric perspective. Indeed, Plaintiff's own physicians do not unequivocally support his claim and the restrictions and limitations placed upon him are not conclusive relative to an inability to return to work in his own occupation as explained by separate independent physicians of various medical disciplines. Given the plethora of evidence contradicting Plaintiff's claimed entitlement to continued benefits, Sun Life's determination is reasonable. Plaintiff is neither entitled to additional benefits nor to any other relief he seeks.  Summary

Judgment should be entered in Sun Life's favor.

## II.   STATEMENT OF UNCONTROVERTED MATERIAL FACTS[1]

### A.  Relevant Group Policy Language

1.    The Group Policy describes the relevant coverage provided as follows:

If Sun Life receives Notice and Proof of Claim that an Employee is Totally or Partially Disabled, a Net Monthly Benefit will be payable, subject to the Limitations and Exclusions.

To be eligible to receive a Net Monthly Benefit, the Employee must:

1.    Satisfy the Elimination Period with the required days of Total or Partial Disability;
2.    Provide proof of continued Total or Partial Disability; and
3.    Have regular and continuous care by a Physician who provides appropriate treatment and regular examination and testing in accordance with the disabling condition.

Proof of Total or Partial Disability must be given to Sun Life upon request and at the Employee's expense.

(AR 127)

2.    The Group Policy defines Total Disability or Totally Disabled as follows:

Total Disability or Totally Disabled means during the Elimination Period and the next 24 months, the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation.  After Total or Partial Disability benefits combined have been paid for 24 months, the Employee will continue to be Totally Disabled if he is unable to perform with reasonable continuity any Gainful Occupation for which he is or becomes reasonable qualified for by education, training or experience.

[…]

(AR 102)

---

[1] Sun Life refers the Court to the administrative record, developed and assembled during the review of Plaintiff's claim, bates labeled AR 1 through AR 1025.  The administrative record is filed simultaneously to Sun Life's motion for summary judgment and accompanying memorandum of law and citations to the record are provided by reference to the bates labeled pages of the record as ("AR ____ ").  The facts set out in the Statement will be referred to within the Legal Argument and Authorities section as "DSF ___").

3.      Own Occupation is defined by the Group Policy as "the usual and customary employment, business, trade, profession or vocation that the Employee performed as it is generally recognized in the national economy immediately prior to the first date Total or Partial Disability began.  Own Occupation is not limited to the job or position the Employee performed for the Employer or performed at any specific location." (AR 101)

4.      Sun Life has discretionary authority to determine benefit eligibility and interpret the terms of the Group Policy:

**Insurer's Authority**

The Plan Administrator has delegated to Sun Life its entire discretionary authority to make all final determinations regarding claims for benefits under the benefit plan insured by this Policy. This discretionary authority includes, but is not limited to, the determination of eligibility for benefits, based upon enrollment information provided by the Policyholder, and the amount of any benefits due, and to construe the terms of this Policy.

Any decision made by Sun Life in the exercise of this authority, including review of denials of benefits, is conclusive and binding on all parties.  Any court reviewing Sun Life's determination shall uphold such determination unless the claimant proves that Sun Life's determination is arbitrary and capricious.

(AR 145)

5.      The Group Policy limits benefits payable for Total or Partial Disability due to Mental Illness, Chemical and Environmental Illness, Chronic Fatigue Illinois and Musculoskeletal and Connective Tissue Illness to 24 months.  (AR 134-135)

6.      Chemical and Environmental Illness is defined in the Group Policy as "an allergy or sensitive to chemical or the environment including but not limited to:

(a) Environmental allergies

(b) Sick Building Syndrome

(c) Multiple Chemical Sensitivity Syndrome

(d) Chronic Toxic Encephalopathy […]"

(AR 100)

7.      Chronic Fatigue Illness is defined in the Group Policy as "an Illness that is characterized by a debilitating fatigue in the absence of known medical or psychological conditions, which includes but is not limited to:

a) Chronic Fatigue Syndrome as supported by Center for Disease Control Guidelines

b) Chronic Fatigue Immunodeficiency Syndrome as supported by Center for Disease Control Guidelines

c) Post Viral Syndrome

d) Limbic Encephalopathy

e) Epstein-Barr virus infection

f) Herpes virus type 6 infection

g) Myalgic Encephalomyelitis.  […]"

 (AR 100)

8.      Mental Illness is defined in the Group Policy as any "mental, nervous, emotional, behavioral, psychological, personality, cognitive, mood or stress related abnormality, disorder, dysfunction or syndrome regardless of cause, including any biological or biochemical disorder or imbalance of the brain.  Mental Illness includes, but is not limited to, bipolar affective disorder, schizophrenia, psychotic illness, manic depressive illness, depression and depressive disorders, anxiety and anxiety disorders and any other mental and nervous condition classified in the Diagnostic and Statistical Manual (DSM) of the American Psychiatric Association, in effect on the date of Total or Partial Disability or a comparable manual if the American Psychiatric Association steps publishing the (DSM)."  (AR 101)

9.      Musculoskeletal and Connective Tissue Illness is defined in the Group Policy as "a disease or disorder of the neck and back and sprains and strains of the joints and adjacent tissue, including but not limited to:

a)  cervical, thoracic and lumbosacral back and its surrounding soft tissue

b)  Carpal Tunnel or repetitive motion syndrome

c)  Fibromyalgia

d)  Temporomandibular joint or craniomandibular joint disorder

e)  Myofascial pain

f)  Scoliosis that does not require surgery. […]"

(AR 101)

10.      The Group Policy requires Termination of Long Term Disability Benefits on the earliest of:

1.  the date the Employee is no longer Totally or Partially Disabled.
2.  the date the Employee dies.
3.  the end of the Maximum Benefit Period
4.  the date the Employee fails to provide adequate employment earnings information or proof of continuing Total or Partial Disability as requested.
5.  the date the Employee refuses to complete a rehabilitative assessment or the date the Employee ceases to participate in the Sun Life approved Rehabilitation Program without Good Cause. […]

8.   for the first 24 months of Total or Partial Disability, the date Sun Life determines the Employee is able to perform on a full-time basis, the Material and Substantial Duties of his Own Occupation, even if the Employee chooses not to work.
9.  after the first 24 months of Total or Partial Disability, the date Sun Life determines the Employee is able to perform on a full-time basis, any Gainful Occupation for which he is or becomes reasonably qualified for by education, training or experience, even if the Employee chooses not to work.

(AR 131-132)

6

**B. Initial Claim Submission and Approval of Plaintiff's Claim.**

11.     Prior to leaving his employment with Garmin International, Inc. on April 4, 2014, Plaintiff (born 1961) was employed as an Engineering Team Leader, a sedentary to light exertion occupation (AR 272 (job description);  AR 461-463, 470). (AR 31)

12.     Subsequently, on October 9, 2014, Sun Life received a portion of a Long Term Disability Claim Packet from Plaintiff, dated September 29, 2014. (AR 31-40) On the Employee's Statement Plaintiff submitted, Plaintiff claimed that he first noticed symptoms of his illness in March 2012 and was first unable to work on April 7, 2014 due to complaints of dizziness, sweating, and muscle spasms after eating. (AR 31)

13.     On October 22, 2014, Sun Life acknowledged receipt of Plaintiff's potential claim for benefits and informed him that it was awaiting the remaining portions of the claim packet, including the completed employer statement and an Attending Physician's Statement completed by his treating physician.  (AR 173)  Sun Life further requested Plaintiff contact the Company to conduct a telephone interview and informed him that it had requested medical records from Plaintiff's physicians disclosed on his Employee's Statement.  (Id.)

