UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS
CENTRAL DIVISION

| | |
|---|---|
| CRAIG PARKER, | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
|      v. | ) |
| | ) |
| SUN LIFE ASSURANCE COMPANY | ) Case No. 2:16-cv-02554-JAR-JPO |
| OF CANADA | ) |
| | ) |
|      and | ) |
| | ) |
|      Defendant. | ) |

**PLAINTIFF CRAIG PARKER'S SUGGESTIONS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………………………......v-vii

STATEMENT OF MATERIAL AND UNCONTROVERTED FACTS……………………...1-48

    A.  Background…………………………………………………………………………..1

    B.  The Subject Long-Term Disability Plan………………………………………….....1

    C.  Medical evidence submitted in support of Parker's claim for benefits following his initial
        application for benefits.………………………………………………………………...3

    D.  SunLife's initial review and approval of Parker's claim………………………….......15

        1.  Nurse Drabik's review of Parker's claim…………………………………………19
        2.  Nurse Bolster's review of Parker's claim…………………………………………22
        3.  SunLife's Occupational Analysis of Parker's claim………………………………23
        4.  Dr. Furhmann's first review of Parker's claim……………………………………28

    E.  SunLife's May 8, 2015 "suspension" of Parker's claim……………………………......33

        i.   Social Worker Jacobus' review of Parker's claim………………………………......34
        ii.  Medical evidence submitted in support of Parker's claim while benefits were
        suspended……...…………………………...………………………………………..35
        iii. Dr. Furhmann's second review of Parker's claim. ………………………….........37

    F.  SunLife's July 30, 2015 termination of Parker's claim. …………………………….38

    G.  Parker's internal appeal of the benefit termination…………………………...............39

        i.   Medical evidence submitted in support of Parker's appeal. ………………………39

    H.  SunLife's review of Parker's appeal………………………….....................................43

        i.   Dr. Kevin Trangle's paper review of Parker's file from an Occupational Medicine
        Perspective…………………………………………………………………………44
        ii.  Dr. Robert Odgers' paper review of Parker's file from a mental health
        perspective…………………………………..………………………………………46

QUESTION PRESENTED………………………………………………………………49

INTRODUCTION………………………………...…………………………………………49

ARGUMENT………………………...…………………………………………………52
    I.   Standard of Review……………………………...……………………………………52

A.  Generally……………………………....................................................52
B.  The ERISA Standard of Review…………………………….......................52
C.  The Impact of MetLife v. Glenn on the ERISA Standard of Review………..53

II.     SUNLIFE'S BENEFIT TERMINATION SHOULD BE OVERTURNED, WHERE
        IT WAS AN ABUSE OF DISCRETION AND NOT BASED ON SUBSTANTIAL
        EVIDENCE………………………………………………………………………..54

        A.  It Was Unreasonable and Improper for SunLife to Terminate Parker's
            Benefits, Where the Evidence in the Record Supports Parker's Total Inability
            to Perform the Material and Substantial Duties of His Own
            Occupation…………………………….................................................54

            1.  Parker's condition did not change nor improve in any way in the two
                month period between the time benefits were approved and
                subsequently terminated…………………………………………...54

            2.  SunLife both approved and terminated Parker's claim benefits based
                on the exact same information. ……………………….................56

        B.  SunLife Failed to Investigate Parker's Eligibility for Benefits Under the
            Terms of the Plan……………………………………………………………57

            1.  SunLife initially terminated Parker's claim based on the allegation that
                he could perform "sedentary" work; however, Parker's "own
                occupation" is considered "light" …………………………..........57

            2.  SunLife failed to assess whether Parker could perform the material and
                substantial duties of his own occupation, as the Plan terms
                require………………………….................................................58

                a.  SunLife erroneously focused only Parker's ability to perform
                    the functional aspects of his occupation, without considering
                    his ability to perform the material and substantial duties of his
                    own occupation. ………………………….........................59

                b.  SunLife's medical review of Parker's claim likewise
                    erroneously focused only Parker's functional capabilities,
                    rather than consider Parker's actual job duties and assess
                    Parker's ability to perform them……………………………..62

                    i.  Dr. Furhmann's report did not support SunLife's
                        benefit termination…………………………………...62

        ii.   Drs. Trangle and Odgers' reports likewise failed to consider Parker's ability to perform the material and substantial duties of his own occupation………………...64

C.  SunLife refused to acknowledge the objective evidence submitted in support of Parker's claim…………………………………………………………………..65

D.  SunLife erroneously required Parker to provide evidence of symptoms that cannot be objectively measured……………………………………………...67

E.  SunLife abused its discretion by terminating Parker's claim due to the difficulty in his diagnosis……………………………………………………68

    1. People are disabled by symptoms, not syndromes…………………….69

F.  SunLife relied on the opinions of biased medical reviewers, none of whom examined Parker in person, and ignored the opinions of Parker's own treating physicians; accordingly, their opinions do not constitute substantial evidence in support of the benefit termination………………………………………71

    1.  Dr. Furhmann's report does not constitute substantial evidence in support of the termination of benefits, as SunLife relied on his report when approving Parker's claim………………………………………...71
    2.  Dr. Trangle's report does not constitute substantial evidence in support of the termination of benefits………………………………………...72
    3.  Dr. Odgers' report does not constitute substantial evidence in favor of SunLife's claim denial…………………………………………………73
    4.  SunLife abused its discretion by failing to employ an independent medical examiner to evaluate Parker in person before denying benefits………………………………………………………………74
    5.  SunLife ignored the opinions of Parker' treating physicians, who have consistently supported his total disability…………………………74

III. SUNLIFE'S INHERENT CONFLICT OF INTEREST INFLUENCED ITS DECISION TO DENY PARKER' BENEFITS………………………………………………………………...75

IV. CONCLUSION………………………………………………………………………77

## TABLE OF AUTHORITIES

Fed.R.Civ.P. 56(c)………………………………………………………………………52

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (U.S. 1986)…………………………52

Bishop v. Long-Term Disability Income Plan of SAP Am., Inc., 323 Fed. Appx. 792, 794-795 (10th Cir. 2007)……………………………………………………………………...60

Black & Decker Plan v. Nord, 538 U.S. 822, 834 (2003)…………………………………..75

Buss v. United of Omaha, 2014 U.S. Dist. LEXIS 123179*45 (D. Kan. 2014)……………..55-56

Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986)…………………………………………..52

Chambers v. Family Health Plan Corp., 100 F.3d 818, 825 n.1 (10th Cir. 1996)……………….52

Cooper v. Life Ins. Co. of N. America, 486 F.3d 157, 168 (6th Cir. 2007) …………………….73

Cooper v. Intel Corp. Long Term Disability Plan, 2014 U.S. Dist. LEXIS 109680 *8 (D. Or. Aug. 8, 2014) ………………………………………………………………………………73

Diondia v. Reliance SunLife Life Ins. Co., 50 F.Supp.2d 934, 941 (N.D. Cal. 1999)…………..61

Elliott v. Metro. Life Ins. Co., 473 F.3d 613, 618-19 (6th Cir. 2006)……………………………63

Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)…………………………………………………………………………………...52-54

Gaither v. Aetna Life Ins. Co., 388 F.3d 759, 807 (10th Cir. 2004)…………………………...53

Gawrysh v. CNA Insurance Co., 8 F. Supp. 2d 791, 794 (N.D. Ill. 1998) …………………..69-70

Holcomb v. Unum Life Ins. Co. of Am., 578 F.3d 1187, 1193 (10th Cir. 2009)………………54

Hopkins v. AT&T Umbrella Benefits Plan No. 1, 2013 U.S. Dist. LEXIS 89970 *29 (W.D. Mo. 2013)
………………………………………………………………………………………56

Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999)………………………………...53

Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321, 1331 (11th Cir. 2001) …………...56

Lijoi v. Cont'l Cas. Co., 414 F. Supp. 2d 228, 245 (E.D.N.Y. 2006) …………………………...71

Marcus v. Califano, 615 F.2d 23, 27 (2d. Cir. 1979) …………………………………………71

McAllister v. Life Ins. Co. of N. Am., 2009 U.S. Dist. LEXIS 38849 *11 (E.D. Ark. May 7, 2009)…………………………………………………………………………………………..77

McDonough v. Aetna Life Ins. Co., 783 F.3d 374, 381 (1st Cir. Mass. Apr. 15, 2015)……..61-63

Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343 (2008)…………………….53-54, 68, 76-77

Miller v. American Airlines, Inc., 632 F.3d 837, 848-849, 855 (3rd Cir. 2011)…………...57, 61

Mitchell v. Eastman Kodak Co., 113 F.3d 433, 442-43 (3rd Cir. 1997). ………………………..67

Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan, 46 F.3d 938, 940-941, 944 (9th Cir. 1994) …………………………………………………………………………………...68

Nance v. Sun Life Assur. Co. of Can., 294 F.3d 1263, 1266 (10th Cir. Okla. 2002)……………52

Nemeth v. Anderson Corp. Welfare Plan, 2012 U.S. Dist. LEXIS 190900, *35 (W.D. Wisc. 2012) …………………………………………………………………………………………64

Norris v. Citibank, N.A. Disability Plan (501), 308 F.3d 880, 885 (8th Cir. 2002)……………...75

Rasenack v. AIG Life Ins. Co., 585 F.3d 1311, 1324 (10th Cir. 2009)…………………………..54

Rawdon v. Stanley, 455 F.2d 482, 484 (10th Cir. 1972) …………………………………… .69

Sacks v. SunLife Ins. Co., 671 F. Supp. 2d 1148 (C.D. Cal. 2009)……………………………...61

Salz v. Std. Ins. Co., 380 Fed. Appx. 723, 724 (9th Cir. 2010)…………………………………..61

Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 382 (10th Cir. 1992)……………………53

Smith v. Champion Int'l Corp., 573 F. Supp. 2d 599, 617, 2008 U.S. Dist. LEXIS 65346, *37 (D. Conn. 2008). …………………………………………………………………………………..71

Smith v. Metro. Life Ins. Co., 344 F.Supp.2d 696, 703 (D. Colo. 2004) ………………………74

State ex rel. Hudson v. Ohio Pub. Emples. Ret. Sys., 2011-Ohio-5362, 2011 Ohio App. LEXIS 4392 (Ohio Ct. App., Franklin County Oct. 18, 2011) …………………………………………73

State ex rel. Morton Int'l, Inc. v. Indus. Comm'n , 2007-Ohio-1497, P30, 2007 Ohio App. LEXIS 1373, *17-18 (Ohio Ct. App., Franklin County Mar. 30, 2007) …………………………………...73

Stone v. First Wyoming Bank, N.A., 625 F.2d 332, 342 n.15 (10th Cir. 1980) ………………...69

Swanson v. Unum Life Ins. Co of Am., 2015 US. Dist. LEXIS 8395, at *25-27 (D. Kan. 2015) ………………………………………………………………………………………………………67

Thompson v. Standard Insurance Company, 167 F. Supp.2d 1186, 1194 (D. Or. 2001) ……68-69

Touhey v. Hartford Life & Accident Ins. Co., 2013 U.S. Dist. LEXIS 70912 *52 (E.D. Mo. May 20, 2013) …………………………………………………………………………………………...75

Weber v. GE Group Life Assur. Co., 541 F.3d 1002 (10th Cir. 2008)……………...........53-54, 76

Woo v. Deluxe Corp., 144 F.3d 1157, 1162 (8th Cir. 1998) …………………………………….68

## STATEMENT OF MATERIAL AND UNCONTROVERTED FACTS

### A.  *Background*

1.  Plaintiff Craig Parker is a former Design Engineer Team Leader for Garmin
    International. Complaint, Doc. 1, ¶9; Administrative Record ("AR")269.

2.  In this role, he supervised approximately 20 employees. AR271.

3.  Parker began working at Garmin in January of 1997. AR269.

4.  As an employee of Garmin, Parker was eligible for long-term disability benefits under
    Garmin's long-term disability insurance policy ("the Plan"). AR90.

5.  His annual salary prior to becoming disabled and stopping work was $132,069.60.
    AR549.

6.  In April of 2014, Parker was forced to stop working due to the disabling effects dizziness,
    sweating, and muscle spasms after eating. Complaint, Doc. 1, ¶11.

7.  Parker has been diagnosed with Lyme disease, in combination with Chronic
    Inflammatory Response Syndrome (CIRS) from mold toxicity caused by mold exposure,
    chronic fatigue syndrome, fibromyalgia, depression and anxiety. Complaint, Doc. 1, ¶11.

8.  Parker filed his claim for long term disability ("LTD") with SunLife on September 29,
    2014, based on disabling symptoms of dizziness, sweating, and muscle spasms after
    eating. AR33.

### B.  *The Subject Long-Term Disability Plan.*

9.   The LTD Plan contains the following relevant definitions:

*"Total Disability or Totally Disabled means the Employee, because of Injury or Sickness, is
unable to perform the Material and Substantial Duties of his Own Occupation.*
*The loss of a professional or occupational license or the inability to obtain or qualify for a
license for any reason does not, in itself, constitute Total Disability.*

*To qualify for benefits, the Employee must satisfy the Elimination Period with the required number of days of Total Disability, Partial Disability or a combination of days of Total and Partial Disability."*
*LTD Plan, p. 20. AR102.*

*"Material and Substantial Duties" means, but is not limited to, the essential tasks, functions, skills or responsibilities required by employers for the performance of the Employee's Own Occupation. Material and Substantial duties does not include any tasks, functions, skills or responsibilities that could reasonably modified or omitted from the Employee's Own Occupation."*
*LTD Plan, p. 19. AR101.*

*"Own Occupation means the usual and customary employment, business, trade, profession or vocation that the Employee performed as it is generally recognized in the national economy immediately prior the first date Total or Partial Disability began. Own Occupation is not limited to the job or position the Employee performed for the Employer or performed at any specific location."*

*LTD Plan, p. 19. AR101*

10. Per the terms of the Plan, SunLife reserves the right to have a claimant examined by "a Physician, or other health Professional or vocational expert of its choice" and may do so "as often as reasonably required", but did not employ a physician, health professional nor vocational expert evaluate Parker at any time. AR143.

11. Based on his age at the time of disability, the long-term disability benefit pays 60% of Parker' former monthly pay, with a maximum of $6,000 per month, minus any other sources of disability income, including Social Security Disability Insurance benefits ("SSDI"), as long as he remains totally and permanently disabled from performing the material and substantial duties of his own occupation, through his Normal Retirement Age under the Federal Social Security Act, which is 67 for Parker.  AR90-91.

12. Parker's monthly pay was $11,005.80. AR483; 90.

13. As such, Parker's monthly benefit amount is $6,000, which is the maximum benefit under the Plan. AR483; 90.

14. Benefits under the Plan begin to accrue on the 91st day of disability, or the day after short term disability benefits end, whichever is later. AR90.

**C.  *Medical evidence submitted in support of Parker's claim for benefits following his initial application for benefits.***

15. In a treatment note dated March 24, 2014, Dr. Robert L. Schuchardt, Parker's treating primary care provider ("PCP"), saw Parker as a follow up to his weight loss. He was also examined for esophagitis. Dr. Schuchardt noted: "Patient was seen for evaluation but by gas ROM is present improvement of symptoms.  States he is told he had esophageal fungal infection."  Dr. Schuchardt ordered the following screenings for Parker: dyslipidemia screening, prediabetes screening, prostate cancer screening, screening for iron deficiency anemia, screening for hypothyroidism, and screening for vitamin D deficiency. AR446-447.

16. In a treatment note dated April 1, 2014, Dr. Bruce L. Pfuetze, Parker's treating allergist noted that Parker was seen for an annual recheck for evaluation for inhalant allergy and food allergy.  Dr. Pfuetze noted: "He continues to struggle with bacteria and yeast overgrowth problems in his small intestine.  He is sensitive to sugars, grains, milk and milk products."  Dr. Pfuetze also reported that Parker had recurrent sinusitis and low pneumococcal titers; and his nose was moderately swollen with slightly pale bluish nasal mucosa. AR444-445.

17. In a treatment note dated April 10, 2014, Dr. Schuchardt reported that Parker was being seen for a follow up for on-ongoing multiple food and medication sensitivities; along with sinusitis. AR441-443

18. In an April 15, 2014 treatment note, Dr. Michael Brown, Parker's treating naturopath, noted under "History of Present Illness": [patient] has all kinds of issues [with] being

3

sensitive to everything…has had very bad stomach aches..went away when he started on an anti-fungal; [patient]'s autonomic system working better [with] diet, etc' [patient]'s numbness, tingling, etc. is getting better…but now GI tract stuff is worse." AR176-177.