14.     On October 30, 2014, Sun Life received medical records from Naturopathic Michael Brown, ND for the period of January 2014 through present. (AR 175) Dr. Brown's records reveal diagnoses of disseminated candidiasis, unspecified endocrine disorder, anxiety, allergies and chronic fatigue syndrome and otherwise list Plaintiff's complaints. (AR 176-184, 190-195, 208-214, 217-229, 236-243) The records do not contain any information relative to physical or mental examinations conducted by Dr. Brown. (Id.)

15.     On April 15, 2014, a hepatic function panel showed increased liver enzymes but was otherwise normal. (AR 178)  The increased enzyme levels were treated with Nitorol/Lamisil

7

for 2 weeks. (Id.) A comprehensive stool analysis was essentially normal. (AR 185-189)

16.     Dr. Brown's June 4, 2014 office visit note indicated that Plaintiff was allergic to "all [prescription] medications," "most carbs & sugar," "chemicals in general" and "soy, dairy, wheat, yeast and sugar." (AR 190) On June 13, 2014, Dr. Brown's office visit note only indicates diagnoses of allergy and irritable bowel syndrome. (AR 192) On July 3, 2014, Dr. Brown's office visit note indicates that Plaintiff would present at Mayo Clinic the following week but the records contain no information relative to the visit or any follow up. (AR 211, id.) Prior diagnostic testing in February 2014 at the Mayo Clinic was normal (EGD and complete GI workup.) (AR 370)

17.     On or about November 4, 2014, Sun Life received the completed Employer's statement of the Claim Packet. (AR 269-271)  Additionally, Garmin provided a job description and pay stubs. (AR 272-288)  Garmin confirmed Plaintiff's job as a Design Engineer Team Lead whose date last worked was October 7, 2014. (AR 269) Garmin indicated that Plaintiff's position allowed him to alternate positions from sitting and standing every 15-30 minutes and from walking at will. (Id.)  His position did not include driving, but he would occasionally bend/stoop, climb, reach above shoulder level, kneel and push/pull.  (AR 271)

18.     Garmin's job description for Plaintiff's position as a Design Engineering Team Leader provided a position summary, stating that the Design Engineering Team Leader was responsible for "[d]irect[ing] and coordinat[ing] activities of an Electrical Engineering team that is responsible for developing electronic components, products, and systems."  (AR 272-273)

19.     Plaintiff's pay stubs demonstrate that he was paid at a rate of $5,079.60 every two weeks. (AR 274-275, AR 345)

20.     On November 5, 2014, Sun Life conducted a telephone interview with Plaintiff.

8

(AR 290) In terms of restrictions and limitations, Plaintiff described not being always able to drive because he got dizzy and had flu like symptoms. (Id.)  He further indicated that while he was able to take care of his own activities of daily living and did not need any walking or assistive devices, could sit and lay down, he felt like having the flu 24/7 every day and did not sleep well as he was coughing and had muscle spasms that woke him up. (Id.)

21.     Plaintiff described that he believed that treatment would allow him to return to work and indicated that Dr. Brown believed so as well and had provided a time frame of "usually six months or so once all the supplements are in him and stay in him." (AR 291)

22.     On November 5, 2014, Sun Life received Dr. Brown's Attending Physician's Statement, dated September 26, 2014.  (AR 294-299) Dr. Brown indicated primary diagnoses of chronic fatigue/fibromyalgia as well as IBS and Adrenal Insufficiency.  (AR 294) He identified Plaintiff's lab results as objective evidence and Plaintiff's complaints of fatigue, weakness, focus issues, sinusitis, brain fog and anxiety as subjective symptoms. (Id.)  He further opined that Plaintiff's condition was "unchanged" and that in a typical work day, Plaintiff could frequently to continuously walk and sit, frequently stand and bend, occasionally squat and climb, continuously twist, push, pull, balance, kneel and reach above shoulder level.  (AR 295)  Dr. Brown further opined that Plaintiff was able to drive during a typical work day. (Id.)

23.     Dr. Brown indicated further that Plaintiff was restricted to medium functional capacity for the following 12 to 20 weeks. (AR 296)  Plaintiff experienced no cardiac limitations. (Id.)

24.     Dr. Brown identified that Plaintiff suffered from anxiety and possible minor depression and experienced an inability to focus, concentrate and communicate clearly. (AR 297) He identified severe limitations to Plaintiff's ability to sustain work performance, attention span

and concentration as a result of his mental conditions.  (AR 298) Dr. Brown estimated a return to full time work within 3 to 6 months. (Id.) Dr. Brown disclosed that Plaintiff's medication regimen consisted of various nutraceuticals, which varied from week to week. (AR 299)

25.    As further medical records remained outstanding, Sun Life informed Plaintiff on November 14, 2014 that it continued to toll the initial decision making period, "pending receipt of the requested Proof of Claim" required under the Group Policy.  (AR 323)

26.    On November 28, 2014, Sun Life received Dr. Steven F. Ellis' medical records. (AR 325) At the most recent office visit, on October 24, 2014, Dr. Ellis noted during his review of systems that Plaintiff denied suffering from appetite loss, chills, excessive perspiration, fatigue, fever, weight gain and weigh loss.   (AR 326)  Plaintiff further denied abdominal pain, black, tarry stools, bloody stool, change in bowel habits, constipation, diarrhea, difficulty swallowing, gas, indigestion, jaundice, nausea, vomiting blood and excessive appetite.  (Id.)  He further did not experience any back pain, joint pain, joint stiffness, joint swelling and muscle pain. (Id.) Additionally, neurologically, Plaintiff did not experience decreased memory, fainting, headaches, incoordination, numbness, spinning sensation, tingling, tremor, weakness in extremities, falling down and poor balance. (Id.)

27.     Plaintiff further had a normal ENMT ("Ear, Nose, Mouth and Throat") examination and a normal neurologic examination. (AR 327)

28.    On December 8, 2014, Sun Life referred Plaintiff's medical records for a medical consultant review (AR 368-369), which was conducted by Bethany Deabik, RN on December 29, 2014.  (AR 369-370)  She provided a summary of Plaintiff's medical records and opined that based on Plaintiff's medical records there was no objective evidence of limitations preventing Plaintiff from exerting up to 10-20 pounds of force occasionally, sit or stand occasionally or

10

exert a negligible amount of force frequently to lift, carry, push, pull or otherwise move objects from August 21, 2014 through present.  (AR 370) She recommended to obtain further medical records for review if further medical comment was needed. (AR 371)

29.     In email correspondence dated December 30, 2014, Plaintiff identified additional physicians, indicating that no neurological disease had been found by Dr. Laura Reilly, MD; that his double vision had improved prior to having been examined by neuro-ophthalmologist Dr. Billi Wallace, MD and that he was being tested for Lyme and associated tickborne illnesses by Diana Smith, RN, LPC, LPRN at Olathe LAD Clinic. (AR 373-374)

30.     Plaintiff confirmed that Dr. Brown was the only physician treating him for chronic fatigue disorder/fibromyalgia. (AR 374)

31.     On January 11, 2015, Plaintiff provided correspondence from Dr. Brown, which outlined Plaintiff's complaints but did not provide any restrictions and limitations or explain the nexus between Plaintiff's diagnoses, experienced symptoms and Plaintiff's claimed inability to perform his own occupation.  (AR 376)

32.     On January 12, 2015, Sun Life informed Plaintiff that it was still waiting for the records from Drs. Wallace and Reilly, identified by Plaintiff on November 30, 2014. (AR 378, 373-374)   Sun Life explained that the time period for its initial decision making remained tolled until receipt of the requested records. (AR 378)

33.     On January 17, 2015, Sun Life received the records from Sabates Eye Center, which revealed that Plaintiff presented on September 2, 2014 with complaints of left cranial nerve 4 palsy, which Dr. Wallace felt to be self-limited.  (AR 382)  Dr. Wallace further noted that Plaintiff otherwise demonstrated misalignment of the eyes on the left and some corneal dystrophy. (Id.)  In correspondence to Dr. Rilley dated September 2, 2014, Dr. Wallace provided

a brief history, indicating that Plaintiff awoke on May 11, 2014 during the night and noted diplopia, with images vertically offset.  (AR 388) While Plaintiff was diagnosed with CN 4 palsy, a subsequent MRI of his brain was negative. (Id.)  An MG panel and EMG were negative as well. (Id.)  Plaintiff reported that diplopia had resolved in June 2014.  (Id.)