19. Lab work from the same date (April 15, 2014) showed that Parker had elevated AST and ALT[1]. AR 178.

20. In a treatment note dated April 15, 2014, Dr. Pfuetze noted that Parker appeared somewhat pale, thin, depressed, and anxious.  He also reported that Parker had moderately swollen pale boggy nasal mucosa without polyps or purulent mucus.  He further noted that Parker had a slight erythematous rash on his mid back area bilaterally with minimal excoriations. Lastly, he noted that Parker was having symptoms with many chemicals as well as inhalant allergens; he recommended Parker to an allergist who deals with chemical sensitivities.  AR439-440

21. In an April 22, 2014 treatment note, Dr. Schuchardt saw Parker for a follow up regarding his sinus infection.  Dr. Schuchardt prescribed pulse therapy with Lamisil for Parker's fungal infection and candida esophagitis. AR437-438

22. In a treatment note dated May 6, 2014, Dr. Schuchardt performed a complete physical on Parker. Dr. Schuchardt noted Parker was suffering from GERD, Candida esophagitis, anxiety, hemorrhoids, and adenomatous colon polyps. Dr. Schuchardt referred Parker to Gastrologist, Dr. Ervin Eaker for a GI consult. AR432-434.

---

1 AST and ALT are liver enzymes. Elevated liver enzymes may indicate inflammation or damage to cells in the liver. Inflamed or injured liver cells leak higher than normal amounts of certain chemicals, including liver enzymes, into the bloodstream, which can result in elevated liver enzymes on blood tests. *Available at http://www.mayoclinic.org/symptoms/elevated-liver-enzymes/basics/definition/sym-20050830*

23. In a treatment note dated May 7, 2014, Dr. Laura Reilly, neurologist, assessed Parker for the first time.  She diagnosed Parker with nervous indigestion and leg weakness.  Dr. Reilly recommended cognitive behavioral therapy and qigong for Parker's nervous indigestion along with some focal leg exercises for his leg weakness. She also referred Parker to Dr. Jim Lemons, who specializes in the psychology of pain. AR428-431.

24. In a treatment note dated May 8, 2014, Dr. Brown noted under "History of Present Illness": "reviewing labs from 4-30-14; has had a [history] of liver enzymes going up for 3 solid years; 2 weeks after being on anti-fungals and Ultra Clear and probiotic 225…liver enzymes totally WNL; feeling better; had die of fxns from probiotics but this was helped by anti-fungals; interphase produced another die-off run; current rotation – 7 days of nizoral than 7 days of laminal then 7 days of nystatin; lots of white slimy stuff in stool – more pronounced with Lamisil and nizoral; saw neurologist yesterday – all wnl". AR179-180.

25. In that note, Parker's diagnoses included: disseminated candidiasis; [unspecified][sic] endocrine disorder; allergy [unspecified. Other][sic]; and chronic fatigue syndrome." AR179.

26. In a treatment note dated May 13, 2014, Dr. Schuchardt referred Parker to Dr. Reilly for his double vision.  Dr. Schuchardt also recommended an MRI scan of the head. AR426-427.

27. The results of an MRI of Parker's brain dated May 16, 2014 showed no intracranial abnormality, and very minimal bilateral maxillary and ethmoid sinus mucosal thickening. AR746.

28. In a treatment note dated May 19, 2014, Dr. Brown reported "fungal die off rxn better – but left arm is weak and the eye position impacted by die-off run as well; first night he restarted Interphase – he had bad die off rxn and sig impacting sight – also bp dropped, feverish, etc.; when he goes off of interphase – eye does better; some tinnitus as well – has f/u w/neurologist coming up; MRI looked good." AR181-82.

29. In a treatment note dated May 27, 2014, Dr. Reilly reported that she did not find any abnormalities to suggest a neuromuscular junction disorder in Parker, but requested a paraneoplastic antibody panel.  Dr. Reilly instructed Parker to increase the servings of whole fish to approximately 4 per week. She noted that she did not address the possibility of depression with Parker because she did not think she had a therapeutic relationship with him. Dr. Reilly stated that in her opinion, the most obvious cause for his overall weakness was lack of energy/nutrition. AR421-423.

30. In a May 29, 2014 treatment note, Dr. Brown stated the "History of Present Illness" to be: neurology work-up – assessment – nerve inflammation – neuritis for eye; [patient] now having dark tarry stools – has apt w/GI tract; has been in bed for 3 weeks; can't tolerate or eat anything – any supplements; pain keeps moving around; has blood in semen as well; can't tolerate any Rx meds either." AR183-184.

31. In a treatment note dated May 30, 2014, Dr. Schuchardt reported under "History of Present Illness": Problem 1. Anxiety. Patient had a history of anxiety and depression. Would like to consider evaluation for counseling.  Has appointment scheduled for neurocognitive testing [with] her neurologist.  Has not been seen by psychiatrist in the past.  Has been increased stress.  Has recently been out of work secondary to his 4th nerve palsy.  Problem 2. GERD. Patient significant history GERD reflux symptoms.  States was

seen in the emergency room and an IV proton pump inhibitor with improvement of symptoms.  Unable to tolerate oral pills. Would like to try dissolving tablet Prevacid. Problem 3. 4th nerve palsy. Patient has appointment scheduled with eye doctor for followup.  Denies improvement.  Patient has been unable to work secondary to his eye complaints."  Dr. Schuchardt prescribed Prevacid dissolving tablets for GERD and recommended a referral to a psychiatrist regarding chronic anxiety.  AR418-420.

32. In a June 4, 2014 treatment note, Dr. Brown noted that Parker had had a bad weekend, where his speech and vision were effected and he had had slimy stools. He noted that since being on PPI[2], he is better able to tolerate ultra clear and regular food, but as soon as food hits his stomach all of his symptoms flare; that the PPI was making food tolerable –that he was having symptoms still but are less severe than without the PPI. Dr. Brown noted that two hours post prandial – when food makes it to a certain spot in the GI tract – he gets dizzy and feels faint; eyes are impacted; able to get in soups, beef bone marrow soup, etc. AR190-191.

33. In a treatment note dated June 10, 2014, Dr. Reilly noted the reason for Parker's appointment was weakness.  Dr. Reilly noted that a paraneoplastic profile[3] was taken on May 27, 2014, and that the results may be a sign of his starvation, as he may be metabolizing his immunoglobulins for immunoacids. AR415-417.

34. In a treatment note dated June 13, 2014, Dr. Schuchardt reported that Parker was having disorientation problems along with weakness and dizziness. He noted that Parker was

---

[2] PPI stands for "Proton Pump Inhibitor", which is used to treat GERD, such as Prevacid. Available at http://www.merckmanuals.com/professional/gastrointestinal-disorders/gastritis-and-peptic-ulcer-disease/drug-treatment-of-gastric-acidity
[3] A paraneoplastic profile is a serological evaluation of patients who present with a subacute neurological disorder of undetermined etiology, especially those with known risk factors for cancer. Available at *http://www.mayomedicallaboratories.com/test-catalog/2011/Overview/83380*

frustrated in regards to his symptoms.  He also noted that Parker had had an approximately 60 pound weight loss over the past year with no change in his appetite, and that he complained of ongoing dizziness and fatigue. Dr. Schuchardt referred Parker to an ophthalmologist and a different neurologist at KU Medical Center. AR400-402

35. In a June 13, 2014 treatment note, Dr. Brown noted that Parker had stopped all supplements for an upcoming test and reacted to eating salmon; that he had huge soft stools with lots of slime and felt great that day; that he had appointments with a neurologist, a primary care doctor and eye doctor; that per the eye doctor – his eye was still offset but his brain was compensating and helping his vision; and that he was going to see an ophthalmologist in near future. AR192-193.

36. In a July 1, 2014 treatment note, Dr. Brown noted that Parker still had a lot of mucus coming out; less split vision that day; that he was in about the same place- no worse no better; and that he had taken a break on supplements on the Sunday prior, and had felt good most of the day but was feeling bad by the end of the day. AR208.

37. In a treatment note dated August 4, 2014, Dr. Schuchardt reported that Parker was suffering from nausea, sinusitis and anxiety.  Dr. Schuchardt gave him sinusitis instructions, recommended that he begin on Flonase, Mucinex, saline rinse with Nettie pot as directed, increase fluids and warm compresses to sinuses; hot showers, and vaporizer as directed.  AR410-AR411.

38. In an August 7, 2014 treatment note, Dr. Brown noted Parker had gone "downhill big time", that he had tried to start back on all supplements, which inflamed his sinuses; that some of the paralysis in leg as back and tinnitus and head felt pressure again. Dr. Brown instructed Parker to try a new drug, Lamisil, and follow up in a week. AR219-220.

39. In a treatment note dated August 15, 2014, Dr. Ellis reported that Parker's August 13, 2014 CT scan showed chronic sinusitis and nasal polyps.  Dr. Ellis reported the additional reasons for the visit to include fatigue, smell/taste disturbance, ceruminosis, and nasal polyps.  Dr. Ellis and Parker discussed endoscopic sinus surgery. AR334-336.

40. In an August 25, 2014 treatment note following Parker's sinus surgery, Dr. Brown noted: "had sinus surgery on Thursday - woke up after surgery w/ sense of taste and smell; no polyps or cysts but lots of infection; he got it all out of there; pain in eyes gone; left eye shift is better; started going down hill after that - same old symptoms came roaring back and worse - eyes started burning again, dizziness after eating returned (pt has a theory- sinuses spasm after he eats food intolerances); pt feels nasal passages still clear; pt experiencing drainage in throat - making voicer raspy; no esophagus pain; thrush not flared; today however…was markedly better than yesterday; some of the brain fog, anxiety, dread - better today which had flared yesterday; doing cultures - waiting on them - 5 days for bacteria; 5 weeks for fungus; pt put on antibiotic orally and could only take l dose then spasms started so at direction of ENT surgeon .. stopped antibiotic; pt did start cat's claw and irrigating w/ saline rinse· only blood coming out - no yellow or green mucus; tinnitus is also flared." AR226-227.

41. In an August 28, 2014 treatment note, Dr. Brown noted that Parker "fell off the recovery band wagon yesterday", stating that a lot of his issues were back. He noted that Parker was still suffering from eye pain, urinary issues, irritable bowel, esophagus pain, slimy tongue, hoarse voice, muscle spasms, and some trouble articulating speech. AR228-229.

42. Parker was evaluated by ophthalmologist Dr. Billi Wallace on September 2, 2014. Dr. Wallace diagnosed Parker with Hypertropia, and Corneal Dystrophy. AR382.

43. Dr. Ellis evaluated Parker for a post-operative visit in follow up to his August 21, 2014 surgery.  During his visit, Dr. Ellis noted Parker was suffering from fatigue and seasonal allergies; eye pain, ringing in the ears, diarrhea, joint pain and muscle cramps; and tingling and weakness in extremities. AR332-333.

44. In a September 9, 2014 treatment note, Dr. Brown reported that since starting his new regimen, Parker had felt nauseated, had yellow mucus coming from sinuses, had oral thrush and was very depressed.  Dr. Brown also noted that Parker had recently developed headaches. AR236-237.

45. In a September 12, 2014 treatment note, Dr. Brown reported Parker's general mood was worsening.  He stated that Parker had been off all supplements for two days, and had been waking up with nightmares, and having anxiety and panic attacks (noting that the anxiety/panic attacks started before stopping supplements). AR238.

46. Dr. Brown treated Parker on September 16, 18, and 30. During those visits, Parker complained of a number of disabling symptoms, including but not limited to constant cramping at night, no improvement in his mood or energy, burning and cramping intestines, urgency for bowel movements, low blood sugar, mucus in his stool, recurrent sinus infection, dizziness, sweats, and eye pain. AR239; 241; 503

47. Dr. Ellis noted that he performed a cerumenectomy[4] on Parker in his office on October 3, 2014. Dr. Ellis added Johnson's baby shampoo to Parker's sinus rinse routine.  AR330-331.

48. In a treatment note dated October 6, 2014, Dr. Brown noted that Parker was having increased muscle spasms. AR505.

---

[4] Ear cleaning.

49. In a treatment note dated October 9, 2014, Dr. Schuchardt noted that Parker complained of headaches, cough and congestion.  AR406-407.

50. In treatment notes dated October 15 and 22, Dr. Brown reported that Parker complained of mucous, coughing, disturbed sleep, and sinus infection. AR508-509.

51. In a follow up visit on October 30, 2014, Dr. Brown's nurse reported Parker had had an allergic reaction to an antibiotic pack and an antifungal, which included runny nose, sneezing, wheezing, and congestion. AR510.

52. In a treatment noted dated November 10, 2014, Dr. Brown noted Parker's systematic reaction to diflucan, an anti-fungal, requiring him to use albuterol to be able to breath. AR512.

53. In a treatment note dated December 2, 2014, Dr. Brown noted that Parker developed some sort of bronchitis/allergy reaction which he thought was due to the nasal steroid. AR513.

54. In a treatment note dated December 9, 2014, Dr. Brown reported that Parker's color was better but he looked fatigued. AR514.

55. The results of Parker's December 22, 2014 brain CT scan identified "mild decreased perfusion in the inferior frontal lobes and moderate to marked decreased perfusion in the bilateral temporal lobes, greater on the left. These findings can be seen in the frontotemporal dementia, clinical correlation is recommended." AR456.

56. On December 23, 2014, Dr. Brown reported that Parker was not doing well. He noted that he did not feel like getting out of bed; and that he was dizzy, confused and emotional. AR515.

57. In a treatment note dated January 6, 2015, Dr. Brown reported that Parker's color was better but that he looked fatigued. AR516.

58. In a treatment note dated February 10, 2015, Dr. Brown noted that Parker's breathing was better, sleeping was improved, and that his color was better, but that he looked fatigued. AR518.

59. In a treatment note dated March 24, 2015, during a follow-up visit, Dr. Brown noted that Parker was tired and that his allergies are flared. AR520.

60. In a treatment note dated March 31, 2015, Parker's treating psychologist, Dr. Jude LaClaire, reported that Parker's mental health was improving but that he had permanent damage that would keep him from functioning adequately in his job.  Dr. LaClaire determined that Parker was permanently disabled and unable to work full or part-time. AR522-223.

61. In a treatment note dated April 7, 2015, Dr. Brown reported that Parker had been feeling really bad since trees and grasses started blooming.  He also noted that Parker had been feeling like he was going to pass out again; was suffering from pain in his flank; and that his vasculitis had flared. AR569.

62. In a treatment note dated April 9, 2015, Dr. Schuchardt reported treating Parker for a sinus infection. AR575-576; 813-814.

63. Dr. Stephen Waller, a specialist in infectious disease (including tick-borne illnesses), evaluated Parker on April 15, 2015. In his treatment note, Dr. Waller opined that it is very difficult to say if Parker ever had a true infection, or whether his symptoms represented cross-reactivity to other rickettsial species such as Rickettsia parkeri. Dr. Waller also reported being concerned that Parker may have a component of anxiety or

other psychological concern that may be contributing to his symptoms, and suggested that he undergo a neuropsychological evaluation. AR581-586.

64. In a treatment note dated April 27, 2015, Dr. LaClaire summarized previous visits with Parker, including his notes about how Parker had issues with poor appetite, low energy, fatigue, low self-esteem, poor concentration, difficulty making decisions, nervousness and anxious feelings. AR536-537.

65. In a treatment note dated May 7, 2015, Dr. Brown noted that Parker's allergies had worsened, and that he had sustained another sinus infection. AR567, 885.

66. A May 12, 2015 x-ray of Parker's sinuses showed mild sinusitis on the right and advanced sinusitis on the left. AR579.

67. In a treatment note dated May 12, 2015, Dr. Pfuetze saw Parker for the worsening of his sinus condition. He noted that Parker was reacting to almost all foods and had a very limited diet. He noted that Parker's DNA analysis indicated that he does not break down histamine at all.  He noted that Parker appeared very week and ill and slow in responses due to his illnesses. AR572-573.

68. Dr. Ellis evaluated Parker due to his allergic rhinitis on May 27, 2015. He noted Parker suffered from nasal congestion, smell/taste disturbance, runny nose and sinus problems. Dr. Ellis discussed with Parker the option and risks involved in endoscopic sinus surgery. AR834-837.

69. On June 4, 2015, Parker underwent four procedures for his nasal polyposis and chronic sinusitis.  Dr. Ellis reported that during surgery, Parker had significant polypoid tissue filling the middle meatus extending into the nasal cavity.  The inferior aspect of the middle turbinate was also very polypoid. AR588-589.

70. In a post-operative visit with Dr. Ellis on June 10, 2015, Dr. Ellis noted that Parker could "smell and taste better" following the procedure. AR59-594; 819-20.

71. In a follow-up visit with Dr. Ellis dated June 23, 2015, Dr. Ellis reported that Parker had improved post-operatively. AR591-592.

72. In a treatment note dated July 7, 2015, Dr. Ellis noted seeing Parker for a post-operative sinus surgery visit along with the onset of laryngopharyngeal reflux, which had been occurring for days. AR838-AR840; AR881-883.

73. In a treatment note dated July 20, 2015, Dr. Schuchardt reported that Parker still had complaints of recurrent sinus pressure and infections following his most recent sinus surgery.  He also noted that Parker has severely low testosterone. AR804-805.

74. On August 31, 2015, Dr. James Seberger, family practice physician, conducted a urinalysis on Parker, the results of which led him to the conclusion that Parker suffers from chronic mold infection, with ochratoxin poison. AR657-661; AR872-876.