34.     Sun Life further received records from family doctor Dr. Robert L. Schuchardt, revealing entirely normal physical and neurological examinations in April, May and June 2014 (AR 400-401, 415-416, 418-423, 432-434, 437-438), including full range of motion of the neck, no lymphadenopathy, no cervical adenopathy, clear lungs, no eostochondral tenderness, regular heart rate and rhythm, soft, nontender, nondistended abdomen without guarding or rigidity, full range of motion in the extremities, normal motor strength in the upper and lower extremities and normal gait as well as intact cognitive function and cooperation during the exam.  (AR 400-401)

35.     Dr. Schuchardt's June 10, 2016 office visit note referenced a May 16, 2014 brain MRI, which was "with regard to intracranial contents and specifically the course of the 4th nerves [] normal," "[n]o intracranial abnormality was identified" and there was only "minimal maxillary and ethmoid sinus mucosal thickening with tiny right maxillary sinus air0fluid level." (AR 415, 424, 453, 746)   Additionally, Plaintiff reported that a previously abnormal ANA titer had normalized.  (AR 416)

36.     On August 11, 2014, Plaintiff presented for follow up related to complaints of food sensitivities.  (AR 408)  He reported a normal gastrointestinal evaluation at the Mayo Clinic as well as a normal dietitian evaluation. (Id.)  Plaintiff claimed that any time he ate something he experienced symptoms of nasal congestion, upper bronchial congestion, some wheezing, dizziness, ears ringing and eyes burning. (Id.)

37.     An additional office visit note from Dr. Schuchardt from October 9, 2014

revealed normal physical and neurological examinations. (AR 406-307)

38.    Dr. Laura G. Reilly's initial office visit note from May 7, 2014 revealed normal physical and neurological examinations and diagnoses of nervous indigestion and leg weakness. (AR 428-430) She recommended that Plaintiff undergo cognitive behavioral therapy for his nervous indigestion and referred him to Dr. Jim Lemons for evaluation and treatment. (AR 430)

39.    On January 21, 2015, Plaintiff provided a radiology report from the University of Kansas Hospital (AR 456), which showed "[m]ild decreased perfusion in the inferior frontal lobes and moderate to marked deceased perfusion in the bilateral temporal loves, greater on the left. " (AR 456)

40.    On January 25, 2015, Sun Life referred Plaintiff's medical records to an outside vendor for a medical review with a view towards identifying Plaintiff's level of functionality (AR 457-458, 460)

41.    Independent nurse Anita Bolster, RN, BS, provided her opinions on February 10, 2015 and after a summary of the medical records submitted, stated that Plaintiff's medical records did not contain "objective evidence to support a level of impairment that would preclude Plaintiff's prior level of function except for a brief period" through the onset of his double vision in May 2014 through its resolution in early July 2014.  (AR 459-460)

42.     On February 10, 2015, Sun Life received an occupational analysis of Plaintiff's regular occupation, which in accordance with vocational rehabilitation consultant Kristin Esposito's opinion, corresponded best to Design Engineering Supervisor (SVP 8), DOT #019.137-042. (AR 461-463, 470) Ms. Esposito explained that this occupation typically exists in the national economy at a Light exertion level, which means exerting up to 20 pounds of force occasionally (up to 1/3 of the time), and/or up to 10 pounds of force frequently (1/3 to 2/3 of the

time) and/or negligible amount of force constantly (over 2/3 of the time) to move objects. (Id.) The physical demand requirements are in excess of those for Sedentary work in that sitting is required frequently and standing and walking are required occasionally.  (Id.)

43.     Ms. Esposito further mentioned in her occupational analysis that the employer statement provided by Garmin indicated that no lifting/carrying of any weight was required as part of Plaintiff's position, which was less than what is required for this occupation as it typically exists in the national economy. (AR 461)

44.     On February 18, 2015, Sun Life informed Plaintiff that based on the medical evidence received, his claim was not payable and he responded by way of an email, providing additional information, including that he had started seeing a psychologist.  (AR 466)

45.     In response to Plaintiff's email from February 18, 2015, Sun Life informed Plaintiff on February 20, 2015 that it would request a second level physician review before making a final determination on his claim. (AR 467-468)

46.     On February 27, 2015, Sun Life received a report relative to a review of Plaintiff's medical information from Calvin P. Fuhrmann, MD, a physician board certified in Internal and Pulmonary Medicine. (AR 476-479)  After providing a summary of the medical records reviewed, Dr. Fuhrmann provided answers to the referral questions, indicating that Plaintiff "would be able to function in his usual capacity provided he was given periods of time to rest," but that he otherwise was not "totally unable to carry out his full-time activities." (AR 477-478)  Dr. Fuhrmann specifically discussed Dr. Brown's attending physician statement, indicating that Dr. Brown had opined that Plaintiff was likely to improve over a 12 to 26 week period. (AR 478) Therefore, Dr. Fuhrmann opined that if Plaintiff's "condition should be reaching the point where he can return to full-time activity."   (Id.) Dr. Fuhrmann further

questioned Plaintiff's diagnosis of "chronic Lyme disease" as unsupported by the medical records provided. (Id.)

47.     Given Dr. Fuhrmann's opinion based on the medical evidence through February 2015, on March 3, 2015 Sun Life approved Plaintiff's claim as of July 15, 2014.  (AR 483-487) Sun Life informed Plaintiff that his continued entitlement was subject to submission of ongoing proof of Total or Partial Disability and that the underlying Group Policy contained benefit limitation provisions, including limitation provisions for Disability due to Mental Illness, Chronic Fatigue Illness and due to Musculoskeoetal and Connective Tissue Illness, including Fibromyalgia.  (AR 484-486)  Moreover, Sun Life pointed Plaintiff to the Group Policy's offset provisions, explaining that the benefit may be reduced by income received from other sources. (AR 485-486)

## C. Sun Life's Continued Review and Termination of Plaintiff's Claim.

48.     On March 27, 2015, Sun Life received updated medical records from Dr. Brown, including an office visit note dated January 22, 2015, where Plaintiff reported that he had not been found to have active Lyme disease or babesia.  (AR 517)  On March 2015, Plaintiff reported feeling "better than he had in a long time" as well as that the neurologist at Kansas University did not think he had dementia. (AR 519) On March 24, 2015, Plaintiff reported further improvement in having "worked his butt off the last two days" and while tired had not been "crashing." (AR 520)

49.     On March 31, 2015, Sun Life received medical records from psychologist Dr. Jude LaClair, which reveal diagnosis of dysthymic disorder and adjustment disorder with anxiety (chronic). (AR 521-523)

50.     On April 8, 2015, Sun Life provided a blank Attending Physician's Statement to

Plaintiff to have completed by his treating physician. (AR 526) Dr. Brown provided the form on April 22, 2015 (AR 527), identifying Plaintiff's primary diagnoses as chronic fatigue/fibromyalgia, allergies, IBS and Adrenal insufficiency.  (AR 529) He reported that Plaintiff's condition had been "unchanged" and assessed Plaintiff's functionality as including the ability, in a typical work day, to walk, sit, stand, bend, push, pull, balance, kneel, crawl and reach above shoulder level frequently and squat and climb occasionally.  (AR 530)  He further said that Plaintiff could drive during a typical work day. (Id.)