75. In a treatment note dated September 8, 2015, Dr. Pfuetze reported that Parker was seen for a recheck evaluation for asthma, allergic rhinitis, food allergies, gastrointestinal problems and chronic recurrent sinus infections.  Dr. Pfuetze referred Parker to the KUMC allergy, immunology, and rheumatology department. AR793-794.

76. Parker underwent neuropsychological testing on November 9, 2015 with Dr. Caleb M. Pearson, neuropsychologist. The results of the evaluation showed that Parker performed in the mildly impaired range for verbal fluency, which correlated with the decreased uptake shown on the SPECT scan. Dr. Pearson noted that these findings could also represent normal intraindividual variability in performance. He opined that his symptoms complaints sound to be attentional in nature and are probably related to his moderate

depression and anxiety. He further opined that his complaints could be the results of physical symptoms such as fatigue, excessive daytime drowsiness, etc. AR910-914.

77. Dr. Thomas Crist, a family practice physician whose practice focuses on borreliosis, evaluated Parker for the first time on December 8, 2015. After a through new patient assessment, Dr. Crist's "Assessment" of Parker included the following diagnoses: Lyme borreliosis, flu-like symptoms, sinus congestion, asthma, myalgia, spasm of muscle, impaired cognition, joint pain, and gluten-sensitive enteropathy. AR663-681.

78. Parker was evaluated by Dr. Pfeutze's nurse practitioner on December 22, 2015, due to Parker's complaints of not feeling well.  She noted that he was experiencing chronic fatigue/malaise. AR850-859.

***D. SunLife's initial review and approval of Parker's claim.***

79. In September of 2014, Parker applied for long-term disability benefits under the Plan. AR31-33.

80. In support of his claim, Parker's treating naturopathic doctor, Dr. Michael Brown, submitted an attending physician's statement ("APS"), dated September 26, 2014. AR294-296.

81. In the statement, Dr. Brown noted Parker's primary diagnoses to include chronic fatigue, fibromyalgia, IBS and Adrenal Insufficiency, which were Parker's diagnoses at the time. AR294.

82. Dr. Brown noted Parker's secondary diagnoses to include other endocrine abnormalities, diplopia and sinusitis. AR294.

83. Dr. Brown listed Parker's objective findings/investigative testing to include numerous labs. AR294.

84. Dr. Brown listed Parker's subjective symptoms to include fatigue, weakness, focus issues, GI issues, sinusitis, brain fog, and anxiety. AR294.

85. Dr. Brown noted that Parker's symptoms began to occur in October of 2013. AR294.

86. When asked to provide Parker's restrictions and limitations, specifically what Parker is able to do in a typical workday, Dr. Brown checked several boxes but noted that Parker's functionality varies from day to day. AR295.

87. Dr. Brown noted Parker's physical impairment to be "medium capacity". AR296.

88. Dr. Brown estimated that Parker's limitations would apply for 12-26 weeks. AR296.

89. When asked to provide additional remarks, Dr. Brown noted: "his day to day condition varies greatly so it is difficult to assess ability to daily activities." AR296.

90. SunLife acknowledged the receipt of Parker's claim in a letter dated October 22, 2014, authored by Benefits Consultant Michelle Doucette. The letter stated it would provide him with "written notice of decision on your claim within a reasonable period of time, but not later than 45 days after receipt of the claim. If we cannot make a decision within 45 days after receiving your claim, we will request a 30-day extension as permitted by U.S. Department of Labor regulations. If we cannot render a decision within that extension period, we will request an additional 30-day extension." AR173-174.

91. The letter also explained "If a period of time is extended because you failed to provide necessary information, the period for making the benefit determination is tolled from the date we send notice of the extension to you until the date on which you respond to the request for additional information. You will have 45 days to provide the specified information." AR173.

92. Doucette interviewed Parker via telephone on November 5, 2014. AR290-1.

93. During that conversion, Parker informed Doucette that at that time, he had been given the diagnoses of fibromyalgia and chronic fatigue; and that he had a sinus infection for which he could not take medications. AR290.

94. Parker explained his disabling symptoms to include: feeling like he has a fever all of the time, muscle and joint pain, cognitive issues with swelling of the brain, body aches, dizziness, double vision, chronic sinusitis, muscle spasms, ears ringing and eye pain. AR290.

95. He also explained that he cannot drive because he gets dizzy or has flu-like symptoms, and that he does not sleep well because coughing and muscle aches wake him up. AR290.

96. Parker followed up the phone conversation with an e-mail to Doucette listing his symptoms to include dizziness, headache, muscle spasm and twitching, muscle weakness, muscle and joint pain, flush feeling, sinus congestion, and bronchial inflammation – often worse after eating or taking meds; tingling, cold, and numbness in extremities and head, feeling of pressure in head, ringing in ears – has escalated to vomiting and passing out; stomach pain and spasms, brain fog and confusion, feverish flu-like chills without fever, painful sometimes bloodshot eyes with double and blurred vision, unable to tolerate meds, most supplements, carbs, or sure –all make symptoms much worse; highly sensitive to chemical smells and fumes – especially bleach; orthostatic hypertension. AR300-301.

97. A November 6, 2014 email from Garmin HR employee Stephanie Prell to Doucette explained that Parker was off for a total of 536 hours between April 1, 2014 through November 6, 2014. AR318.

98. The e-mail also stated that Parker had attempted to return to work a few times between April and October, but the very last time he is shown working in the Garmin system was a partial day on October 7, 2014. AR318.

99. In a letter dated November 14, 2014, Doucette informed Parker that it was awaiting medical records from Dr. Ellis, Parker's treating provider, and would toll the initial 45-day period while waiting for the medical records. The letter said that SunLife had utilized 13 days of the initial 45-day review period, and would render a claim determination within 32 days after the medical records were received. AR323.

100.     In a letter dated December 12, 2014, Doucette informed Parker that SunLife was waiting to receive the correct breakdown of FMLA hours and Salary Continuation begin and end dates; and that it had received all medical records requested, and were in the process of conducting an internal medical review. AR343.

101.     The letter also stated that it had utilized 25 days of the 45-day review period to date, and that when the Proof of Claim was received (in this case, the breakdown of FMLA hours and Salary Continuation), they would render a claim within 20 days, unless there were extenuating circumstances beyond its control. AR343.

102.     Doucette referred Parker's file for a "med/psych" review on December 8, 2014. AR368.

103.     On the referral form, Doucette asked the medical reviewer the following questions:

- 1 – based on the medical available does the documentation support that the extent of Parker's impairments preclude him from sustaining a light capacity from April 5, 2014 to the present?

- 2 – It appears the employee may have been working with this condition for a while, what changed on or around April 2014 to prevent the employee from doing his pre-disability level of function?

- 3 – based on the medical data available does the documentation support that the extent of Parker's impairments would preclude him from sustaining a sedentary capacity from April 5, 2014 to anytime to the present?

AR369.

104.     Doucette did not provide the medical reviewer with any information about the material and substantial duties of Parker's own occupation, nor ask the medical reviewer to consider Parker's ability to perform the material and substantial duties of his own occupation. AR369.

> **i.   Nurse Drabik's review of Parker's claim.**

105.     On December 29, 2014, SunLife's captive nurse consultant Bethany Drabik reviewed Parker's claim. AR369-371.

106.     Even though Drabik was asked to assess whether the available documentation supported that Parker was precluded from sustaining both sedentary and light capacity, Drabik only commented on Parker's ability to perform at a sedentary capacity, opining, "there is insufficient objective evidence in the file at present to support that he would be unable to exert up to 10-20 pounds of force occasionally, sit or stand occupationally or exert a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body from [date of disability] through his sinus surgery on 8/21/14 (with a recovery period of two weeks to include no activity) through present." AR370.

107.     Drabik did not consider whether Parker could perform the material and substantial duties of his own occupation.  AR369-371.

108.     SunLife did not ask Nurse Drabik to determine whether there was objective evidence in the file to support Parker's ability to perform sedentary work. AR369.

109.     Parker emailed Doucette on December 30, 2014, letting her know that he had seen additional doctors regarding his illness, including a neurologist and a Neuro Ophthalmologist. AR373-374.

110.     He noted that no neurological disease was found. AR373.

111.     Parker attached to his email his initial diagnosis from Diana Smith at Olathe LAD Clinic, noting that she diagnosed him with Chronic Fatigue Syndrome. He also informed her that the sinus infection and asthma were ongoing, and he had not been able to return to work. He explained that he was currently undergoing testing for Babesiosis[5], Bartonellosis[6], Lyme Disease, and Rocky Mountain Spotted Fever[7]. AR373.

---

[5] According to the Center for Disease Control, Babesiosis is caused by microscopic parasites that infect red blood cells and are spread by certain ticks. In the United States, tickborne transmission is most common in particular regions and seasons: it mainly occurs in parts of the Northeast and upper Midwest and usually peaks during the warm months. Many people who are infected with *Babesia microti* feel fine and do not have any symptoms. Some people develop nonspecific flu-like symptoms, such as fever, chills, sweats, headache, body aches, loss of appetite, nausea, or fatigue. *Available at* *https://www.cdc.gov/parasites/babesiosis/disease.html*.

[6] According to the Center for Disease Control, Bartonellosis is a bacteria that causes several types of diseases in humans. The Most common one is known as Cat Scratch Disease. Symptoms may include low-grade fever, enlarged, tender lymph nodes that develop 1–3 weeks after exposure, a papule or pustule at the inoculation site. Rarely, unusual manifestations such as eye infections, severe muscle pain, or encephalitis may occur. *Available at* *https://www.cdc.gov/bartonella/symptoms/index.html*

[7] Rocky Mountain Spotted Fever is a tickborne disease caused by the bacterium Rickettsia rickettsi. The first symptoms of Rocky Mountain spotted fever (RMSF) typically begin 2-14 days after the bite of an infected tick. A tick bite is usually painless and about half of the people who develop RMSF do not remember being bitten. The disease frequently begins as a sudden onset of fever and headache and most people visit a healthcare provider during the first few days of symptoms. Because early symptoms may be non-specific, several visits may occur before the diagnosis of RMSF is made and correct treatment begins. The following is a list of symptoms commonly seen with this disease, however, it is important to note that few people with the disease will develop all symptoms, and the number and combination of symptoms varies greatly from person to person: Fever, Rash (occurs 2-5 days after fever, may be absent in some cases; see below), Headache,

112.     Doucette responded that she had placed a request for the records and upon receipt,

would move forward with the evaluation of his claim. AR373.

113.     Dr. Brown submitted a letter to Doucette dated January 11, 2015, in an effort to

"summarize and help clarify the issues preventing Parker from returning to his job at

Garmin." AR376.

114.     Dr. Brown explained:

"as my records have indicated, Craig is suffering from chronic fatigue syndrome and
associated fibromyalgia. As someone who has treated this condition for 15+ years, I can
tell you that most individuals suffering from Fibromyalgia/Chronic Fatigue Syndrome
deal with a very broad range of symptoms impacting several key systems in his body.
Craig suffers from chronic sinus infection, visual processing issues, asthmatic and
allergenic issues including severe reactions to many foods, Rx and OTC medications,
chemicals, and airborne pollutants. In addition, his condition is complicated by several
systematic endocrine imbalances and deficiencies. These issues, though varied from day
to day in their severity, manifest as flu-like symptoms, allergic reactions, and debilitating
muscle fatigue and/or spasms that often cause a great deal of pain and discomfort
restricting him to bed rest. This illness has also created significant cognitive processing
issues, depression, and severe anxiety. All of these symptoms significantly inhibit Craig
from adequately carrying out the daily requirements of his job at Garmin.
…
Other doctors continue to treat Craig for more specific problems in their areas of
specialty such as the sinus infection, vision problems, asthma, and allergies. IN addition,
Craig is currently being tested for Lyme's disease and other associated co-infections by a
specialist in tick born diseases. He has also being referred to Dr. Jude LeClaire, PhD
psychologist, to help with his anxiety and depression.
…
I have provided all requested medical records in support of my diagnosis and treatment of
Craig. Please let me know if I can provide any additional help in this matter."
AR376.

115.     Doucette sent Parker a letter dated January 12, 2015, explaining that she was

waiting for medical records from Drs. Wallace and Reilly, and that SunLife was

continuing to toll the 45-day initial decision making period. AR378.

---

Nausea, Vomiting, Abdominal pain (may mimic appendicitis or other causes of acute abdominal pain), Muscle
pain, Lack of appetite, Conjunctival injection (red eyes). *Available at*
*https://www.cdc.gov/rmsf/symptoms/index.html*

116.     SunLife received Dr. Wallace's records on January 17, 2015. AR379.

117.     SunLife received Dr. Schuchardt's records on January 20, 2015. AR405.

118.     Parker emailed Doucette on January 21, 2015 to let her know that he had his follow up visit with tick specialist Diana Smith on that date; that testing had confirmed that he likely does have Lyme diseases and associated tick-borne coinfections; that a SPECT scan from KU confirmed lack of blood flow to certain areas of the brain which causes cognitive dysfunction; and that this loss of blood flow is consistent with tick-borne illness. AR455.

119.     In his email, Parker expressed relief in finally knowing the root cause of his health problems. AR455.

120.     Doucette referred Parker's file for another medical review on January 27, 2015, asking the same questions she had sought with Nurse Drabik. AR458.

**ii. Nurse Bolster's review of Parker's claim.**

121.     A second captive nurse consultant, Anita Bolster, reviewed Parker's claim on January 27, 2015. AR458-460.

122.     According to her report, Nurse Bolster did not review nor consider Parker's ability to perform the material and substantial duties of his own occupation. AR458-460.

123.     When asked whether Parker's impairments would preclude him from performing light duty work, Nurse Bolster did not answer the question; rather, she opined that there was "no objective evidence to support a level of impairment that would preclude his prior level of function" except for a brief period through resolution of his diplopia. AR460.

124.     Nurse Drabik was never asked to opine as to whether there was objective evidence to support Parker's level of impairment that would preclude his prior level of function. AR458.

125.     Like Nurse Drabik, Nurse Bolster opined that Parker was not precluded from sustaining a sedentary capacity, but did not comment on Parker's ability to perform his light duty occupation. AR460.

### i.     SunLife's Occupational Analysis of Parker's claim.

126.     SunLife conducted an Occupational Analysis on Parker's claim on February 10, 2015. AR461-465.

127.     The Analysis evaluated Parker's Own Occupation as it exists in the national economy, finding that it corresponds to the occupation of "Design Engineering Supervisor" under the Dictionary of Occupational Titles, e/DOT #019.137-042. AR461.

128.     The results of the analysis determined that Parker's Own Occupation is a *Light duty* job, which requires exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects. Physical demand requirements are in *excess of* those for *Sedentary* work. Sitting is required frequently and standing and walking are required occasionally. AR461.

129.     Regarding the physical requirements of his own occupation, the report determined that Parker's occupation typically requires frequent reaching, talking, handing, keyboarding, hearing, near acuity, and depth perception; occasionally requires reaching upwards, reaching downwards, fingering, sit/stand option, far acuity and accommodation. AR461.

130.    The report determined that the primary duty of Parker's occupation is "supervises employees engaged in design engineering". AR462.

131.    Regarding functions of Parker's own occupation, the report determined that Parker's occupation required the following:

- Oversees activities related to design engineering, including staffing, scheduling, coordinating, and planning;

- Analyzes and resolves work problems, or aids employees in solving work problems;

- Supervises professional and paraprofessional engineering personnel;

- Assists in administering personnel functions, including recruiting, review and approval of job descriptions and salary classifications, and selection of placement personnel;

- Plans and establishes engineering schedules and follows up performance against estimates;

- Supervises assembly of cost control and statistical data;

- May supervise development of material selection standards;

- May recruit, hire, train staff, evaluate employee performance, and recommend or initiate promotions, transfers, and disciplinary action;

- May recommend new policies or procedures as necessary.

AR462.

132.    The Occupational Analysis found that in terms of "literacy demands - reasoning", the job was rated at a "Level 5" defined as: "apply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions.

Interpret an extensive variety of technical instructions in mathematical or diagrammatic form. Deal with several abstract and concrete variables." AR462-463.

133.    The Occupational Analysis found that in terms of "literacy demands – mathematics" Parker's occupation was rated at a "Level 5" requiring the application of Calculus, Algebra, and Statistics. AR463.

134.    The Occupational Analysis found that in terms of "literacy demands – language", Parker's occupation was rated at a "Level 5", defined as "Reading: read literature, book and play reviews, scientific and technical journals, abstracts, financial reports and legal documents; Writing: write novels, plays, editorials, journals, speeches, manuals, critiques, poetry, and songs; Speaking: conversant in the theory, principles, and methods of effective and persuasive speaking, voice and diction, phonetics and discussion and debates." AR463.

135.    Garmin's job description for Parker's position as "Design Engineering Team Leader" as it was performed at Garmin summarized the position as "direct and coordinate activities of an Electrical Engineering team that is responsible for developing electronic components, products and systems." AR464.