51.     He identified Plaintiff's physical impairment as limiting him to medium capacity (lifting, carrying, pushing, pulling 20-50 lbs. occasionally, 10-26 lbs frequently, or up to 10 lbs. constantly):

> **Physical Impairment**
> ☐  No limitation of functional capacity -- (no restrictions)
> ☑  Medium capacity -- (lifting, carrying, pushing, pulling 20-50 lbs. occasionally; 10-25 lbs. frequently; or up to 10 lbs. constantly)
> ☐  Light capacity -- (lifting, carrying, pushing, pulling 20 lbs. occasionally; 10 lbs. frequently; or negligible amount constantly. Can include walking and/or standing frequently even if the weight is negligible. Can include pushing or pulling of arm or leg controls.)
> ☐  Sedentary capacity -- (lifting, carrying, pushing, pulling 10 lbs. occasionally. Mostly sitting, may involve standing or walking for brief periods of time.)
> ☐  Comments (please explain):

(AR 531)

52.     Dr. Brown indicated that Plaintiff did not experience any cardiac limitations and the identified limitations limiting him to medium level work were to apply for 12 to 26 weeks. (AR 531)  Dr. Brown further indicated that Plaintiff was stable and was able to tolerate more nutraceutical and prescription medication treatment than previously. (Id.)

53.     On April 27, 2015, Jude LaClair, Ph.D., LCPC, provided a completed behavioral health conditions Attending Physician's Statement and indicated that Plaintiff  experienced limitations as a result of depression and anxiety. (AR 533) Dr. LaClair further provided

correspondence relative to the limits of his assessment as solely based on Plaintiff's self-reports. (AR 535)

54.     On May 4, 2015 Sun Life referred Plaintiff's file for another medical review. (AR 542, 563)  In correspondence dated May 8, 2015 (AR 547-548), Sun Life advised Plaintiff of the pending medical review and informed him that benefits were suspended as of March 31, 2015 as the "current clinical data" did not support ongoing benefit eligibility beyond March 31, 2015.  (AR 547)

55.     On May 14, 2015, Lisa Jacobus, MSW, LICSW, provided her response to the referral questions, indicating that Plaintiff's medical records did not contain "sufficient clinical information such as comprehensive mental status exam results or information on limitations in day-to-day functioning to support an incapacitating psychiatric condition."  (AR 564)  She further pointed out the mental status exam findings provided by Plaintiff's primary care physician were mostly unremarkable.  (Id.)

56.     Ms. Jacobus further detailed that someone with an incapacitating psychiatric condition would be expected to be engaged in intensive psychotherapy and medication management with a specialist in psychiatric care.  (Id.)  She noted that Plaintiff while having treatment with a therapist was not engaged in medication management. (Id.)

57.     In April 2015, Plaintiff presented to the internal medicine, infectious disease clinic at the University of Kansas Physicians for a lumbar puncture for possible infectious etiology leading to his brain SPECT findings.  (AR 581, 582) In correspondence dated April 20, 2015, Dr. Stephen Waller noted that Plaintiff had difficulty describing his symptomatology in connection with his alleged disability from employment, but alleged that he left his employment as a result of his inability to stay focused and remain mentally clear. (AR 581)  Dr. Waller noted

that Plaintiff described nervousness and anxiety with paranoia and complained of fatigue, while a sleep study undergone by Plaintiff was normal. (Id.)   While Dr. Waller further noted that Plaintiff reported having had an elevated Rocky Mountain spotted fever IgG serology, he had no preceding history of fevers, chills, night sweats etc. (Id.) Similarly, a peripheral blood smear tested for babesiosis was also negative. (Id.)  Dr. Waller further noted that Plaintiff reported a lack of short term memory but did an "excellent job recalling all laboratory tests in detail and specific clinic visit details over the last several months" and that "[h]e was very detail oriented in specific." (AR 582) Dr. Waller documented a normal physical examination and concluded that there was no strong indication to pursue a lumbar puncture with work up of infectious etiologies given the lack of any evidence of an infection, including Lyme disease and specifically chronic meningitis. (AR 584-585)

58.      Dr. Waller noted that Plaintiff's anxiety and other psychological conditions may be contributing to Plaintiff's symptoms and described fairly normal affect and appropriate response. (AR 586) Dr. Waller suggested neuropsychological evaluation.  (Id.)

59.      Plaintiff underwent endoscopic sinus surgery in June 2015 and was noted to be improved post-operatively. (AR 591, 593) On June 23, 2015, Plaintiff had a normal physical, neurological and mental status exam. (AR 591-592)

60.      In correspondence dated July 22, 2015, Sun Life informed Plaintiff that it received updated medical records since its previous correspondence, suspending Plaintiff's benefits and that it had requested a medical consultant review prior to making a final determination on Plaintiff's claim. (AR 602-603)

61.      On July 25, 2015, Sun Life received the requested report from Dr. Fuhrmann (AR 604-607), who opined that based on Dr. Waller's assessment from April 2015, Plaintiff had

obviously shown significant improvement and that he would not be prevented form carrying out his usual activities.  (AR 606)

62.      In correspondence dated July 30, 2015, Sun Life terminated Plaintiff's claim beyond March 31, 2015.   (AR 613-619) Sun Life advised Plaintiff of his right to request reconsideration of the determination and the need to pursue such review prior to filing suit. (AR 618)

### D.  Plaintiff's Request for Reconsideration.

63.      On October 1, 2015, Sun Life received Plaintiff's request for reconsideration of the termination of his claim.  (AR 621-622) Sun Life acknowledged receipt of Plaintiff's appeal on October 12, 2015 and provided Plaintiff with requested information. (AR 629-630)

64.      On February 1, 2016, Plaintiff submitted additional medical records to Sun Life as well as four letter narratives and argument.  (AR 634-638)

65.      Including in Plaintiff's submission was a follow up office visit note from Dr. Stephen Waller from August 19, 2015, indicating that Plaintiff had no clinical evidence of active sinus infection and his "sinuses actually feel better than they have felt in quite some time." (AR 741) Dr. Waller did not recommend antimicrobial treatment and while he agreed to refer Plaintiff for neuropsychological testing due to complaints of brain fog, lack of mental clarity and issues with memory loss, he noted that "the patient did not appear to me to have any issues with memory given his ability to readily [re]call specific [facts] and details regarding medical procedures, tests etc." (Id.)  Dr. Waller additionally noted that there is no evidence of obstructive sleep apnea based on sleep studies undergone by Plaintiff.  (AR 741)

66.      The submission further showed that in June 2015, Plaintiff began Xolair treatment for asthma complaints and Dr. Pfuetze noted on October 13, 2015 that since being on Xolair