136.    Garmin's job description for Design Engineer Supervisor describes the essential functions of Parker's own occupation to include the following:

- Lead a team of electrical engineers and technicians to design new products, enhance existing designs, improve production techniques, and develop test procedures;

- Directly supervise Engineers and Technicians on the design team with daily observation, assuring appropriate attendance, and providing assistance to team members;

- Work with Human Resources to address employee relations issues as needed including writing and conducting annual performance evaluations;

- Interview and hire new associates as directing by engineering management;

- Mentor and train new associates in the arts of Electrical Engineering and project management;

- Participate in design reviews, assuring proper attendees and proper coverage of topics, imparting lessons learned and good design practices to all that attend;

- Create Product Development Plans as directed by engineering management;

- Ensure the team meets overall design goals in accordance with the product development plan or market requirements;

- Ensure the design is partitioned appropriately and assigned to qualified engineers;

- Monitor progress of the design team in meeting product requirements and schedule compliance;

- Mentor and evaluate the Design Engineers and Technicians ability to design and troubleshoot circuits and products;

- Ensure appropriate lab and field testing is performed;

- Assist Design Engineers and Technicians in performing tradeoff analysis of different circuit options;

- Understand production needs and ensure that engineers are working effectively with the production group;

- Facilitate team work with other groups both inside and outside of Garmin (software, mechanical, sales, QA…)

Other responsibilities:

- Assist Human Resources with recruitment through attendance at recruitment events;

- Perform other job-related duties as assigned.

AR464.

137.     In a February 10, 2105 claim note, Doucette noted that Parker's occupation is a Design Engineer Supervisor, which typically exists at a light exertion level. AR16.

138.     On the same date, Doucette referred Parker's file to "Rehab Referral". AR470-1.

139.     In a February 18, 2015 e-mail from Parker to Doucette, Parker explained:

*"I have a very real and debilitating disease, and I am being treated by multiple doctors that agree that I have been unable to work. These same doctors have expressed their surprise that my claim would be denied, and I am not certain that you have the records from the psychologist that I have started seeing. Also, I will be returning to KU medical Center for a follow-up on the abnormal brain SPECT scan that I sent to you. While we continue to make progress in identifying root cause and in treatment of my illness, there is no dispute that I have the illness. So I can assure you that I will continue to fight for the benefit that I am entitled to, and feel confident that my claim will be validated in the appeal process.*
*As I mentioned on the phone, I would ask that your letter provide explicit details on the reasons why the claim is being denied."*
AR466.

140.     In a letter to Parker dated February 20, 2015, 144 days after Parker filed his claim, Doucette explained that Parker's claim was reviewed by an RN Medical Consultant, and based on the nature of Parker's claim and her discussion with Parker on February 20, 2015, Doucette had requested a second level review by an MD before making her final determination on his claim. The letter stated she expected to have a decision on his claim

on or before February 28, 2015, and that the deadline for making a decision on his claim

had been tolled while SunLife collected more information. AR467.

141.     Upon receipt of Doucette's February 20 letter, Parker e-mailed Doucette on

February 27, 2015. In the email, he provided Doucette with additional information about

his conditions, urged her to obtain records from his psychologist Dr. LaClair, and wanted

to make sure that she had the latest treatment noted from Diana Smith and Dr. Brooks; he

also explained that as a follow up to his SPECT scan which showed brain inflammation,

he was recommended to have a spinal tap to gain further insight into the cause of the

inflammation; that his allergist had started him on allergy injections, that his asthma and

sinus treatments continued, and that he was undergoing additional allergy testing to find

the root cause of his highly elevated IgE allergic response; he also informed her that "Dr.

Brown would be happy to do a case review with your reviewing doctor as you mentioned

in our phone conversation. Chronic fatigue syndrome has recently been renamed to

systematic exertion intolerance disease (SEID). Dr. Brown is familiar with diagnosing

and treating this illness and has been seeing and treating me on a weekly basis since April

of 2014."  AR472-473.

142.     Doucette referred Parker's claim for a Med-Psych review on February 23, 2015.

AR480.

143.     Doucette wrote Parker another letter dated February 27, 2015, explaining that

SunLife needed a 30-day extension of time to review his claim, through March 29, 2015.

AR474-475.

> ii.     *Dr. Furhmann's first review of Parker's claim.*

144.     Doucette then sent Parker's file to SunLife in-house medical reviewer Dr. Calvin Fuhrmann to review Parker's claim from an internal medicine perspective. In a February 27, 2015 memorandum from Fuhrmann to Doucette, Fuhrmann responded to the following inquires regarding Parker's claim: (1) whether the medical evidence supports that Parker's multiple diagnoses (recurrent sinus infections, food allergies, double vision, sensitivity to medications, muscle fatigue and weakness, GERD, fibromyalgia and chronic fatigue)  are resulting in impairment; (2) if the symptoms and conditions are resulting in functional impairment, what specific restrictions and limitations are supported; (3) if the severity of the reported symptoms and their impact on the claimant's reported daily function are consistent and credible with the medical evidence; (4) it appeared that Parker may have been working with his condition, and if so, what changed in April of 2014 to prevent him from sustaining predisability level of functioning; and (5) to consider a peer to peer call with Dr. Brown, Parker's primary care physician. AR476-478.

145.     Regarding whether the medical evidence supported that Parker's multiple diagnoses were resulting in impairment, Fuhrmann agreed that Parker's symptomology was compatible with fibromyalgia and chronic fatigue, and that "this is the part of the claimant's complaints that is the limiting factor in terms of his ability to carry out full-time activities." AR477.

146.     Regarding whether Parker's symptoms and conditions were resulting in impairment, Fuhrmann opined that Parker would be able to function in his usual capacity provided he was given periods of time to rest and "this might translate into part-time employment." AR477.

147.     Regarding restrictions and limitations, Fuhrmann opined that Parker should be given the opportunity to have periods of rest during the day and that "a modified schedule allowing for example working from home would be reasonable." AR477.

148.     Regarding whether the severity of the reported symptoms and their impact on Parker's daily function is consistent and credible with the medical evidence, Furhmann acknowledged Dr. Brown's extensive experience with the syndrome, and responded that the diagnoses of fibromyalgia and chronic fatigue syndrome were supported. AR478.

149.     Regarding what changed in April of 2014 to prevent him from sustaining his predisability level of functioning, Fuhrmann opined that he could not identify any specific event or change other than the fact that he reached a point where he described to his physician that he could not work on a full-time basis. AR478.

150.     In response to the request to make a peer to peer call to Dr. Brown, Fuhrmann responded: "…As noted, issues regarding when and how he can work on a full-time basis are still open. What is quite clear is that if he is given appropriate time to rest that he will be able to work on a part-time basis and work through this." AR478.

151.     According to his report, Dr. Fuhrmann did not contact Dr. Brown, despite SunLife's request that he do so. AR476-479.

152.     SunLife did not provide Fuhrmann with information about the material and substantial duties of Parker's own occupation, nor did it ask Dr. Fuhrmann to opine as to whether Parker had the ability to perform those duties. AR476-478.

153.     In a March 2, 2015 claim note, Doucette noted that she called Parker to tell him that his claim had been approved for the diagnoses of CFS/Fibromyalgia, and that a claim based on these diagnoses is limited to 24-months. AR14.

154.     In a "Team Leader/Manager Referral" note in the file, completed by Doucette on March 2, 2015, Doucette noted: "the current medical records support total disability but will need to obtain the recent records from Dr. Smith regarding the confirmation of tick born origin 'Chronic Lyme Disease' as implied and current notes do not support this diagnosis as well as all treatment notes from the Psychiatrist (Dr. Jude LeClair) the employee has indicated he began seeing end of January 2015 into February 2015 for anxiety and cognitive issues and has currently seen about five or six times already." AR490-923.

155.     In response, Doucette's team leader David Cairns noted that medical reviews by an MD and RN had taken place; that the MD had opined, in part, that the diagnoses of fibromyalgia and chronic fatigue syndrome were supported; that in regard to limitations and restrictions, the MD opined that Parker would be able to function in his usual capacity provided that he was given periods of rest and that this might translate into part-time employment; and concluding that it was reasonable that Parker would be unable to perform the material and substantial duties of his own occupation from his date of disability through his review on March 2, 2015, on a full-time sustained basis. AR491.

156.     SunLife approved Parker's claim in a letter dated March 3, 2015. AR483-487.

157.     In the benefit approval letter, Doucette explained that Parker's claim was approved under the diagnoses of Chronic Fatigue Syndrome and Fibromyalgia, and would be subject to Plan's the 24-month limitation for such claims. AR485.

158.     The approval letter explained that Parker's monthly benefit would be $6,000, which was the maximum benefit under the Plan. AR483.

159.    Dr. Brown completed an Attending Physician's Statement on Parker's behalf on April 21, 2015. AR529-532.

160.    In that statement, Dr. Brown explained that parker's condition was unchanged. AR530.

161.    When asked to state Parker's functional capabilities in a work day, Dr. Brown responded that Parker could walk, sit, stand, end, twist, push, pull, balance, kneel, crawl and reach above shoulder level "frequently", and squat and climb "occasionally", but noted that Parker's functional capabilities vary day to day. AR530.

162.    When asked to check a box regarding Parker's restrictions and limitations, as he had in his previous Attending Physicians' Statement form (relied upon in approving Parker's claim), Dr. Brown checked the box associated with "Medium capacity" which corresponds with "lifting, carrying, pushing, pulling 20-50 lbs occasionally; 10-25 lbs frequently; or up to 10 lbs constantly" and noted that those limitations would apply for 12-26 weeks. AR531; AR296.

163.    When asked to provide additional comments about Parker, Dr. Brown wrote, "He is overall about the same with regards to fatigue/mental fog/concentration. He is able to tolerate more nutritional + Rx [treatment] than he previously could." AR531.

164.    Dr. LaClaire, Parker's treating psychologist, also completed an Attending Physician's form on Parker's behalf, on April 18, 2015. AR 533-4.

165.    When asked to describe Parker's initial reason for seeking treatment, and to specify how and when the symptoms first appeared and the progression of symptoms to the current level, Dr. LaClaire responded, "Depression, anxiety, poor concentration, fatigue, memory problems, difficulty making decisions." AR533.

166.     When asked if any quantitative evaluations of functional impairment have been performed, Dr. LaClaire marked "no" and wrote "not by me." AR533.

167.     When asked to describe Parker's mental status, Dr. LaClaire responded: "low functioning, intermittently able to function. See neurologist report." AR533.

168.     When asked to describe if/how Parker's psychiatric condition is limiting his functional capacity, Dr. LaClaire responded: "depression and anxiety; see above symptoms." AR533.

169.     Dr. LaClaire wrote a letter to Doucette dated April 27, 2015, explaining "Parker's Neurological findings seem to indicate, quantitatively, that he has brain disease. His symptoms are indicative of someone who has this neurological diagnosis. He suffers from depression and anxiety, mood ups and down, inability to focus and concentrate, sleep and eating difficulties. These often also effect mood causing depression and anxiety. One cannot separate the physical and neurological findings, the allergy test results and his subsequent performance and functioning level." AR535.

**E.  SunLife's May 8, 2015 "suspension" of Parker's claim.**

170.     In a letter dated May 8, 2015, SunLife suspended Parker's benefits, alleging "based on the current clinical data we are unable to support total disability beyond March 31, 2015." AR547.

171.     The letter stated the termination decision was based on the APS forms provided by Drs. Brown and LaClaire, and Dr. LaClaire's treatment notes. AR547.

172.     The letter also stated that Dr. LaClaire's records had been sent to a medical consultant to review the behavioral component of Parker's claim. AR547.

### i.  Social Worker Jacobus' review of Parker's claim.

173.     A Med-Psych review of Parker's claim was conducted on May 15, 2015 by social worker Lisa Jacobus. AR 562-564.

174.     Jacobus did not evaluate Parker in person, only reviewed his medical records and opined regarding his functional capabilities. AR 562-4.

175.     Jacobus did not review the findings, nor comment on the significance of the December 2015 SPECT scan, which provided objective evidence of Parker's brain disease. AR563-564; AR456.

176.     Based solely on the review of Dr. LaClaire's records, Jacobus, who is not a psychiatrist, opined: "Documentation in the file does not provide support for an incapacitating psychiatric disorder impacting the claimant's ability to function including ability to work. Records do not contain sufficient clinical information such as comprehensive mental status exam results or information on limitations in day-to-day functioning to support an incapacitating psychiatric condition. In fact, mental exam findings that were provided from his primary care provider are mostly unremarkable." AR564.

177.     In a May 21, 2015 claim note, Doucette noted that Parker's own occupation is considered "Light" in the national economy. AR10.

178.     In a May 26, 2015 claim note, SunLife employee Kelly Parshley noted that she offered Parker $54,000 as a voluntary lump sum settlement of the claim, explaining that if he were awarded SSDI in the future, he would not have to reimburse SunLife for any overpayment. Parker turned down the offer. AR10.

**ii. Medical evidence submitted in support of Parker's claim while benefits were suspended.**

179.     In a treatment note dated May 21, 2015, Dr. Brown noted that Parker's sinus infection was still raging but starting to improve. He reviewed the new SNP testing, noting that Parker had histamine overload signs and symptoms. He instructed Parker to try reishi mushroom formula – for its impact on histamine, glucans, and immune enhancing potentials. AR566; AR886.

180.     In a treatment note dated May 27, 2015, Dr. Ellis saw Parker that day for a follow up of his sinus surgery, nasal congestion, hyposmia and hypogeusia. Dr. Ellis discussed the option and risks involved in endoscopic sinus surgery. AR834-AR837.

181.     In a treatment note dated May 27, 2015, Dr. Schuchardt reported discussing the risks of endoscopic sinus surgery with Parker. Parker told him that he wanted to proceed with the surgery if he did not receive enough improvement from Medrol dosepak. Dr. Schuchardt prescribed hydrocodone-acetaminiphen and Cefdinir. AR599-601.

182.     In an "Operative Report" dated June 4, 2015, Dr. Ellis performed 4 procedures for to treat Parker's nasal polyposis and chronic sinusitis. Dr. Ellis reported that during surgery, Parker had significant polypoid tissue filling the middle meatus extending into the nasal cavity. The inferior aspect of the middle turbinate was also very polypoid. Dr. Ellis instructed Parker to follow up in two weeks. AR588-589.

183.     In a report dated June 8, 2015, Dr. Ellis reported a final diagnosis for Parker, to include: sinusal mucosa with acute and chronic inflammation with prominent eosinophils and allergic mucous. He also reported that GMS special stain did not demonstrate any definitive fungal hyphal forms. AR595.

184.    In a treatment note documenting the surgical follow-up visit with Dr. Ellis dated June 10, 2015, Dr. Ellis noted "Patient is 5 days postop procedure.  Patient can 'smell and taste better' following procedure.". AR593-594; AR819-20.

185.    In a follow-up visit with Dr. Ellis dated June 23, 2015, Dr. Ellis reported that Parker was 19 days postop procedure and that he had improved post-operatively. AR591-592.

186.    In a treatment note dated July 7, 2015, Dr. Ellis noted seeing Parker for a post-operative sinus surgery visit along with the onset of laryngopharyngeal reflux, which has been occurring for days. Dr. Ellis switched Parker's medications to Zantac from PPI. Dr. Ellis also performs a "P.O. Nasal Debridement (31237) Routine)" to treat Parker's chronic sinusitis. AR838-AR840; AR881-883.

187.    In a treatment note dated July 20, 2015, Dr. Schuchardt reported Parker still complained of recurrent sinus pressure and infections after the sinus surgery.  He also noted Parker had severely low testosterone and had tried testosterone replacement therapy without improvement. AR804-805.

188.    In a July 2, 2015 claim note, SunLife employee Jessica Partin noted that she called Parker to discuss his application for SSDI, explaining "the benefits of applying for SSDI at this juncture as well as benefits of assistance by a vendor." AR7.

189.    In a July 22, 2015 letter from Doucette to Parker, Doucette explained that benefits were still suspended; that additional medical records had been received and were under review, and that SunLife needed additional time to render a determination about any ongoing potential LTD benefits. AR602-603.

### iii. Dr. Furhmann's second review of Parker's claim.

190.    Dr. Fuhrmann reviewed Parker's claim for a second time in a report issued July 25, 2015. AR604-607.

191.    In his report, Furhmann opined that based on the "recently received medical records", Parker does not have evidence of chronic Lyme disease. AR606.

192.    Furhmann's second report did not state which medical records were reviewed, only that he reviewed "recent medical records from Dr. Brown, Dr. Ellis, Dr. Pfuetze, and Dr. Stephen Waller". AR604.

193.    Furhmann alleged, "the fact that the claimant has recently indicated that his sinus symptoms have returned is inconsistent with the most recent examinations carried out by Dr. Ellis, who is the surgeon who performed the sinus surgery and who noted in several follow-up examinations significant improvement in the claimant's overall symptomology." AR606.

194.    Fuhrmann also noted that Parker does have chronic sinus disease with evidence of functional abnormalities, but that his condition had stabilized, and he would be capable of carrying out full-time sedentary activities. AR606.