Plaintiff's "asthma and allergies have been doing significantly better." (AR 778-788, 782, 796, 798, 807, 809) A comprehensive physical examination on September 15, 2015 was normal, including Plaintiff's mood and affect and on October 13, 2015, Plaintiff also had a normal spirometry study. (AR 783, 789)

67.     Dr. Stephen Ellis' June 10, 2015 and July 28, 2015 office visit notes documented a comprehensive physical exam and a lack of appetite loss, chills, fatigue, feeling sick, fever, night sweats, persistent infections, seasonal allergies and weight loss. (AR 816, 819) Moreover, Dr. Ellis noted an absence of blurred vision and double vision (id.), decreased memory, incoordination, tingling, weakness in extremities, anxiety, depression and inability to concentrate.  (Id.)  Anaerobic and aerobic as well as fungus cultures were negative. (AR 884)

68.     An office visit note from a visit at the University of Kansas Hospital on December 22, 2015 confirmed that Plaintiff's sinus surgeries were successful and brought about improvement, that his lung function tested normal on September 8, 2015 and that his asthma has been well controlled on Xolair and Advair. (AR 850) Moreover, it was noted that while Plaintiff complained about feeling feverish, his temperature was 97.5. (Id.)

69.     Plaintiff underwent a neuropsychological evaluation on November 9, 2015. (AR 910-914) The evaluation referenced a prior neurological examination conducted by Dr Marilyn Rymer, which had concluded that Plaintiff had a normal Trails B performance and normal memory.  (AR 911) Dr. Caleb M. Pearson, Psy.D, ABPP,'s neurobehavioral status examination of Plaintiff was unremarkable and Plaintiff was described as alert and oriented, fluent and articulate.   (AR 912) Plaintiff's judgment and insight were adequate and his recent/remote memory intact; his concentration normal, gross motor behavior intact and there was no evidence of psychotic symptoms.  (Id.)  The results of the neuropsychological testing demonstrated that

Plaintiff "performed in the mildly impaired range on tests of verbal fluency, however, all other language tests were normal.  All other cognitive domains, including learning and memory were normal […]."  (Id.)  Dr. Pearson noted that Plaintiff's symptom complaints "are probably related to his moderate depression and anxiety.  Somatoform disorder should also be considered on the differential if all other potential etiologies for his symptoms are ruled out."  (Id.) Dr. Pearson recommended increased physical activity and cognitive behavioral therapy.  (AR 913)

### E.  Sun Life's Review of Plaintiff's Appeal and Final Determination.

70.     On February 19, 2016, Sun Life provided a status of its review (AR 930-931) and on March 15, 2016, Sun Life informed Plaintiff that it had referred his file for an independent medical records assessment. (AR 937)

71.     On or about March 28, 2016, Sun Life received independent internal and occupational medicine specialist Dr. Kevin Trangle's forty-nine page assessment of Plaintiff's medical records and his functionality.  (AR 938-986, CV at AR 987-996) Dr. Trangle provided a detailed summary of Plaintiff's treatment history and medical records and attempted to have a peer-to-peer discussion with Dr. Keith Berndtson as well as with Dr. James Seberger, however was unable to connect with either one despite several attempts. (AR 941-956, 956)  Dr. Trangle further summarized all imagining and diagnostic studies performed, Plaintiff's surgeries and provided detailed descriptions of the reported diagnoses. (AR 956-974)  Thereafter, he responded to the referral questions and provided the following opinions:

> (a) While the medical records reflected a number of purported diagnoses, very few of them were supported by the medical evidence, including seasonal allergies, chronic recurrent polypoid rhinosinusitis, mild asthma, irritable bowel syndrome (IBS), gastroesophageal reflux disease (GERD), hypertropia (strabismus) in the left eye

suggestive of 4th cranial nerve palsy, dysthymic disorder and chronic adjustment disorder with anxiety. (AR 974-975)

(b) The only condition causing impairment was the hypertropia and reported diplopia, however, that condition had essentially resolved by September 2014. (AR 975)

(c) Limitations and/or restrictions relative to the aforementioned hypertropia were supported from approximately 05/15/2014 to 09/02/2014.  (AR 975)

(d) Plaintiff's medical records fail to support any tick-borne illness base don a combination of negative serological testing, PCR DNA analysis and lack of clinical evidence of tick-borne disease, including Lyme disease. (AR 976)

(e) There is no evidence for a diagnosis of CIRS. (AR 976-977)

(f) Plaintiff's reported levels of fatigue and pain are out of proportion to the objective clinical findings in his medical records. (AR 976)

(g) Plaintiff's medical records do not include any evidence that Plaintiff cannot tolerate medications of widely varied pharmacological classes. (AR 979)

(h) Plaintiff's medical records exhibit a pattern of "going from one physician to the next until he was able to find one or more physicians who seemingly provided him with an explanation for his ongoing symptoms, especially one that was not based on mental illness. […] As long as he continues to operate under the mistaken belief that these conditions are actually present, his changes for improvement will be exceedingly low." (AR 979)

72.     On April 4, 2016, Sun Life further received a neuropsychological file review prepared by Dr. Robert P. Odgers, PhD, ABPP. (AR 997-1003)  After a summary of Plaintiff's medical records, Dr. Odgers provided answers to the referral questions and rendered the

following opinions:

    (a) There is no objective data to support functional limitations from a neuropsycholgical perspective given the findings on Dr. Pearson's neuropsychological evaluation. (AR 1001)

    (b) The medical records do not support cognitive limitations and Plaintiff's treating physicians consistently make reference to Plaintiff being alert, oriented, cognitively intact with normal concentration and memory. (AR 1001-1002)

    (c) Plaintiff is not limited by psychiatric symptoms. (AR 1002)

    (d) Given the lack of objective evidence to support the claimant's somatic complaints, it appears highly likely that somatization is playing a significant role in his clinical presentation.  (AR 1002)

    73.    On April 11, 2016, Sun Life upheld its previous determination to terminate Plaintiff's claim effective March 31, 2015 and provided a detailed explanation of its decision. (AR 1004-1012)

    74.    On August 11, 2016 Plaintiff filed the present lawsuit.  (AR 1017-1025)

## III.    LEGAL ARGUMENT AND AUTHORITIES

### A.  STANDARD OF REVIEW

#### 1.  Summary Judgment

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if the movant demonstrates the absence of a genuine dispute and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S. Ct. 1689 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548 (1986), *Gonzales v. Shelter Mut. Ins. Co.*, No. 15-CV-1199-JTM, 2016 WL 2736083, at *1 (D. Kan. May 11,

2016) (granting summary judgment in favor of defendant because an ATV is not an uninsured motor vehicle entitling plaintiffs to uninsured motorist coverage) (citing FED. R. CIV. P. 56(c)).. To defeat summary judgment, "a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). The Tenth Circuit approves of cross-motions for summary judgment as the proper method of adjudication of cases asserting claims for benefits under ERISA, 29 U.S.C. §§1001, 1132. *Nance v. Sun Life Assur. Co. of Can.*, 294 F.3d 1263, 1275 (10th Cir. 2002); *Carter v. Cen. States, SE & SW Areas Pension Plan*, 656 F. 2d 575 576 (10th Cir. 1981).