195.    Fuhrmann also opined that Parker's overall symptoms had improved from the point of view of his sinuses, and that there was nothing objective at the time to corroborate his issues regarding cognitive dysfunction or brain fog. AR606.

196.    Fuhrmann also noted that Parker had been referred for neuropsychological testing, and that when that information was made available, it would shed further light on his condition. AR606.

197.      Despite this uncertainty, Fuhrmann expressed that in his medical opinion, Parker was at that time fit for duty. AR606-7.

198.      In a July 30, 2015 claim note Doucette noted that she went over the appeal process with Parker, explaining it was not necessary for him to hire an attorney to assist him with the appeal process. AR6.

**F.  SunLife's July 30, 2015 termination of Parker's claim.**

199.      In a letter dated July 30, 2015, SunLife officially terminated Parker's claim, alleging he did not qualify for benefits beyond March 31, 2015, effectively retroactively terminating his benefits four months prior to the issuance of the letter. AR613-619.

200.      The letter explained that SunLife's Occupational Analysis had determined that Parker's own occupation exists in the national economy at a "Light" exertion level, as physical demands of the job are in excess of those of sedentary work. AR615.

201.      However, the letter went on to state: "in conclusion, it is our medical staff's opinion that you have the ability to perform a **sedentary level of activity** on a sustained basis throughout the day and that based on the current clinical noted the medical documentation does not provide any objective evidence to support any restrictions or limitations from performing the material and substantial duties of your own occupation" but did not state what objective evidence was required in order to prove his claim. AR618. (emphasis added).

202.      The letter did not mention whether or not SunLife considered whether Parker could perform a light-duty job, despite the fact that it conceded in the same letter that Parker's own occupation was considered to be light duty. AR613-19.

203.　　　The letter made no mention of SunLife's analysis of Parker's ability to perform the material and substantial duties of his own occupation – including "the essential tasks, functions, skills or responsibilities required by employers for the performance of the employee's own occupation" as the Plan requires. AR613-619; AR101-102.

204.　　　The letter explained that Parker had 180 days in which to appeal the benefit termination. AR618.

**G.  Parker's internal appeal of the benefit termination.**

205.　　　In a letter dated October 1, 2015, Parker's former counsel, Teresa Meagher, wrote SunLife a letter of representation and notice of appeal, seeking a copy of all documents, records, or other information relevant to the benefit denial, including a copy of the group policy or plan relevant to the claim. AR621-622.

206.　　　SunLife wrote Meagher a letter dated October 12, 2015, acknowledging receipt of her appeal and request for information, agreeing to toll the appeal deadline until Meagher submitted additional information on Parker's behalf. AR629-630.

207.　　　Parker's file was referred to the appeals department on October 2, 2015. AR631.

208.　　　Jillian Croteau, Sr. Benefit Consultant, wrote a letter to Meagher dated January 28, 2016, letting her know that the appeal period on Parker's claim expired January 26, 2016, asking Meagher to submit any additional documentation to be considered on appeal by February 29, 2016, and that as of March 1, 2016, SunLife would proceed with its review of Parker's appeal. AR632.

**i. Medical evidence submitted in support of Parker's appeal.**

209.　　　Meagher submitted a supplement to Parker's appeal in a letter dated February 1, 2016. AR634-638.

210.    In the appeal supplement, Meagher pointed out that SunLife had determined Parker's own occupation was performed at a Light exertional level, yet had determined that Parker was capable of performing sedentary activities, which would *not* allow him to return to his former Light duty job as a Design Engineering Supervisor. AR635.

211.    Meagher also pointed out that the new medical evidence she was submitting with the appeal showed that Parker had disseminated Lyme disease in combination with Chronic Inflammatory Reponses Syndrome (CIRS) caused by mold toxicity, and that together they were causing Parker's continuing chronic symptoms, previously diagnosed as chronic fatigue and fibromyalgia. AR635.

212.    Meagher reported to SunLife that Parker had recently been evaluated by Dr. Keith Berndtson, a nationally recognized expert in both mold and Lyme disease, and that Dr. Berndston had diagnosed Parker with untreated, disseminated Lyme disease and CIRS. AR635.

213.    Meagher pointed out that blood tests had revealed Parker's genetic susceptibility to illness from both mold and Lyme, and that both were likely contributing to his ongoing symptoms. AR635.

214.    Meagher also highlighted the fact that Parker's blood test results confirmed an antigen response to Rickettsia Rickettsii (the bacterial cause of Rocky Mountain Spotted fever or "RMSF") and a weaker response to Borrelia Burgdorferi (the primary bacterial cause of Lyme disease). AR636.

215.    Meagher submitted with the appeal supplement three letters of support from Parker's treating physicians: Paul Seberger, M.D., Keith Berndtson, M.D., and Charles Crist, MD. AR645, AR648, AR662.

216.      In his letter of support, Dr. Seberger explained that Parker "very clearly has one of the most extreme mold infections that I have seen. He has very definitive proof in his laboratory results, with toxic levels of ochra toxin detected in his urine. He has further laboratory values that very clearly show a high level of mold infection." AR648.

217.      Dr. Seberger further explained that the infection is also within Parker's brain, according to the results of increased reflexia demonstrated on the deep tendon reflexes portion of his exam, which indicates upper motor neuron damage."

218.      Dr. Seberger concluded that he did not believe Parker would be able to return to work even on a part-time basis for the foreseeable future, if at all. AR648.

219.      In his letter of support, Dr. Berndston explained that he had evaluated Parker in person; that Parker had a history of multiple tick bites but only the first of those bites was followed by antibiotic treatment consisting of 4 weeks on doxycycline in 1992. AR645.

220.      Dr. Berndtson explained that Lyme bacteria are pleomorphic: they exist in the active spirochete forms or in dormant forms. Only 3 antibiotics (none of which had been used to treat Parker) have been shown to work against the dormant forms, which are known to reactive in response to certain chemical signals. AR 645.

221.      Dr. Berndtson explained that while Parker did not meet the CDC criteria for Lyme disease, he presents with symptoms that are highly consistent with the late dissemination stage of Lyme disease. AR 645.

222.      Dr. Berndtson concluded that "with a reasonable degree of medical certainty, I believe that disseminated Lyme is contributing to his current disability." AR 645.

223.      Dr. Berndtson explained that Parker also suffers from CIRS, in which the innate immune response is chronically activated, and that he could not distinguish whether his

abnormal innate immune system inflammation markers are driven by Lyme, or by prior

exposures to toxic mold, or both, stating "even if we were to succeed in putting his Lyme

disease into remission, he will remain disabled unless we treat the CIRS as well." AR645.

224.      Dr. Berndtson also opined that Parker is disabled by recurrent flu-like symptoms

with flushing, chills, and sweats. He explained that he gets headaches, and bouts of

tachycardia and irregular heart rhythms. He opined that his anxiety and panic alone are

disabling, and are non-responsive to anti anxiety medications, psychological counseling

and other methods. AR646.

225.      Dr. Berndtson went on to opine that "in summary, Parker has been and remains

totally and absolutely disabled by a complex combination of disseminated Lyme disease

and CIRS. Parker had to stop working May 15, 2014, because of the severity of his

symptoms. Based on his medical history, reported symptoms, and my recent exam, it is

my opinion, that he is a credible historian and has clearly been unable to maintain any

employment since that date." AR646.

226.      In his letter of support, Dr. Crist explained:

> "Craig Parker has an autoimmune disease based upon his positive ANA
> (Antinuclear Antibody) test. His aldosterone hormone level is insufficient. His
> lead level, which is a toxic metal, is high. His brain has decreased blow flow
> based upon an abnormal SPECT (Single Photo Emission Computed
> Tomography). Craig has a low metabolism. He has hypercoagulation. His
> testosterone levels are low. His triglyglycine level was at the 100th percentile,
> which is a marker for mitochondrial dysfunction.
> Considering the multitude of his various diagnoses, they could easily explain his
> medical problems. Flu-like symptoms, constant fatigue, body aches, muscle pains,
> nausea, headaches, lightheadedness, cognitive issues, depression and anxiety
> could easily be explained by his organic medical problems. It is medically
> reasonable and believable for him to receive social security and long term
> disability to the best of my medical knowledge and opinion."
> AR662.

**H. SunLife's review of Parker's appeal.**

227.     Croteau wrote a letter to Meagher dated February 19, 2016, listing the information

received in SunLife's review of Parker's appeal. AR931

228.     The letter explained that SunLife understood that there was no more information

forthcoming, and that it would proceed with the appeal review. AR931.

229.     Croteau told Meagher that SunLife excepted to complete the review by March 15,

2016, unless circumstances required an extension. AR931.

230.     On February 19, 2016, Meagher submitted a letter from Dr. Brown dated

February 11, 2016, which stated the following:

"As my records have indicated, Craig is suffering from a history of chronic and
debilitating conditions which include but are not limited to: CIRS, history of mold
exposure, Lymes and/or potential other tick born vectors and concomitant infections.
These conditions have been diagnosed and repeatedly confirmed by multiple expert
medical doctors from across the country. As a result of these conditions, Craig suffers
from associated symptoms including but not limited to: severe fatigue and malaise,
cognitive impairment, chronic sinus infection, visual processing issues, asthmatic and
allergenic issues including severe reactions to many foods, Rx and OTC medications,
chemicals, and airborne pollutants. In addition, his condition is complicated by several
systemic endocrine imbalances and deficiencies. These issues, though varied from day to
day in their severity, manifest as flu-like symptoms, allergic reactions, and debilitating
muscle fatigue and/or spasms that often cause a great deal of pain and discomfort
restricting him to bedrest. This illness has also created significant cognitive processing
issues, depression, and severe anxiety. All of these symptoms significantly inhibit Craig
from adequately carrying out the activities of daily living, let alone return to work or
preform duties required from him in a work environment.
This broad spectrum of expert and specialized doctors continue to treat Craig for specific
problems in their areas of specialty such as the lymes and associated tick born vectors,
mold, CIRS, sinus infection, vision problems, asthma, and allergies. He has also been
treated by Dr. Jude LeClaire, Phd psychologist, to help with his anxiety and depression."
AR934

231.      Croteau acknowledged receipt of Dr. Brown's letter in a letter to Meagher dated March 1, 2016. She told Meagher that SunLife intended to complete its review by March 15, 2016, unless circumstances required an extension. AR935-936.

232.      Croteau wrote to Meagher on March 15, 2016, explaining that SunLife needed an additional 45-days to make the decision on Parker's appeal, and that it expected to make a final decision by April 29, 2016. AR937.

   **i.   Dr. Kevin Trangle's paper review of Parker's file from an Occupational Medicine Perspective.**

233.      As part of its review of Parker's appeal, SunLife hired Dr. Kevin Trangle of MLS Peer Review Services to conduct an "Occupational Medicine Evaluation" of Parker's claim. AR938-986.

234.      Dr. Trangle did not evaluate Parker, nor speak to Parker at any point prior to rendering his report. AR938.

235.      According to his curriculum vitae, Dr. Trangle he has not treated patients for at least 28 years. AR987-996.

236.      Since 1984, Dr. Trangle has worked in occupational medicine, including medical-legal consulting. AR987-996.

237.      While his Curriculum Vitae does not list it, Dr. Trangle runs his own business entitled "Kevin Trangle & Associates" assisting attorney, employers, third party administrators and insurers, which purports to provide "Expert medical services", including assisting experts in preparing for depositions. AR987-996.

238.      Dr. Trangle issued a report dated March 28, 2016, summarizing his review of Parker's claim. AR938-986.

239.    17 pages of Trangle's 49-page report provide canned information about Parker's various diagnoses, and do not pertain to Parker specifically. AR938-986.

240.    According to the documents he stated to have reviewed prior to issuing his report, Dr. Trangle did not review SunLife's Occupational Analysis of Parker's own occupation, was not asked to opine as to whether Parker could perform the material and substantial duties of his own occupation, and did not comment as to whether Parker could perform the material and substantial duties of his own occupation. AR938-941.

241.    On the bottom of page 4 through the top of page 5 of Dr. Trangle's report, there is a paragraph entitled "educational and occupational history", but the description that follows lists only the physical demands of Parker's light duty job. AR941-942.

242.    On page 38 of Dr. Trangle's report, SunLife asked Dr. Trangle to "outline reasonably supported restrictions and limitations" and to "address endurance restrictions/limitations if any, for example, from performing full time activities through an 8-hour day", yet never asked Trangle to assess whether Parker could perform the material and substantial duties of his own occupation as a Design Engineer Supervisor. AR975.

243.    Dr. Trangle alleged to have attempted to contact Drs. Berndtson and Seberger on March 23, 2016, but did not speak with either of them before issuing his report. AR956.

244.    Dr. Trangle found that no limitations or restrictions were supported after September 2, 2014, when Parker's hypertropia resolved. AR975.

245.    Dr. Trangle disagreed with Parker's Lyme diagnosis, alleging there was no objective evidence to support the diagnosis. AR976.

246.     Dr. Trangle alleged that Parker's diagnosis of CIRS was based on "unsubstantiated theories with no scientific basis". AR976.

247.     Dr. Trangle likewise denied Parker's mold infection/mold allergy, alleging neither were supported by objective evidence, as the urine mytoxin panel relied on by Parker's treating physician when rendering the diagnosis was "experimental, unvalidated and of unproven clinical significance". AR977.

248.     Dr. Trangle also alleged that Parker's "reported level of pain and fatigue did not correlate with and was out of proportion to the objective clinical findings in the record." AR978.

249.     Dr. Trangle further alleged that Parker "has received inappropriate, unnecessary treatment for a number of unsupported conditions including antibiotics, anti-fungals, charcoal, gluthathione, and a variety of supplements. Most of these treatments, although not necessarily harmful, have no proven scientific efficacy in the treatment of these conditions if they were supported." AR978.

250.     According to his report, Dr. Trangle reviewed Dr. Furhmann's report, but explain why his conclusions differed from Dr. Fuhrmann's. AR939.

251.     Dr. Trangle also denied that Parker is unable to tolerate common medications, alleging that there was no objective basis for his complaints. AR979.

**ii. Dr. Robert Odgers' paper review of Parker's file from a mental health perspective.**

252.     SunLife also hired Dr. Robert Odgers to review Parker's claim from a mental health perspective. AR997.

253.     Dr. Odgers did not evaluate Parker in person, nor speak to Parker prior to rendering his report. AR997.

254.      Dr. Odgers faxed his completed neuropsychological review of Parker's file to SunLife on April 5, 2016. AR997-1003.

255.      Odgers noted in his report that "this file review does not constitute a psychological or psychiatric evaluation." AR997.

256.      SunLife asked Dr. Odgers to (1) describe Parker's "current abilities and limitations in his/her performance of daily tasks", paying particular attention to abilities and limitations in performing tasks secondary to psychological symptoms and abilities"; (2) whether his medical records are consistent with each other and with collateral interviews; (3) his recommendations for treatment of Parker's psychological problems; and (4) if there is documented psychologically based impairment in Parker's ability to perform tasks, what should Parker do to enhance success for improvement in his ability to carry out those tasks? AR1001-1003.

257.      SunLife did not provide Dr. Odgers with the material and substantial duties of Parker's own occupation, nor did it ask Dr. Odgers to comment on whether Parker could perform those tasks, and Dr. Odgers did not comment on whether Parker could perform those tasks. AR1001-3.

258.      Regarding question (1), Dr. Odgers summarized Parker's neuropsychological test evaluations and SPECT scan, and opined that "there are no objective data to support functional limitations". AR1001.

259.      Regarding question (2), Dr. Odgers opined that based on the level of care, it is unlikely that Parker's symptoms would be of sufficient severity to cause functional limitations. AR1002.

260.    As to question (3), regarding his recommendations for treatment, Dr. Odgers

opined that "it appears highly likely that somatization[8] is playing a significant role in his

clinical presentation" and recommended he undergo psychotherapy on a weekly basis, to

assist with his coping strategies. AR1002.

261.    In response to question (4), Dr. Odgers responded, "there are no substantial data

in the record to support psychologically or neuropsychologically based impairment in this

claimant's ability to perform tasks." AR1003.

262.    Less than a week after receiving Dr. Odgers' report, SunLife upheld the denial of

Parker's benefits in a letter dated April 11, 2016. AR1004-1012.

263.    The final denial letter alleged that based on Dr. Trangle's review, which

determined there was no objective evidence to support Parker's diagnosis of Lyme

disease; there is no evidence to support that Parker cannot tolerate common medications;

and that there is no scientific basis for the diagnosis of CIRS. AR1011.

264.    The letter went on to allege that according to Dr. Odgers' review, there is nothing

in the medical evidence to indicate the severity of his symptoms, and that therefore, it is

unlikely that they are functionally limiting. AR1011-2.

265.    The letter concluded with the statement that "the medical documentation does not

support the conclusion that Parker meets the Plan definition of Total Disability beyond

March 31, 2015. Sun Life Assurance Company recognizes that Parker has multiple

symptoms; however, these symptoms would not cause functional impairment and impact

his ability to function and/or work as a Design Engineer. Therefore, based on our review

---

[8] Somatization is the expression of mental phenomena as physical (somatic) symptoms. Available at http://www.merckmanuals.com/professional/psychiatric-disorders/somatic-symptom-and-related-disorders/overview-of-somatization.

of the entire file, including the independent medical records assessments, the decision to deny benefits effective March 31, 2015, was correct and is reaffirmed." AR1012.