### 2. ERISA Standard of Review

Typically, federal courts review the denial of ERISA benefits under a *de novo* standard of review "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948 (1989). When the terms of a plan provide for such discretion, judicial review of the administrator's decision is limited to an arbitrary-and-capricious standard of review. *Id.* The abuse of discretion standard is the same as, and often referred to as, the arbitrary and capricious standard of review. *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 925 n. 1 (10th Cir. 1996). The Tenth Circuit has stated that "this standard is a difficult for a claimant to overcome." *Nance, supra,* at 1269. Indeed, the administrator's decision may not be set aside if it is based upon "a reasonable interpretation of the plan's terms." *Averhart v. USWest Mgmt. Pension Plan*, 46 F.3d 1480, 1485 (10th Cir. 1994). To be upheld by a court, a determination "need not be the only logical one nor even the best one. It need only be

24

sufficiently supported by facts within [its] knowledge to counter a claim that it was arbitrary or capricious. The decision will be upheld unless it is not grounded on any reasonable basis." *Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141 (10th Cir. 2009) (*citing Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan,* 379 F.3d 1168, 1176 (10th Cir. 2004), *see also Woolsey v. Mraion Labs., Inc.*, 934 F.2d 1452, 1460 (10th Cir. 1991) (administrator's decision "need only be sufficiently supported by the facts within [its] knowledge to counter a claim that it was arbitrary or capricious" and the court "will not substitute [its] judgment for the judgment of the [Administrator] unless the action of the [Administrators] are not grounded on any reasonable basis.").   Indeed, an administrator's decision must only fall "somewhere on a continuum of reasonableness — even if on the low end." *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006);  *Kimber v. Thiokol Corp.,* 196 F.3d 1092, 1098 (10th Cir. 1999); *see also Schandel v. Siebert*, 175 F.Supp.3d 1238, 1245 (D. Colo. 2016).

In this case, the Group Policy provides as follows:

**B.  Insurer's Authority**

The Plan Administrator has delegated to Sun Life its entire discretionary authority to make all final determinations regarding claims for benefits under the benefit plan insured by this Policy. This discretionary authority includes, but is not limited to, the determination of eligibility for benefits, based upon enrollment information provided by the Policyholder, and the amount of any benefits due, and to construe the terms of this Policy.

Any decision made by Sun Life in the exercise of this authority, including review of denials of benefits, is conclusive and binding on all parties. Any court reviewing Sun Life's determination shall uphold such determination unless the claimant proves that Sun Life's determination is arbitrary and capricious.

(AR 145)

There can be no question – and Plaintiff has previously conceded -- that this language is sufficient to trigger the arbitrary and capricious standard of review in this case.  Sun Life's

determination must be upheld because it has a reasonable basis and is sufficiently supported by facts within Sun Life's knowledge.

### 3. There Is No Evidence That Sun Life's Conflict Of Interest Influenced Its Determination.

The deference granted to a fiduciary under ERISA is tempered somewhat to account for any conflict of interest. *See Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343 (2008). In this case, Plaintiff cannot point to any evidence that Sun Life's presumed conflict of interest impacted the denial of benefits in any way despite having expressly been allowed to conduct discovery into same. [DE # 29] To the contrary, the claim file, and its discovery answers, attached hereto as **Exhibit A**, reveal that Sun Life provided Plaintiff with a thorough and unbiased review, which included obtaining the opinions of independent medical consultants prior to termination of Plaintiff's claim (DSF at ¶¶41, 46, 61) and during its review of Plaintiff's request for reconsideration.  (DSF at ¶¶ 71, 72)

Moreover, Sun Life's answers to Plaintiff's discovery demonstrate that there is no history of biased claim administration in light of the approval of forty claims and only two involuntary terminations during the relevant time period under the plan at issue, resulting in only one challenge to Sun Life's determination and only one lawsuit – the present one.  (Ex. A, pp. 6-8)

As the Court explained in *Glenn*, the conflict of interest cannot alter the standard of review from deferential to *de novo.  Id.*  Additionally, there are times when the conflict of interest will not matter. Indeed, it only deserves weight when other factors are closely aligned and it acts as a "tie-breaker." This is not a close case given Sun Life's thorough review, which allowed for a meaningful dialogue between Plaintiff and Sun Life, its involvement of independent physicians at all levels of review, *Loughray v. Hartford Group Life Ins. Co.*, 366 Fed. Appx. 913 (10th Cir. 2010); *Holcomb v. Unum Life Ins. Co. of Am.,* 578 F.3d 1187, 1192

(10th Cir. 2009); and the lack of history of biased claim determinations; therefore, no "tie-breaker" is needed in this case.

**A.  Sun Life Reasonably Terminated Benefits Because Plaintiff Failed To Satisfy His Burden of Proof to Demonstrate Total Disability Under the Group Policy**

**1.  Burden of Proof**

The Policy places the burden of proof on Plaintiff to submit Notice of Claim and Proof of Loss to Sun Life that he satisfied the conditions precedent to benefit eligibility. (DSF at ¶ 1) (AR 143-145) Consequently, Plaintiff must prove that he is unable to perform the material duties of his own occupation as a result of his medical conditions and that Sun Life's determination was arbitrary and capricious. *Hancock, supra,* at 1155; *McGee v. Equicor-Equitable HCA Corp.,* 953 F.2d 1192, 1205 (10th Cir. 1992); s*ee also, e.g., Ruttenberg v. U.S. Life. Ins. Co.*, 413 F.3d 652, 663 (7th Cir. 2005) ("Mr. Ruttenberg seeks to enforce benefits under the policy; he therefore bears the burden of proving his entitlement to contract benefits.").

It is further Plaintiff who bears the burden of proof on the lack of applicability of any limitation provisions to his claim.  In *Hoffmann v. Life Insurance Company of North America*, the court held that a provision limiting the payment of benefits to two years for disabilities based upon a mental disorder was not an exclusion under the policy, and therefore, the plaintiff bore the burden of proving the limitation did not apply. 2014 U.S. Dist. LEXIS 177956, at *5-6 (C.D. Cal. 2014); *see also Doe v. Prudential Ins. Co. of Am.*, 2016 U.S. Dist. LEXIS 186074, at *5 (C.D. Cal. 2016) (relying on *Hoffmann* in concluding that the mental disorder provision is a limitation, not an exclusion, and that the plaintiff has the burden of proof as to the application of the limitation); *Ringwald v. Prudential Ins. Co. of Am.,* 754 F. Supp. 2d 1047, 1056-57 (E.D. Mo. 2010) (same).

Plaintiff cannot and did not meet his burden in this matter.

**2. Plaintiff's Own Treating Physicians' Records Support Sun Life's Determination.**

Under the Group Policy, Sun Life is only obligated to provide long term disability benefits so long as Plaintiff provides satisfactory proof that he was Totally Disabled as defined in the Group Policy.  Sun Life rightfully determined not to pay further benefits to Plaintiff because his medical records did not support that, as of March 31, 2015, he was unable to perform all of the material duties of his Own Occupation. To the contrary, his medical records show (and his treating physicians opined) that despite his complaints, he was capable of even medium level work, which was in excess of the strength demand of his Engineering Team Leader position at Garmin – which was performed at a lower strength level than otherwise in the national economy. (DSF, at ¶¶41, 66; SR-001)