266.     The final denial letter made no mention of SunLife having conducted any sort of evaluation regarding Parker's ability to perform the material and substantial duties of his own occupation as a Design Engineer. AR1004-1012.

267.     The denial letter explained that Parker had exhausted his administrative remedies under the Plan. AR1012.

268.     Parker filed suit on August 11, 2016.  Dkt. 1; AR1017-1025.

## QUESTION PRESENTED

Was Defendant SunLife Insurance Company's decision to terminate Plaintiff, Craig Parker's claim for long-term disability benefits arbitrary and capricious, as not based on substantial evidence?

## INTRODUCTION

Plaintiff Craig Parker is a 56-year-old former Engineer for Garmin International, Inc. ("Garmin").  Prior to becoming disabled, he worked for Garmin for more than 14 years as a Design Engineering Supervisor. In April of 2014, Parker was forced to stop working due to a number of disabling symptoms, including pain, fatigue, gastrointestinal issues, brain-fog/impaired cognition, experience of constant-flu like symptoms, chronic sinusitis, inability to eat most foods, and the inability to tolerate medications. Initially, his physicians could not pinpoint the source of his symptoms and diagnosed him with fibromyalgia and chronic fatigue syndrome, two diagnoses of exclusion. After being evaluated by numerous infectious disease doctors, he was diagnosed with disseminated Lyme disease, in combination with Chronic Inflammatory Response Syndrome (CIRS) from mold toxicity caused by mold exposure based on the detection of toxins in his urine.

As a Garmin employee, Parker was a participant in Garmin's long-term disability plan ("the Plan"), insured and administered by Defendant SunLife Assurance Company of Boston ("SunLife").  When he stopped working, his annual salary at Garmin was just over $132,000. In order to be eligible for long-term disability ("LTD") benefits under the Plan, Parker needed only to prove that he was unable to perform the material and substantial duties of *his own occupation*, which was a Design Engineer Supervisor. This definition of disability remains the same for the life of the policy, which should pay Parker through his Social Security retirement age in the event that he remained disabled through that time.

In October of 2014, Parker applied for LTD benefits under the Garmin Plan. Six months after he filed his claim, after employing two nurses and one doctor to conduct paper reviews of Parker's claim, SunLife awarded Parker's LTD benefits in a letter dated March 3, 2015, agreeing that he had become disabled as of April 7, 2014, and had remained disabled throughout the Plan's 180-day elimination period. Due to a brief return to work, the letter explained that Parker's benefits began to accrue under the LTD Plan as of July 15, 2014. Along with the benefit approval letter, SunLife paid Parker his benefits for the period of July 15, 2014 through February 28, 2015. The benefit approval letter explained that based on Parker's former salary, his monthly benefit amount was $6,000. The letter further explained that Parker's claim had been approved for the diagnoses of chronic fatigue and fibromyalgia, and that claims based on both of these conditions were subject to a 24-month limitation under the Plan.

Less than two months after approving benefits, in a letter dated May 8, 2015, SunLife suspended Parker's benefits, claiming it needed to continue reviewing his claim. After three more months of reviewing his claim, SunLife officially terminated Parker's claim in a letter

dated July 30, 2015, based on the allegation that his treating physician had reported that Parker was capable of medium function. The benefit termination letter offered Parker appeal rights.

When it terminated Parker's claim, SunLife had in its possession numerous records and reports from Parker's several treating physicians who consistently reported that Parker suffers from a multitude of disabling symptoms, including but not limited to fatigue, malaise, gastrointestinal issues, chronic sinus infections, cognitive impairments, anxiety, and depression. Rather than consider the opinions of Parker's treating physicians, in denying Parker's claim, SunLife instead relied upon the medical record reviews conducted by its hired personnel, none of whom evaluated Parker in person nor addressed whether Parker was able to perform the material and substantial duties of his own occupation, which is the relevant question regarding whether or not Parker is entitled to benefits under the subject Plan.

When Parker appealed SunLife's denial decision, he submitted with his appeal three letters from treating physicians attesting to his total disability and complete inability to work, based on test results which confirmed the diagnoses of Lyme disease and Toxic Mold Exposure. Rather than credit the opinions of Parker's treating physician, SunLife hired two additional, biased physicians, who discounted Parker's diagnoses and criticized the veracity of his treating physicians' diagnoses and course of treatment. Relying only on their opinions alone, SunLife upheld the denial, forcing Parker to file suit. Parker was awarded Social Security Disability benefits after his claim was finally denied.

SunLife's benefit denial is not supported by the evidence in the record. In the absence of substantial evidence to support SunLife's benefit denial, the Court should find the denial of benefits was unreasonable. Summary judgment for Plaintiff is the only proper remedy, and Plaintiff's Motion should be granted.

**ARGUMENT**

I.   **STANDARD OF REVIEW**

    *A.  Generally.*

Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986); Nance v. Sun Life Assur. Co. of Can., 294 F.3d 1263, 1266 (10th Cir. Okla. 2002).  The court must view the evidence in the light most favorable to the nonmoving party and accord it the benefits of all reasonable inference.  Id.  A fact is "material" if it "might affect the outcome of the suit" when applying the relevant substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (U.S. 1986).

    *B.  The ERISA Standard of Review*

A court reviewing an ERISA plan administrator's decision denying benefits should apply a *de novo* SunLife of review unless the plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms.  Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989).

If a plan gives the administrator discretionary authority, then a court should review a plan administrator's decision only for abuse of discretion.  Id. at 115.  The abuse of discretion standard is the same as, and often referred to as, the arbitrary and capricious standard of review. Chambers v. Family Health Plan Corp., 100 F.3d 818, 825 n.1 (10th Cir. 1996).  Under this standard, the proper inquiry is whether the Plan Administrator's decision is "sufficiently

supported by facts within [his] knowledge to counter a claim that it was arbitrary and capricious." Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999)(quoting Woolsey v. Marion Laboratories, Inc., 934 F.2d 1452, 1460 (10th Cir. 1991)).  A claim must be supported by substantial evidence in order to not be arbitrary and capricious.  Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 382 (10th Cir. 1992).  A decision-maker's failure to investigate may render its decision arbitrary and capricious.  Gaither v. Aetna Life Ins. Co., 288 F.3d 759, 807 (10th Cir. 2004).  The Plan at issue in this case provides discretionary authority to SunLife to interpret the terms of the Plan; therefore the Court should review SunLife's decision under the abuse of discretion SunLife.

### C.  The Impact of *MetLife v. Glenn* on the ERISA Standard of Review.

In Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343 (2008), the Supreme Court confirmed the applicability of Firestone and trust law, and for purposes of the appropriate standard of review, approved the Sixth Circuit's use of a "combination-of-factors method of review."  Glenn, 128 S.Ct. 2352.  Under such a review, the court will "take account of several different considerations of which a conflict of interest is one."  Id. at 2351.  The Glenn Court explained:

> In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced the degree of closeness necessary depending upon the tiebreaking factors' inherent or case-specific importance.  The conflict of interest at issue here, for example, should prove more important (perhaps of greater importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claim administration.  See *Langbein, supra, at 1317-1321* (detailing such a history for one large insurer).

The Tenth Circuit evaluated and applied this changed method of review in Weber v. GE Group Life Assurance Co., 541 F.3d 1002 (10th Cir. 2008).  The Weber Court held:

> "…we dial back our deference if "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest." <u>Glenn</u> at 2343 (*quoting* <u>Firestone</u> at 115).  In such a situation, that "conflict should be weighed as a factor in determining whether there is an abuse of discretion."  <u>Id.</u> at 2350.  To incorporate this factor, we have "crafted a 'sliding scale approach' where the 'reviewing court will always apply an arbitrary and capricious standard, but [will] decrease the level of deference given…in proportion to the seriousness of the conflict..This approach mirrors the <u>Glenn</u> Court's method of accounting for the conflict-of-interest factor."
> <u>Id.</u> at 1010-1011.

Thus, post-<u>Glenn</u>, the Tenth Circuit embraces a combination-of-factors method of review that allows judges to take account of several different, often case-specific factors, including the impact of conflict, in reaching a result by weight all together.  <u>Holcomb v. Unum Life Ins. Co. of Am.</u>, 578 F.3d 1187, 1193 (10th Cir. 2009).  Accordingly, when deciding whether SunLife's denial decision was arbitrary and capricious, or correct, Parker urges the Court to consider and weigh the effect of SunLife's conflict as a motivating factor on its decision to deny benefits.

## II.   SUNLIFE'S BENEFIT TERMINATION SHOULD BE OVERTURNED, WHERE IT WAS AN ABUSE OF DISCRETION AND NOT BASED ON SUBSTANTIAL EVIDENCE.

Although the insured ultimately carries the burden of showing he is entitled to benefits, the administrator has a fiduciary duty to the insured to conduct an investigation and to seek out information necessary for a fair and accurate assessment of the claim.  <u>Rasenack v. AIG Life Ins. Co.</u>, 585 F.3d 1311, 1324 (10th Cir. 2009).  As explained below, SunLife failed to adequately investigate Parker' claim, rendering its decision wholly incorrect, and an abuse of its discretion.

### A. It Was Unreasonable and Improper for SunLife to Terminate Parker's Benefits, Where the Evidence in the Record Supports Parker's Total Inability to Perform the Material and Substantial Duties of His Own Occupation.

#### 1.   <u>Parker's condition did not change nor improve in any way in the two month period between the time benefits were approved and subsequently terminated.</u>

Parker received a letter dated March 3, 2015, explaining that his claim had been

approved. Statement of Facts ("SOF") ¶156. Then, in a letter dated May 8, 2015, just two months after he had received notice that his claim was approved, Parker was notified that his benefits were suspended as of March 31, 2015, less than 30 days after the claim approval letter had been issued. SOF ¶170. While all of Parker's medical records support his inability to work in his own or any other occupation, and resultant eligibility for continued benefits for LTD benefits under the Plan, in order to conduct a proper inquiry regarding whether SunLife's denial decision was proper, the Court should focus on Parker's medical condition leading up to the time benefit payments were stopped on March 31, 2015. Id.

As explained above, when SunLife suspended Parker's LTD benefits as of March 31, 2015, SunLife had already accepted liability under the Plan's "own occupation" definition SOF ¶ 156. The March 3, 2015 approval letter was issued *after* SunLife had obtained three in-house medical reviews, and the claim approval had been signed off by Michelle Doucette, the claims adjustor assigned to Parker's claim, as well as her manager, David Cairns. SOF ¶¶ 154, 155.

Furthermore, as evidenced from the records described above, nowhere in Parker's medical records is there documented improvement in his condition, neither warranting nor substantiating SunLife's suspension of benefits between the time that the claim was approved on March 3, 2015, through the date benefits were terminated as of March 31, 2015. SOF ¶¶ 156, 170. Courts have held that when a recipient of disability benefits submits medical proof of continuing disability, and the plan accepts liability based on that proof, the burden shifts to the Plan to produce medical evidence that the recipient is no longer disabled.

In Buss v. United of Omaha, 2014 U.S. Dist. LEXIS 123179 (D. Kan. 2014), Judge Marten found United of Omaha's termination be arbitrary and capricious, where United had no

new information upon which to justify its termination of benefits. In so finding, the Court held:

> "United's decision that Buss's medical records and performance on occupational evaluations do not support a finding of disability would perhaps be a reasonable one in a vacuum. But considering United's previous decisions that Buss was disabled under the same information, the reversal is not reasonable. Determining a person to be disabled one day and not disabled the next day upon review of the same information fits the very definition of arbitrary. To be clear, the court would not require insurers to get their disability decision right the first time upon penalty of forever being stuck with that conclusion. Rather, the court requires that an insurer must show substantial evidence to support changing its disability determination, as it must do to support its initial decision."

Id at *45.

Courts around the country have come to similar conclusions. For example, in McOskar v. Paul Revere Life Ins. Co., 279 F.3d 586 (8th Cir. 2001), the Eighth Circuit held that unless information available to an insurer alters in some significant way, "the previous payment of benefits is a circumstance that must weigh against the propriety" of an insurer's decision to terminate those benefits. Id. at 589. See also Hopkins v. AT&T Umbrella Benefits Plan No. 1, 2013 U.S. Dist. LEXIS 89970 (W.D. Mo. 2013) (prior award of benefits is relevant to the overall reasonableness of the decision to terminate benefits); see also Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321, 1331 (11th Cir. 2001)(where claimant satisfied his obligations under the terms of the plan, Reliance had to produce evidence showing that he was no longer disabled in order to terminate his benefits). Accordingly, SunLife abused its discretion by terminating benefits, despite any lack of improvement in Parker's condition.

## 2. SunLife both approved and terminated Parker's claim benefits based on the exact same information.

In this case, Parker consistently provided SunLife with proof that he was totally disabled under the Plan. Parker's physicians likewise consistently communicated that Parker

remained disabled due to the same disabling symptoms for which SunLife certified Parker's

disability for almost a year prior. The only change in circumstances at the time of denial was

SunLife's changed interpretation of same medical information it relied upon in finding Parker

disabled under the terms of the Plan. The Third Circuit has held that an administrator's

"inconsistent treatment of medical evidence used to determine whether a claimant is disabled"

shows that the decision to terminate benefits was arbitrary and capricious. Miller v. American

Airlines, Inc., 632 F.3d 837, 848-849 (3rd Cir. 2011). Parker urges the Court to consider

SunLife's termination decision to be incorrect and an abuse of its discretion, in light of the fact

that SunLife both approved and terminated Parker's claim based on the same information.

**B. SunLife Failed to Investigate Parker's Eligibility for Benefits Under the Terms of the Plan.**

    **1.    SunLife initially terminated Parker's claim based on the allegation that he could perform "sedentary" work; however, Parker's "own occupation" is considered "light".**

According to the July 30, 2015 benefit termination letter, Parker's claim was terminated

based on the allegation that Parker had the ability to perform sedentary work. SOF ¶ 201.

However, pursuant to SunLife's evaluation of Parker's "Own Occupation", the occupation of

Design Engineer Supervisor falls in the "light" strength demand category, not "sedentary".  SOF

¶ 128; 200. Confusingly, the July 30, 2015 denial letter even articulated same. SOF ¶ 199.

Parker's former counsel highlighted this error to Parker in his internal appeal letter. SOF ¶ 210.

Thus, whether or not Parker could or could not perform sedentary work is irrelevant to an

evaluation regarding his entitlement to benefits, which is premised on his inability to perform his

own occupation, which is considered light duty, and therefore an unreasonable and

unsubstantiated premise for terminating benefits. SOF ¶ 9. Accordingly, SunLife erroneously

terminated Parker's claim without first evaluating whether or not he qualified for benefits under the Plan, rendering its claim denial arbitrary and capricious.

**2.    <u>SunLife failed to assess whether Parker could perform the material and substantial duties of his own occupation, as the Plan terms require.</u>**

As explained in Plaintiff's Statement of Facts, the subject Plan defines "disability" as:

*"Total Disability or Totally Disabled means the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation.*
*The loss of a professional or occupational license or the inability to obtain or qualify for a license for any reason does not, in itself, constitute Total Disability.*
*To qualify for benefits, the Employee must satisfy the Elimination Period with the required number of days of Total Disability, Partial Disability or a combination of days of Total and Partial Disability."*
SOF¶ 9.

The Plan defines "Material and Substantial Duties" as the following:

*"Material and Substantial Duties" means, but is not limited to, the essential tasks, functions, skills or responsibilities required by employers for the performance of the Employee's Own Occupation. Material and Substantial duties does not include any tasks, functions, skills or responsibilities that could reasonably modified or omitted from the Employee's Own Occupation."*
SOF ¶ 9.

The Plan defines "Own Occupation" as the following:

*"Own Occupation means the usual and customary employment, business, trade, profession or vocation that the Employee performed as it is generally recognized in the national economy immediately prior the first date Total or Partial Disability began. Own Occupation is not limited to the job or position the Employee performed for the Employer or performed at any specific location."*
SOF ¶ 9.

Parker's "Own Occupation" is Design Engineering Supervisor. SOF ¶¶ 1, 127.

Accordingly, per the terms of the Plan's definition of "total disability" quoted above, in determining Parker's eligibility for benefits, SunLife was required to evaluate Parker's ability to perform the *material and substantial duties of his own occupation* as a Design Engineering Supervisor. SOF ¶ 9. As explained below, SunLife wholly failed to conduct such an analysis.

a. <u>SunLife erroneously focused only Parker's ability to perform the functional aspects of his occupation, without considering his ability to perform the material and substantial duties of his own occupation.</u>

In February of 2015, SunLife conducted an "Occupational Analysis" of Parker's claim. SOF ¶126. As explained in the statement of facts, SunLife's Occupational Analysis determined that the "functions" of Parker's own occupation included the following:

- Oversees activities related to design engineering, including staffing, scheduling, coordinating, and planning;
- Analyzes and resolves work problems, or aids employees in solving work problems;
- Supervises professional and paraprofessional engineering personnel;
- Assists in administering personnel functions, including recruiting, review and approval of job descriptions and salary classifications, and selection of placement personnel;
- Plans and establishes engineering schedules and follows up performance against estimates;
- Supervises assembly of cost control and statistical data;
- May supervise development of material selection standards;
- May recruit, hire, train staff, evaluate employee performance, and recommend or initiate promotions, transfers, and disciplinary action;
- May recommend new policies or procedures as necessary.
- Perform other job-related duties as assigned.