Plaintiff left his employment on April 4, 2014 with complaints of dizziness, sweating and muscle spasms. (DSF at ¶ 12)  Time corresponding diagnostic testing, including at the Mayo Clinic in February 2014 (EGD and complete GI workup) and hepatic funtcion panel as well as stool analysis in April 2014 were normal. (DSF at ¶¶15, 16)  While Plaintiff's naturopath Dr. Brown's office visit notes from January 2014 through submission of Plaintiff's claim included no physical or mental examinations and reveal diagnoses of disseminated candidiasis and unspecified endocrine disorder as well as anxiety and allergies, his Attending Physician's Statement dated September 26, 2014 suddenly indicated that Plaintiff had primary diagnoses of chronic fatigue/fibromyalgia, IBS and Adrenal Insufficiency. (DSF at ¶¶14, 16, 22) Despite these diagnoses, however, Dr. Brown opined that Plaintiff should be able to return to work in approximately six months and at the time of submission of his Attending Physician's Statement was able to frequently to continuously walk and sit, frequently stand, bend, occasionally squat and climb, continuously twist, push, pull, balance, kneel an d reach above shoulder level in a

typical work day.  (DSF at ¶22) Dr. Brown restricted Plaintiff to medium functional capacity for the following 12 to 20 weeks and indicated that Plaintiff experienced no cardiac limitations. (DSF at ¶23)  Despite the fact that Dr. Brown opined that Plaintiff's inability to work at that time was due to an inability to focus, concentrate and communicate clearly as a result of his mental conditions, he nonetheless estimated a return to full time work within 3 to 6 months.  (DSF at ¶24)

While Plaintiff complained of diplopia and double vision in April 2014 and was diagnosed with CN 4 palsy, a subsequent MRI of his brain was negative. (DSF at ¶33) Similarly, an MG panel and EMG were negative as well. (Id.)

Office visit notes from Plaintiff's other treating physicians, including Dr. Ellis from October 2014, demonstrated a lack of any signs of an infection, any fever or fatigue as well as no abdominal pain or indigestion, no pain, including back, joint and muscle pain and no decreased memory, headaches, incoordination or weakness. (DSF at ¶26) Dr. Ellis further conducted normal ENMT and neurological examinations.  (DSF at ¶27) Subsequent medical records from Dr. Brown did not set out any restrictions and limitations and did not provide any explanation of Plaintiff's functionality or lack thereof in connection with his own occupation. (DSF at ¶31)

Medical records from Plaintiff's primary treating physician family doctor Dr. Schuchardt reveal normal physical and neurological examinations as well as intact cognitive function on and around the time of Plaintiff leaving his employment through October 2014.  (DSF at ¶¶34, 37) Additionally, a previously abnormal ANA titer had normalized. (DSF at ¶35)  Neurologist Dr. Laura G. Reilly likewise was unable to find any abnormalities and noted normal physical and neurological examinations and eventually diagnosed Plaintiff with nervous indigestion. (DSF at ¶38)

Updated medical records received by Sun Life during the first half of 2015 did not present a different picture.  Indeed, Plaintiff reported to Dr. Brown in January 2015 that despite his attempt to secure such a diagnosis, he had not been found to have active Lyme disease or babesia. (DSF at ¶48) In March 2015, Plaintiff's records noted continued improvement and a dementia diagnosis was ruled out. (Id.)   In April 2015, Dr. Brown indicated that Plaintiff's condition had been "unchanged" and that he remained able, in a typical work day, to walk, sit, stand, bend, push, pull, balance, kneel, crawl and reach above shoulder level frequently and squat and climb occasionally.  (DSF at ¶50) He identified Plaintiff's conditions to be stable and to limit him to medium capacity (lifting, carrying, pushing, pulling 20-50 lbs occasionally, 10-20 lbs frequently, or up to 10 lbs constantly).  (DSF at ¶¶51, 52)

In April 2015, Plaintiff also presented to the internal medicine, infectious disease clinic at the University of Kansas physicians and Dr. Stephen Waller's opinions further support Sun Life's position.  (DSF at ¶57)  Not only did Dr. Waller point out that Plaintiff's complaints of short term memory problems were contradicted by his excellent recall of his medical history, including all laboratory tests and clinic visit details, but his office visit record also emphasized that (a) Plaintiff had difficulty describing his symptomatology in connection with his inability to work, that (b) his alleged infections, including with Rocky Mountain spotted fever were unsupported given a lack of history of fevers, chills and night sweats; that (c) Plaintiff presented for an entirely normal physical examination and that (d) he demonstrated normal affect and appropriate response.  (DSF at ¶¶57, 58)  Subsequent to sinus surgery in June 2015, Plaintiff noted improvement in that area of his health as well. (DSF at ¶¶59, 65, 68)

Dr. Waller confirmed his previous findings in a subsequent office visit note from August 2015, where he recorded that Plaintiff "did not appear to me to have any issues with memory

given his ability to readily [re]call specific [facts] and details regarding medical procedures, tests etc." despite his complaints of brain fog, lack of mental clarify and issues with memory loss. (DSF at ¶65)  He further halted Plaintiff's efforts to obtain antimicrobial treatment and noted that there was no evidence of obstructive sleep apnea based on previous sleep studies undergone by Plaintiff. (Id.)

Plaintiff's asthma and allergies complaints improved subsequent to June 2015 as a result of Xolair treatment and he was doing "significantly better" according to Dr. Pfuetze in October 2015. (DSF at ¶66)  In accordance with his other treating physicians' findings, Dr. Ellis' office visit notes from June and July 2015 also document normal comprehensive physical examinations and an absence of decreased memory, persistent infections, fatigue, feeling sick, seasonal allergies, weight loss, double vision, incoordination, weakness, anxiety, depression and inability to concentrate. (DSF at ¶6)  Anaerobic, aerobic and fungus cultures were negative as well.  (Id.)

At the University of Kansas Hospital in December 2015, it was noted that while Plaintiff complained about feeling feverish, his temperature was normal (97.5). (DSF at ¶68)

The neuropsychological evaluation Plaintiff underwent on November 9, 2015 correspondence with a prior neurological examination conducted by Dr. Rymer in that it rendered normal findings. (DSF at ¶69)  Dr. Caleb M. Pearson, Psy.D, ABPP, noted an unremarkable neurobehavioral status examination and described Plaintiff as alert, oriented, fluent and articulate. (Id.)  His judgment and insight were adequate and his recent/remote memory intact, his concentration was normal and there was no evidence of psychotic symptoms. (Id.) Except for some mildly impaired findings in the area of verbal fluency, all other language tests were normal and all other cognitive domains, including learning and memory were normal. (Id.) Dr. Pearson suspected either depression and anxiety or a somatoform disorder to be responsible

for the mild impairment. (Id.)

The medical findings and opinions expressed in Plaintiff's medical records indisputably do not lend support to his claim for disability benefits.  To the extent that Plaintiff attempts to buttress his claim on his subjective reports and impressions only – even though they are largely contradicted by his own medical records (DSF at ¶¶57, 58, 65, 68, 69), it is settled Tenth Circuit precedent that a claimant is required to *objectively* establish that the symptoms he experiences prevent him from performing the material and substantial duties of his own occupation and that a claims administrator is not required to give deference to subjective reports.  *Rizzi v. Hartford Life & Acc. Ins. Co.*, 383 Fed. Appx. 738, 753 (10th Cir. 2010); *Holcomb, supra*, at 1194; *Meraou v. Williams Co. Long Term Disability Plan,* 221 Fed. Appx. 696, 706 (10th Cir. 2007) (rejecting wholly subjective complaints of pain without further medical evidence in concluding denial of ERISA benefits was not unreasonable); *see also Williams v. Aetna Life Ins. Co.*, 509 F.3d 317 (7th Cir. 2007); *Pralutsky v. Met. Life Ins. Co.*, 435 F.3d 833, 840-41 (8th Cir. 2006); *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, at 16-17 n. 5 (1st Cir. 2003) ("In this case, Prudential did not require Boardman to present objective medical evidence to establish her illnesses. On the contrary, Prudential was willing to accept that Boardman suffered from the illnesses she reported to her doctors. Rather, Prudential wanted objective evidence that these illnesses rendered her unable to work. While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."); *Reddick v. Chater*, 157 F.3d 715, 719-20 (9th Cir. 1998); *Michele v. NCR Corp.*, No. 94-3528, 1995 U.S. App. LEXIS 11608, at *8-9 (6th Cir. May 15, 1995).