SOF ¶ 131.

The Occupational Analysis was conducted before SunLife referred Parker's claim to reviewers Jacobus, Furhmann, Odgers, and Trangle for review. SOF ¶¶ 126; 144; 173; 233; 252. Yet, SunLife did not ask its medical reviewers to consider Parker's ability to perform the material and substantial duties of his own occupation listed above, nor were they ever in fact considered by any of SunLife's captive consultants or hired medical reviewers at any point in the review of Parker's claim. SOF ¶¶ 104; 107; 122; 152; 240; 257. Accordingly, SunLife erroneously terminated Parker's claim without first evaluating whether or not he qualified for benefits under the terms of the Plan, rendering its claim denial arbitrary and capricious.

To further confuse matters, in its initial benefit termination letter dated July 25, 2015, SunLife explained that the Occupational Analysis was used to determine that Parker's own occupation exists in the national economy at the Light exertion level, leading to SunLife's conclusions regarding the physical demands of Parker's occupation.  SOF ¶ 200. However, the denial letter made no reference to the material and substantial duties of Parker's occupation as identified in the Occupational Analysis discussed above, nor that SunLife had conducted any sort of evaluation of Parker's *ability to perform those duties*. SOF ¶ 203. Instead, as discussed *infra*, the initial benefit termination letter solely rest on the allegation that Parker had the ability to "…perform a sedentary level of activity on a sustained basis throughout the day and that based on the current clinical notes the medical documentation does not provide any objective evidence to support any restrictions or limitations from performing the material and substantial duties of your own occupation." SOF ¶201.  Accordingly, as stated above, SunLife's primary reason for terminating Parker's benefits is illogical, unfounded, and not based on the evidence in the record. Again, Parker's ability to perform sedentary work is irrelevant here, where Parker's own occupation was considered Light duty. Moreover, even if Parker's job was considered to be sedentary, which it is not, the ability to perform sedentary or light work does not render one able to perform the material and substantial duties of a particular job that that falls into a particular strength category.

Courts around the country have agreed that when considering a claimant's ability to perform his/her own occupation, focusing on the physical aspects of a job alone, without considering the actual job duties, is an abuse of discretion. Bishop v. Long-Term Disability Income Plan of SAP Am., Inc., 232 Fed. Appx. 792, 794-795 (10th Cir. 2007)(insurer was required to consider the claimant's actual job duties in determining the "essential duties" of

his occupation"); Miller, 632 F.3d at 855 (concluding that "it is essential that any rational decision to terminate disability benefits . . . consider whether the claimant can actually perform the specific job requirements of a position"); McDonough v. Aetna Life Ins. Co., 783 F.3d 374, 381 (1st Cir. Mass. Apr. 15, 2015)("Let us be perfectly clear: under an own occupation standard, medical evidence is only part of the equation…To assess a claimant's ability to perform his own occupation, a decisionmaker must be aware of, and apply, the requirements of the occupation…Here, those requirements are measured by how the occupation is normally performed in the national economy — but the claims administrator and the various reviewers seem to have ignored that fact. Because they failed to take such requirements into account, the determination of disability under the plan cannot be said to be reasoned."); Sacks v. Std. Ins. Co., 671 F. Supp. 2d 1148, 1165, 2009 U.S. Dist. LEXIS 111331, *40 (C.D. Cal. 2009)("It is error to evaluate a claimant's disability under the DOT exertional strengths of "sedentary, light, etc." when the relevant plan definition is the more generous "own occupation" criteria); Salz v. Std. Ins. Co., 380 Fed. Appx. 723, 724 (9th Cir. 2010)("While the policy states that Standard 'is not limited to looking at the way you perform your job for your Employer (emphasis added), a proper administrative review requires Standard to analyze, in a reasoned and deliberate fashion, what the claimant actually does before it determines what the 'Material Duties' of a claimant's occupation are"); other insurers have likewise been criticized for the same behavior. See e.g. Diondia v. Reliance SunLife Life Ins. Co., 50 F.Supp.2d 934, 941 (N.D. Cal. 1999)(Defendant's decision was erroneous because "instead of defining Diondia's 'regular occupation' based on the contours of her previous job, Reliance tailored its definition of Diondia's 'regular occupation to fit her physical capabilities after becoming disabled'). Accordingly, SunLife abused its discretion in terminating Parker's benefits based on the allegation that he could perform sedentary work.

b. <u>SunLife's medical review of Parker's claim likewise erroneously focused only Parker's functional capabilities, rather than consider Parker's actual job duties and assess Parker's ability to perform them.</u>

i. *Dr. Furhmann's report did not support SunLife's benefit termination.*

Despite having evaluated the material and substantial duties of Parker's Own Occupation, when Doucette arranged for a medical review of Parker's claim in February of 2015, prior to the initial award of benefits, she asked Dr. Fuhrmann to determine whether Parker was precluded from performing sedentary or light duty work - and not whether he could perform the material and substantial duties of his own occupation. SOF ¶ 152. As explained above, Dr. Furhmann did not opine as to whether Parker could perform the material and substantial duties of his own occupation. <u>Id.</u>

This distinction is important, because while Parker's own occupation falls within the "light work" category, and not "sedentary", in evaluating his eligibility for benefits, it was improper for SunLife to focus solely on the *functional* aspects of Parker's own occupation, where the *material duties* of the occupation involve much more than sitting, standing, walking, etc. As an analogy, this is akin to SunLife alleging that an attorney who had the ability to sit, stand, or walk, could perform the occupation of an attorney based on these functional capabilities alone – without considering the attorney's ability to communicate with clients, draft briefs, conduct research, appear in court, etc. This would be a proper evaluation if, for example, the Plan defined "disability" to mean one's inability to perform only the physical demands of his/her occupation – but, as discussed above, this Plan does not. In fact, the subject Plan's definitions of "disability" and "material and substantial duties" make no mention of physical demands whatsoever. Thus, a proper inquiry into Parker's ability to perform his own occupation would be an evaluation of his ability to perform the actual tasks required by the job, such as overseeing

employees, mentoring and training employees, and assisting human resources with recruitment of new employees – to name just a few of Parker's job duties.  SOF ¶ 136. "An ERISA benefits determination must be a reasoned determination, and '[a] benefits determination cannot be 'reasoned' when the [claims] administrator sidesteps the central inquiry…By the plain language of the plan at issue here, the key inquiry is whether the claimant is 'able to perform the material duties of [his] own occupation' as 'normally performed in the national economy.' Thus, a reasoned determination of the existence of disability vel non requires, inter alia, a review of the material duties of the claimant's particular position and an assessment of how those duties align with the position as it is normally performed in the national economy. Only then can a claims administrator distill the medical and vocational evidence, apply it to the occupational profile, and make a reasoned determination of whether or not the claimant is disabled. McDonough v. Aetna Life Ins. Co., 783 F.3d 374, 380, 2015 U.S. App. LEXIS 6153, *11-12, 59 Employee Benefits Cas. (BNA) 2289 (1st Cir. Mass. Apr. 15, 2015) citing Elliott v. Metro. Life Ins. Co., 473 F.3d 613, 618-19 (6th Cir. 2006).

For disability determinations, the evidence that a plan administrator should consider in making its determination includes a review of the material duties of the claimant's particular position and an assessment of how those duties align with the position as it is normally performed in the national economy. See Elliott v. Metro. Life Ins. Co., 473 F.3d 613, 618-19 (6th Cir. 2006). Only then can a claims administrator distill the medical and vocational evidence, apply it to the occupational profile, and make a reasoned determination of whether or not the claimant is disabled." McDonough v. Aetna Life Ins. Co., 783 F.3d 374, 380 (1st Cir. 2015).

Furthermore, when considering the ability to perform these tasks, SunLife should have considered how the symptoms of Parker's conditions affect his ability to perform those tasks –

including his cognitive limitations, such as brain fog, and not just how the symptoms affect his ability to physically function (stand, walk, etc.). Calling a job sedentary or light duty is the beginning and not the end of determining the essential duties of an occupation.  See Nemeth v. Anderson Corp. Welfare Plan, 2012 U.S. Dist. LEXIS 190900, *35 (W.D. Wisc. 2012).

> ii.   *Drs. Trangle and Odgers' reports likewise failed to consider Parker's ability to perform the material and substantial duties of his own occupation.*

After Parker filed his appeal, SunLife hired two additional physicians to conduct paper reviews of Parker's file: Drs. Kevin Trangle and Robert Odgers. SOF ¶ 233; 252. As discussed above, neither physician was asked to consider Parker's ability to perform the material and substantial duties of Parker's occupation prior to alleging that he could return to work. SOF 240; 257.

Dr. Trangle reviewed Parker's claim from an occupational medicine perspective on March 28, 2016. SOF ¶ 233. According to his report, Dr. Trangle did not review the Occupational Analysis of Parker's occupation before rendering his report. SOF ¶ 240. In fact, Sun Life never asked Dr. Trangle whether he believed Parker was disabled from performing his own occupation; the only inquiry SunLife made regarding Parker's ability to return to work was when it asked Dr. Trangle, "When clarifying the supported restrictions and limitations, please be sure to address endurance restrictions/limitations if any, for example, from performing full time activities throughout an 8-hour day." SOF ¶ 242. In asking Dr. Trangle to opine regarding whether Parker was capable of performing "full-time activities", without providing Dr. Trangle with information regarding Parker's full-time *work* activities, Dr. Trangle's response that Parker was not restricted is therefore rendered meaningless, as it does not respond to the issue of

whether or not Parker can perform the material and substantial duties of his own occupation, which is the only relevant question regarding his entitlement to benefits.

Dr. Odgers' report likewise did not address any assessment of Parker's ability to perform the material and substantial duties of his own occupation. SOF ¶ 257. However, SunLife did ask Odgers to determine Parker's "abilities and limitations in performing tasks secondary to psychological symptoms and abilities", instructing Dr. Odgers to "pay particular attention to abilities and limitations in performing tasks that currently impact performance in the workplace". SOF ¶ 256. Yet, according to the information Dr. Odgers stated to have reviewed, SunLife did not provide Odgers with any information regarding the tasks Parker was required to perform in his own occupation as a Design Engineer Supervisor. SOF ¶ 257.  In any event, Odgers likewise did not opine as to whether Parker was able to perform the material and substantial duties of his own occupation. SOF ¶ 257.

Even still, SunLife relied on the reports of Drs. Trangle and Odgers in upholding the denial of Parker's benefits. SOF ¶ 262. Accordingly, in contravention of the clear terms of the Plan and national ERISA precedent, SunLife abused its discretion by failing to evaluate Parker's ability to perform the material and substantial duties of his own occupation as a Design Engineer Supervisor; because of this, SunLife's conclusion that Parker is not disabled under the terms of the Plan is not based on substantial evidence, and the benefit denial should be overturned.

### C. SunLife refused to acknowledge the objective evidence submitted in support of Parker's claim.

In both SunLife's initial and final benefit termination letters, SunLife alleged Parker had failed to provide "objective evidence" of his disability. SOF ¶ 201; 263.

Primarily, it is unclear what "objective evidence" SunLife demanded from Parker, as the denial letters never explained what type of evidence was required in order to substantiate

Parker's claim for benefits. SOF ¶ 201. This was made even more confusing due to the fact that SunLife had accepted as proof of claim the same information which it later stated did not constitute objective evidence of his disability, discussed *supra*. That said, SunLife's allegation that Parker did not provide objective evidence of his disability is wholly incorrect and unfounded. The record contains a plethora of objective evidence supporting Parker's multiple disabling symptoms, including blood test results, urine tests, SPECT scan results, and the findings resulting from numerous physical examinations conducted by multiple treating physicians.

Aside from the documentation provided at the outset of his claim, including blood test results, physical exam results and SPECT scan results, as his physicians continued to determine the source of his disabling conditions throughout the appeal process, Parker provided objective evidence in the form of lab results which showed toxic levels of ochre toxin in his urine, as well as other values that showed a high level of mold infection. SOF ¶216. Dr. Berndtson also determined that the infection has reached his brain based on reflexia demonstrated on the deep tendon reflexes portion of his physical exam. SOF ¶217. Furthermore, while he did not meet the CDC criteria for Lyme disease, his treating physician still diagnosed him with the condition and believed that the disease was contributing to his disability based on his symptomology which indicates late dissemination of Lyme disease. SOF ¶ 221.

Rather than acknowledge the objective evidence provided by Parker's multiple physicians on appeal, Dr. Trangle criticized each physician's theories and treatment protocol, alleging that Parker "had received inappropriate, unnecessary treatment for a number of unsupported conditions including antibiotics, anti-fungals, charcoal, gluthathione, and a variety of supplements. Most of these treatments, although not necessarily harmful, have no proven

scientific efficacy in the treatment of these conditions if they were supported." SOF ¶ 249. As

explained further below, Dr. Trangle's harsh criticisms of Parker's treating physicians' opinions

at the very least warranted an in-person evaluation by a physician, and SunLife abused its

discretion by accepting Dr. Trangle's bald assertions without exploring them further.

**D.  SunLife erroneously required Parker to provide evidence of symptoms that cannot be
objectively measured.**

Parker's medical records have consistently reflected that he suffers from multiple

disabling subjective symptoms, including but not limited to pain, flu-like symptoms, fatigue,

chronic sinusitis, brain fog, inability to eat most foods. SunLife has consistently alleged that

Parker's subjective complaints are not supported by substantial evidence. However, it is

undisputed that objective evidence of the aforementioned *symptoms* simply does not exist. Put

another way, there is no blood test for fatigue, pain, or flu-like symptoms.  In Swanson v. Unum

Life Ins. Co of Am., 2015 US. Dist. LEXIS 8395, at *25-27 (D. Kan. Jan 26, 2015) the court

held that if a plaintiff's condition only has symptoms that are entirely subjective, the plan

administrator cannot reasonably demand objective medical evidence of the condition. Four of

Parker's treating physicians (Brown, Crist, Seberger and Berdtson) provided medical opinions

attesting to the fact that Parker is unable to perform his former occupation due to the disabling

symptoms associated with his multiple diagnoses. SOF ¶¶114; 218; 225; 226. Disability plan

administrators may not require objective medical evidence of the cause of disabling symptoms

if there is consistent evidence of disability symptoms, and no finding that the claimant is not

credible in her complaints. Mitchell v. Eastman Kodak Co.,113 F.3d 433, 442-43 (3rd Cir.

1997). Thus, it was an abuse of discretion for SunLife to deny Parker's claim based on a lack of

objective evidence to substantiate his subjective disabling symptoms.

**E.  SunLife abused its discretion by terminating Parker's claim due to the difficulty in his diagnosis.**

Several cases have recognized the fact that medical diagnoses evolve and that medicine is not an exact science. Indeed, there is a whole line of cases, which for lack of a better term, which may be called "later diagnosis cases" which hold that later diagnoses must be considered by the plan administrator when those diagnoses explain symptoms that existed during the time period the person was insured.  In Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan, 46 F.3d 938 (9th Cir. 1994), CIGNA first paid Mongeluzo benefits for anxiety and depression and limited those benefits to two years based upon the mental health limitation of the Plan. Id. at 940-941. Much later after the administrative appeal period had closed, Mongeluzo was diagnosed with chronic fatigue syndrome. Id. The District Court and the plan administrator refused to consider evidence of this later diagnosis. Id. at 941.  The Ninth Circuit held that the District Court must consider this evidence stating, "the claim of chronic fatigue is not a new claim, but simply a new explanation for Mongeluzo's disability." Id. at 944; see also, Thompson v. Standard Insurance Company, 167 F. Supp.2d 1186, 1194 (D. Or. 2001) (the fact that a diagnosis is not made contemporaneously within the period that a claimant is insured does not undercut the viability of a later diagnosis); Woo v. Deluxe Corp., 144 F.3d 1157, 1162 (8th Cir. 1998) reversed on other grounds by Metro. Life Ins. Co. v. Glenn, at 115–19 (denial of benefits was improper in part because all of Woo's physicians connected the physical problems that she experienced during the insured period to her eventual diagnosis of scleroderma).