Here, Plaintiff has not provided any evidence of physical limitations beyond being

32

limited to medium duty work. – which exceeds the strength demand of his own occupation. In addition, he has not provided any objective evidence of cognitive impairment that would prevent him from returning to his own occupation. Plaintiff cannot show that he would be unable to work in his light level occupation and based on Plaintiff's own medical records, Sun Life's determination to terminate his claim was reasonable.

    **3.  In Any Event, Sun Life Could Reasonably Rely On The Opinions Of Several Independent Physicians.**

While Sun Life's determination in this case is reasonable based on Plaintiff's own medical records and test results alone, it is further supported by the opinions of several independent physicians, who conducted thorough and detailed assessments of the medical records in file and provided opinions relative to Plaintiff's diagnoses, symptoms, complaints and impairment. Internal and occupational medicine specialist Dr. Kevin Trangle provided a forty-nine page assessment of Plaintiff's medical records, his alleged diagnoses and his functionality. (DSF at ¶71)  He responded to Sun Life's referral questions and provided the following opinions:

    (i)  While the medical records reflected a number of purported diagnoses, very few of them were supported by the medical evidence, including seasonal allergies, chronic recurrent polypoid rhinosinusitis, mild asthma, irritable bowel syndrome (IBS), gastroesophageal reflux disease (GERD), hypertropia (strabismus) in the left eye suggestive of 4th cranial nerve palsy, dysthymic disorder and chronic adjustment disorder with anxiety. (Id.)

    (j)  The only condition causing impairment was Plaintiff's hypertropia and reported diplopia, however, that condition had essentially resolved by September 2014. (Id.)

    (k)  Limitations and/or restrictions relative to the aforementioned hypertropia were supported from approximately 05/15/2014 to 09/02/2014.  (Id.)

33

(l) Plaintiff's medical records fail to support any tick-borne illness base don a combination of negative serological testing, PCR DNA analysis and lack of clinical evidence of tick-borne disease, including Lyme disease. (Id.)

(m) There is no evidence for a diagnosis of CIRS. (Id.)

(n) Plaintiff's reported levels of fatigue and pain are out of proportion to the objective clinical findings in his medical records. (Id.)

(o) Plaintiff's medical records do not include any evidence that Plaintiff cannot tolerate medications of widely varied pharmacological classes. (Id.)

(p) Plaintiff's medical records exhibit a pattern of "going from one physician to the next until he was able to find one or more physicians who seemingly provided him with an explanation for his ongoing symptoms, especially one that was not based on mental illness. […] As long as he continues to operate under the mistaken belief that these conditions are actually present, his changes for improvement will be exceedingly low." (Id.)

Additionally, on April 4, 2016, Sun Life received a neuropsychological file review from Dr. Robert P. Odgers, PhD, ABPP. (DSF at ¶72)  After a summary of Plaintiff's medical records, Dr. Odgers provided answers to the referral questions and rendered the following opinions:

(e) There is no objective data to support functional limitations from a neuropsycholgical perspective given the findings on Dr. Pearson's neuropsychological evaluation. (Id.)

(f) The medical records do not support cognitive limitations and Plaintiff's treating physicians consistently make reference to Plaintiff being alert, oriented, cognitively intact with normal concentration and memory. (Id.)

(g) Plaintiff is not limited by psychiatric symptoms. (Id.)

(h) Given the lack of objective evidence to support the claimant's somatic complaints, it appears highly likely that somatization is playing a significant role in his clinical presentation.  (Id.)

Sun Life could reasonably rely on the independent consultants' opinions provided and had the discretionary authority to resolve any conflicts in the medical data received. When evaluating conflicting medical evidence, a claims administrator in the ERISA context need not give deference to a plaintiff's treating physicians when determining eligibility for benefits but can rely on conflicting opinions provided by independent physicians.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (holding that a treating physician's opinions are not entitled to special deference by ERISA plan fiduciaries in determining whether their patients are disabled); *see also Chen v. CenturyLink,* No. 15-cv-01651-MSK-KMT, 2017 U.S. Dist. LEXIS 76511 (D.  Colo. May 18, 2017); *Mote v. Aetna Life Ins. Co*., 502 F.3d 601, 607 (7th Cir. 2007) ("We also have recognized that '[m]ost of the time, physicians accept at face value what patients tell them about their symptoms; but insurers. .. must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk).' […] Accordingly, the claims administrator did not act improperly when it looked to, and credited, evidence that conflicted with Mote's treating physicians' opinions as part of its deliberative process in evaluating her claim."); *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 578 (7th Cir. 2006) *cert. denied* 2006 U.S. LEXIS 7191 (U.S., Oct. 2, 2006) ("[R]eaching a decision amid such conflicting medical evidence is a question of judgment that should be left to [the insurer] under the arbitrary-and-capricious standard. *See* [*Nord,* at 1972]; *Ruiz*, 400 F.3d at 992); *Hobson v. Metropolitan Life Ins. Co.,* 574 F.3d 75, 90 (2d Cir. 2009).

Plaintiff's own treating physician's assessments of his conditions and functionality, in

particular Dr. Waller's and Dr. Pearson's assessments, as well as Drs. Trangle's and Odgers' opinions are all evidence "that a reasonable mind might accept as adequate to support the conclusion reached by [Sun Life] [here]." *Flint v. Sullivan,* 951 F.2d 264, 266 (10th Cir. 1991). There can be no question here that Sun Life's determination is predicated upon a reasoned basis and supported by substantial evidence. *Adamson, supra,* 455 F.3d at 1212; *Sandoval v. Aetna Life & Cas. Ins. Co.,* 967 F.2d 377, 382 (10th Cir. 1992).  Therefore, it should be upheld.

## IV.  <u>CONCLUSION</u>

For all of these reasons, Sun Life respectfully requests that this Court grant its motion for summary judgment upholding its claim determination and denying Plaintiff's cross-motion.

Dated this 9th day of June 2017                    Respectfully Submitted,

                                                   **SUN LIFE ASSURANCE COMPANY
                                                   OF CANADA, Defendant**

                                                   By:    */s/ Matthew R. Brunkhorst*
                                                          Matthew R. Brunkhorst #25873
                                                          2345 Grand Boulevard, Suite 1500
                                                          Kansas City, Missouri 64108-2617
                                                          816-221-3420
                                                          816-221-0786 (facsimile)
                                                          mbrunkhorst@armstrongteasdale.com

                                                          and

                                                          */s/Edna S. Kersting*
                                                          Edna S. Kersting
                                                          Wilson Elser Moskowitz Edelman & Dicker LLP
                                                          55 West Monroe Street - Suite 3800
                                                          Chicago, IL 60603-5001
                                                          312-821-6162 (Direct)
                                                          312-704-0550 (Main)
                                                          312-704-1522 (Fax)
                                                          edna.kersting@wilsonelser.com

2326692v.1

CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on June 9, 2017, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which sends notification of such filing to all counsel of record.


/s/ Matthew R. Brunkhorst
Attorney for the Defendant
Sun Life Assurance Company of Canada

38