The record reflects that Parker suffers from a debilitating condition which prevents him from engaging in any work similar to his job with Garmin. Just a month prior to the time Parker's claim was denied, Dr. Fuhrmann agreed that Parker's symptomology limited his ability to carry out full-time activities and that he might only be able to perform part-time work.  SOF

¶¶ 145; 146. Drs. Berndtson, Seberger and Crist all agreed that Parker is disabled by due to his recurrent flu-like symptoms, including headaches, nausea, fatigue, body aches, muscle pains, cognitive issues. SOF ¶¶218; 225; 226. These doctors did not use a crystal ball to conclude that Parker was disabled; their opinions were based on clinical physical examinations. The verification requirement must be treated as evidentiary in nature.  Medicine is, at best, an inexact science, and we should not disregard the great weight of the evidence merely because objective laboratory diagnostic findings either are not yet within the state of the art, or are inconclusive. Stone v. First Wyoming Bank, N.A., 625 F.2d 332, 342 n.15 (10th Cir. 1980) ("Testimony as to a simple fact capable of contradiction, not incredible, and standing uncontradicted, unimpeached . . . must be taken as true."); Rawdon v. Stanley, 455 F.2d 482, 484 (10th Cir. 1972) ("Unimpeached credible evidence may not be disregarded by the trier of fact.").

1.  **People are disabled by symptoms, not syndromes.**

SunLife's final denial decision rest on the allegation that based on Dr. Trangle's review, Parker's Lyme Disease diagnosis is not supported by the available clinical evidence, and that there is no scientific basis for the diagnosis of CIRS.  SOF ¶ 263.  Although Plaintiff maintains that his symptoms are due to his chronic Lyme Disease and toxic mold exposure, courts have held that it is arbitrary and capricious to deny a claim for benefits because a claimant's symptoms cannot be linked to a specific illness.  Gawrysh v. CNA Insurance Co., 8 F. Supp. 2d 791 (N.D. Ill. 1998).  See also Thompson, 167 F. Supp. 2d at 1194 (internal citations omitted)("[a] diagnosis of [claimant's] condition may properly be made several years subsequent to the onset of the disability.")

In Gawrysh, the claimant suffered from several symptoms including debilitating fatigue, headaches, and sore throat.  Gawrysh at 794.  Although CNA reviewed a multitude of medical records and letters from her attending physicians, all proving that the claimant's symptoms were disabling, CNA ultimately denied Gawrysh's claim.  Id.  CNA had concluded that because the symptoms could not, with complete certainty, be linked to a specific illness, that Gawrysh was not totally disabled.  Id. In holding that the decision to deny Gawrysh's benefits on this basis was arbitrary and capricious, the court stated the following:

> "Rather than punishing [the claimant] for the inability of medicine to specifically pinpoint the cause of her debilitating fatigue, CAN should have hired experts or used its own doctors to examine [the claimant] to determine the cause and degree of her fatigue."
> Id.

Although in this case, SunLife did have Parker's file reviewed by numerous medical professionals, it was not to determine the cause or the severity of his disabling symptoms. Instead, SunLife and Dr. Trangle, upon whose opinion the final denial decision rest, chose to focus their denial on criticizing Parker's complicated diagnoses rather than determining the true severity of his disabling symptoms. SOF ¶263. Parker's symptoms, i.e. his sickness or injury, clearly prevent him from performing the material and substantial duties required of Design Supervisor Engineer, regardless of whether the etiology of his symptoms is toxic mold exposure, Lyme Disease, Babesia infection, fibromyalgia, chronic fatigue, or something else his physicians have not yet ascertained.

Moreover, it is undisputed that Parker's treating physicians did not know exactly what was the source of his disabling symptoms, yet consistently maintained that those symptoms rendered him disabled. At no point in time did any of Parker's treating physicians question his credibility. Despite this, SunLife and its reviewers consistently discounted Parker's subjective

reports of pain, fatigue, and other disabling symptoms. SOF ¶¶ 123; 248; 259. Indeed, when

credible evidence is before the administrator, "subjective pain may serve as the basis for

establishing disability, even if such pain is unaccompanied by positive clinical findings or other

'objective' medical evidence." <u>Marcus v. Califano</u>, 615 F.2d 23, 27 (2d. Cir. 1979); see also <u>Lijoi</u>

<u>v. Cont'l Cas. Co.</u>, 414 F. Supp. 2d 228, 245 (E.D.N.Y. 2006) (holding that "credible complaints

of pain . . . cannot be disregarded" even though plan terms required participant to submit

"objective medical findings" to substantiate a disability claim). <u>Smith v. Champion Int'l Corp.</u>,

573 F. Supp. 2d 599, 617, 2008 U.S. Dist. LEXIS 65346, *37 (D. Conn. 2008). For these

reasons, SunLife abused its discretion by failing to acknowledge that Parker's symptoms are the

cause of his disability, and not his diagnoses.

### F. SunLife relied on the opinions of biased medical reviewers, none of whom examined Parker in person, and ignored the opinions of Parker's own treating physicians; accordingly, their opinions do not constitute substantial evidence in support of the benefit termination.

#### 1. <u>Dr. Furhmann's report does not constitute substantial evidence in support of the termination of benefits, as SunLife relied on his report when approving Parker's claim.</u>

Prior to the initial determination of benefits, SunLife asked Dr. Calvin Fuhrmann, its

captive medical consultant to review Parker's file. SOF ¶ 144. Dr. Fuhrmann agreed that

Parker's fibromyalgia and chronic fatigue symptoms were "the limiting factor in terms of his

ability to carry out full-time activities.". SOF ¶145. Dr. Fuhrmann concluded that Parker could

work part-time, perhaps working from home. SunLife obtained Dr. Fuhrmann's opinion prior to

approving Parker's claim. SOF ¶144. Fuhrmann reviewed Parker's medical records after his

claim was approved, but did not identify which records he reviewed. Without any new

information supporting a chance in his condition, without speaking to Parker's treating

physicians, or examining him in person, and without evaluating the material and substantial

duties of Parker's own occupation, Dr. Fuhrmann alleged that Parker was no longer disabled as of the date of his second report. SOF ¶ 197. Thus, Dr. Furhmann's opinion does not constitute substantial evidence in support of Parker's claim denial.

**2. *Dr. Trangle's report does not constitute substantial evidence in support of the termination of benefits.***

As explained above, SunLife hired Dr. Trangle to review Parker's medical records on appeal. SOF ¶ 233. Dr. Trangle issued to SunLife a 49-page report dated March 28, 2016. SOF ¶ 238. 17 pages of the 49 page report provided general information about Parker's various illnesses and diagnoses, and not information or opinions specific to Parker. SOF ¶ 239. In his report, Dr. Trangle alleged to have called Drs. Berndtson and Seberger, but he did not reach either of them before issuing his report. SOF ¶ 243. Dr. Trangle determined that Parker was limited from diplopia (eye issues) from 5/15/14 to 9/2/14. SOF ¶ 244.  However, he disagreed with Parker's Lyme diagnosis, and alleged that his diagnosis of CIRS has no scientific basis. SOF ¶¶ 245; 246. He further alleged that Parker's mold infection/mold allergy diagnosis was not supported by objective medical evidence. SOF ¶ 247. As discussed above, he determined that Parker's urine mytoxin panel was "experimental, unvalidated and of unproven clinical significance". SOF¶ 247. He claimed that Parker's fatigue and pain do not correlate with objective findings. SOF ¶ 248. He went on to allege that Parker has received "inappropriate, unnecessary treatment for a number of unsupported conditions" and that the "medical evidence failed to establish an objective basis for his complaints". SOF ¶ 249.

While Dr. Trangle delivered harsh criticisms of Parker's multiple treating physicians, as discussed above, Trangle's report did not discuss Parker's job duties and/or his ability to perform those duties, which is the relevant question under the terms of the Plan. SOF ¶ 240.

However, despite having extremely divergent opinions from Parker's treating physicians, Trangle did not consult with one of them prior to issuing his report. He wholly disregarded Seberger's observations, which were based on objective evidence (urine tests and abnormal reflexia). A plan administrator does not have to wait indefinitely for a response from a doctor, but it does have to establish that the treating physician was informed of the importance to their patient of a prompt reply. Cooper v. Life Ins. Co. of N. America, 486 F.3d 157, 169 (6th Cir. 2007).

Furthermore, for the past 27 years, Dr. Trangle has devoted his career to helping employers and insurers and employers minimize their risk. SOF ¶¶ 235; 236; 237. He is in no way "independent", and therefore, his credibility must come into question[9]. Furthermore, he has previously been accused of being biased against claimants with the diagnoses of fibromyalgia and chronic fatigue. See e.g. State ex rel. Hudson v. Ohio Pub. Emples. Ret. Sys., 2011-Ohio-5362, 2011 Ohio App. LEXIS 4392, 2011 WL 4924259 (Ohio Ct. App., Franklin County Oct. 18, 2011) and Cooper v. Intel Corp. Long Term Disability Plan, 2014 U.S. Dist. LEXIS 109680 *8, (D. Or. Aug. 8, 2014). Courts have also found his opinion to be unrealistic. See e.g. State ex rel. Morton Int'l, Inc. v. Indus. Comm'n , 2007-Ohio-1497, P30, 2007 Ohio App. LEXIS 1373, *17-18 (Ohio Ct. App., Franklin County Mar. 30, 2007). Accordingly, the Court should not construe Dr. Trangle's opinion as "independent" nor credit his opinion over the opinions of Parker's multiple treating physicians.

### 3. Dr. Odgers' report does not constitute substantial evidence in favor of SunLife's claim denial.

As discussed above, SunLife hired Dr. Odgers to conduct a paper review of Parker's file from a psychiatric perspective. SOF ¶ 252. Dr. Odgers did not evaluate Parker in person prior to

---

[9] See Dr. Trangle's web site, *available at www.indepedentmedicalexperts.com*

alleging that Parker was not functionally limited. SOF ¶ ¶ 253; 259. Furthermore, t is pertinent to

note that Parker did not file his claim based on a mental illness, so Dr. Odgers' opinion regarding

whether or not Parker is disabled from a psychiatric illness is irrelevant. SOF ¶ 8. Clearly,

SunLife's decision to hire Dr. Odgers to review Parker's claim, when his claim was not based on

a mental illness, only provides evidence of SunLife's system of hiring multiple physicians from

whom it knows they will obtain a report favorable to support a claim denial.

### 4. *SunLife abused its discretion by failing to employ an independent medical examiner to evaluate Parker in person before denying benefits.*

The Plan provides that SunLife may, as often as often as reasonably required, require

Parker to undergo an in-person medical examination with a physician, health professional or

vocational expert of its choice. SOF ¶ 13. Despite the stark disagreement in opinions between

Parker's treating physicians and SunLife's hired reviewing physicians, SunLife never required

Parker be evaluated in person. In a case such as this, where SunLife's hired reviewer wholly

disagreed with Parker's diagnoses and subsequent treatment plans, SunLife abused its discretion

by not requiring an in-person examination of Parker. "Seeking independent expert advise is

evidence of a thorough investigation…" and if a conflict of interest may impede the insurer's

impartiality, the insurer "best promotes the purposes of ERISA by obtaining an independent

evaluation." Smith v. Metro. Life Ins. Co., 344 F.Supp.2d 696, 703 (D. Colo. 2004).

### 5. *SunLife ignored the opinions of Parker' treating physicians, who have consistently supported his total disability.*

Since the time that Parker filed his initial claim for benefits in April of 2014, Parker's

treating physicians consistently reported that Parker has remained totally unable to return to

work in any capacity.  Throughout the treatment notes contained in the record, his physicians

repeatedly recounted Parker's complaints of disabling pain, fatigue, flu-like symptoms, and

inability to tolerate most foods and medications, to name a few. Upon the final review of Parker's appeal, SunLife allegedly considered the information supporting Parker's disability which was contained in the claim file and submitted on appeal, yet either discounted or completely ignored the opinions of Parker' physicians.  While Parker does not contend that SunLife should have deferred to the opinions of Parker' treating physicians, it was wholly improper for SunLife to ignore them completely.  See e.g. Norris v. Citibank, N.A. Disability Plan (501), 308 F.3d 880, 885 (8th Cir. 2002)(holding that a plan administrator had abused its discretion, in part, by failing to address the extensive medical evidence relating to the claimant's disability or the consistent conclusion of her doctors and various plan administrators and personnel that she could not work); see also  Touhey v. Hartford Life & Accident Ins. Co., 2013 U.S. Dist. LEXIS 70912 *52 (E.D. Mo. May 20, 2013)("The Courts have frequently expressed concern where, as here, the administrator denies a claim with reliance on the reports of paper-review consultants, in opposition to the treating and examining physicians' consistent and concurring opinions that the claimant is disabled.").

SunLife has wholly disregarded the opinions of Parker's treating physicians and instead relied on its nurse and physician reviewers' baseless conclusions that Parker was not disabled from working in his own occupation. The Supreme Court has held that while a plan administrator is not necessarily required to give deference to a treating physician's opinion, it cannot improperly discount, ignore or mischaracterize the opinion.  Black & Decker Plan v. Nord, 538 U.S. 822, 834 (2003).  Plan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinion of a treating physician.  Id. at 823.  SunLife's complete disregard for the opinions of Parker's physicians was both improper and an abuse of discretion, and its denial should not be upheld.

### III.   SUNLIFE'S INHERENT CONFLICT OF INTEREST INFLUENCED ITS DECISION TO DENY PARKER' BENEFITS.

If a benefit plan gives discretion to an administrator or fiduciary that is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.  Glenn, 554 U.S. at 115, Weber, 541 F.3d at 1010 (10th Cir. 2008).  As discussed above, SunLife is both the plan administrator and the payor of benefits.  In the dual role of ultimate decision-maker regarding entitlement to benefits, as well as the payor of benefits, SunLife was certainly motivated by its own financial concerns when it decided to deny Parker's benefits.

Craig Parker is 56-years old. Without accounting for inflation or interest, if he remains disabled through the life of the policy (age 67), SunLife would be required to pay him more than $300,000. SOF ¶ 11. This leaves little question as to why it was eager to keep Parker off the books – so eager that it did not want to spend the time or money to conduct a proper evaluation of his claim.

Pursuant to Glenn and the Tenth Circuit's decision in Weber, discussed *supra,* the Court should weigh the impact of SunLife's inherent conflict of interest on its decision to deny his benefits as an important factor in determining whether its decision to deny Parker' claim was reasonable.  As the Supreme Court stated in Glenn, "In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessarily depending upon the tie-breaking factor's inherent or case-specific importance."  Glenn, 128 S.Ct. at 2351.

As discussed above, SunLife's decision to deny benefits was not based on substantial evidence.  This fact, coupled with SunLife's inherent conflict of interest, weighs heavily in favor of a finding by the Court that SunLife abused its discretion in determining that Parker is not entitled to benefits under the Plan.

"This lack of relevant evidence along with Defendants' conflict of interest under Glenn lead only to one conclusion:  Defendants abused their discretion when denying Plaintiff's claim."  McAllister v. Life Ins. Co. of N. Am., 2009 U.S. Dist. LEXIS 38849 *11 (E.D. Ark. 2009.

## IV.   CONCLUSION

Craig Parker has remained totally disabled from working in any capacity since he was forced to stop working in April 2014, and he remains totally disabled today.  Summary judgment in favor of Parker is appropriate, where SunLife failed to investigate Parker's ability to perform the material and substantial duties of his own occupation, ignored the opinions of his treating physicians in favor of its hired, biased and non-credible reviewing physicians, who did not evaluate Parker in person, picked and chose what would evidence would benefit its denial decision from the reports of Parker's physicians and its own, and ignored portions of those reports which did not support is arbitrary denial.  Benefits have been improperly withheld for more than two years, and SunLife's claim administration does not support its denial.

Accordingly, SunLife's decision to deny Parker's claim was an abuse of discretion; not based on substantial evidence; and motivated by its inherent conflict-on-interest to deny Parker's meritorious claim.

WHEREFORE, Plaintiff prays for an Order granting Summary Judgment in favor of Plaintiff Craig Parker, requiring Defendant to:

1. Pay Plaintiff's past due benefits through the date of judgment, plus prejudgment interest;

2. Reinstate Plaintiff's benefits, ordering Defendant to pay benefits as they become due;

3. For reasonable attorney's fees and costs;

4.   and for any other relief the Court deems just and equitable.

Respectfully Submitted,

/s/Talia Ravis
Talia Ravis
KS Bar No. 22212
The Law Office of Talia Ravis, P.A.
9229 Ward Parkway, Suite 370
Kansas City, Missouri 64114
1-800-694-3016 (fax)
travis@erisakc.com
Attorney for Plaintiff, Craig Parker

**CERTIFCATE OF SERVICE**

I hereby certify that on June 9, 2017, Plaintiff Craig Parker served his Memorandum in Support of Motion for Summary Judgment on Defendant SunLife Assurance Company of Canada, via electronic mail and US Mail, on counsel for Defendant:

Matthew R. Brunkhorst
2345 Grand Boulevard, Suite 1500
Kansas City, Missouri 64108-2617
816-221-3420
816-221-0786 (facsimile)
mbrunkhorst@armstrongteasdale.com

and

Edna S. Kersting (IL627775) (*pro hac vice*)
Wilson Elser Moskowitz Edelman & Dicker LLP
55 West Monroe Street - Suite 3800
Chicago, IL 60603-5001
312-821-6162 (Direct)
312-704-0550 (Main)
312-704-1522 (Fax)
edna.kersting@wilsonelser.com