# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CRAIG PARKER,

     Plaintiff,

     v.

SUN LIFE ASSURANCE COMPANY OF
CANADA,

     Defendant.

Case No. 16-2554-JAR

## MEMORANDUM AND ORDER

Plaintiff Craig Parker brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), seeking judicial review of Defendant Sun Life Assurance Company of Canada's denial of his claim for long-term disability benefits. This matter is before the Court on the parties' cross motions for summary judgment (Docs. 40 and 43). For the reasons stated below, the Court denies Plaintiff's motion for summary judgment and grants Defendant's motion for summary judgment.

## I.     Uncontroverted Facts

### A.     The Parties and the Plan

Plaintiff is a 56-year-old former engineer for Garmin International, Inc. ("Garmin"). He began working as an engineer for Garmin in January of 1997. He stopped working for Garmin on or about April 4, 2014, claiming he suffered from chronic fatigue, fibromyalgia, irritable bowel syndrome ("IBS"), and adrenal insufficiency.[1] When he left Garmin, he was a Design

---

[1] AR at 31, 294.

Engineering Team Leader, responsible for "[d]irect[ing] and coordinat[ing] activities of an Electrical Engineering team that is responsible for developing electronic components, products, and systems."[2] Plaintiff was a salaried exempt employee with an annual salary of $132,069.60, paid $5,079.60 every two weeks.[3]

Garmin sponsored an employee welfare plan that provided long-term disability ("LTD") benefits to eligible, qualifying participants. This plan is fully funded by a group insurance policy Garmin purchased from Defendant (the "Plan"). Plaintiff was a participant of the Plan.

The Plan provides LTD benefits of 60% of the employee's Total Monthly Earnings with a maximum monthly benefit of $6,000 under the following circumstances:[4]

> If Defendant receives Notice and Proof of Claim that an Employee is Totally or Partially Disabled, a Net Monthly Benefit will be payable, subject to the Limitations and Exclusions.
>
> Proof of Total or Partial Disability must be given to Defendant upon request and at the Employee's expense.
>
> To be eligible to receive a Net Monthly Benefit, the Employee must:
>
> 1. satisfy the Elimination Period with the required days of Total or Partial Disability;
>
> 2. provide proof of continued Total or Partial Disability; and
>
> 3. have regular and continuing care by a Physician who provides appropriate treatment and regular examination and testing in accordance with the disabling condition.[5]

For salaried exempt employees such as Plaintiff, the Plan contains the following applicable definitions:

> **Material and Substantial Duties** means, but is not limited to, the essential tasks, functions, skills or responsibilities required by employers for the performance of

---

[2] AR at 272.

[3] AR at 549.

[4] AR at 90.

[5] AR at 127.

the Employee's Own Occupation. Material and Substantial Duties does not include any tasks, functions, skills or responsibilities that could be reasonably modified or omitted from the Employee's Own Occupation.

**Own Occupation** means the usual and customary employment, business, trade, profession or vocation that the Employee performed as it is generally recognized in the national economy immediately prior to the first date Total or Partial Disability began. Own Occupation is not limited to the job or position the Employee performed for the Employer or performed at any specific location.

**Total Disability or Totally Disabled** means the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation.

* * *

To qualify for benefits, the Employee must satisfy the Elimination Period with the required number of days of Total Disability, Partial Disability or a combination of days of Total and Partial Disability.[6]

The Plan provides that Defendant has discretionary authority to determine benefit eligibility and interpret the terms of the Plan.[7] This discretionary authority includes the right to determine eligibility for benefits, the amount of benefits due, and to construe the terms of the Plan.

### B. Plaintiff's Claim for LTD Benefits

On October 9, 2014, Defendant received Plaintiff's form request for LTD benefits, dated September 29, 2014.[8] In section 2 of the form, Plaintiff indicated that he first noticed symptoms of his illness in March 2012, and described the nature of his illness/condition as "Dizziness, sweating, and muscle spasms after eating. Symptoms have increased since that time."[9] Plaintiff

---

[6] AR at 101–02.

[7] AR at 145.

[8] AR at 31–40.

[9] AR at 31.

listed April 4, 2014, as the last day he worked, and April 7, 2014, as the first day he was unable to work.[10]

In a letter dated October 22, 2014, Defendant acknowledged receipt of Plaintiff's claim for LTD benefits and informed him that it was awaiting documents from his employer and an Attending Physician's Statement ("APS") to be completed by his treating doctor.[11] Defendant requested Plaintiff contact it to conduct a telephone interview. It also advised that it had requested records from his doctors and explained the timeframe for its written decision.[12]

After receiving the requested medical records, Defendant obtained medical records reviews from two registered nurses ("RN") and an occupational analysis from a vocational consultant. The latter stated, based on her review of the employer's statement and job description and the Economic Research Institute ("ERI") Occupational Assessor:

> [Plaintiff's] occupation [of Design Engineering Supervisor] typically exists in the national economy, according to ERI, at a **Light** exertion level – Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects. Physical demand requirements are in excess of those for Sedentary Work. Sitting is required frequently and standing and walking are is [sic] required occasionally.
>
> This occupation also typically requires:
>
> Frequent: reaching, talking, handling, keyboarding, hearing, near acuity, depth perception
>
> Occasional: reaching upwards, reaching downwards, fingering, sit/stand option, far acuity and accommodation
>
> * * *
>
> The employer statement indicates that no lifting/carrying any weight is required. This requirement is less than what is required for this occupation as it typically exists in the national economy.[13]

---

[10] *Id.*

[11] AR at 173.

[12] *Id.*

[13] AR at 461 (emphasis in original).

Both nurses opined that there was insufficient objective evidence in the current medical records to support Plaintiff's claim that he was unable to perform his job.[14]  Despite these opinions, after talking to Plaintiff, Defendant referred the matter for a second level review by a medical doctor ("MD") before making a final determination.[15]

On February 27, 2015, Calvin P. Fuhrmann, M.D., opined the following in his report to Defendant:[16]

1.  [When Plaintiff had double vision, Plaintiff could not work; but this condition had cleared completely after vitamin therapy.][17]

2.  [With respect to the claimant's intermittent symptoms of fatigue, muscle weakness, and generalized pain, it] is my considered medical opinion that [he] would be able to function in his usual capacity provided he was given periods of time to rest and this might translate into part-time employment. . . .  I do not believe at the present time the claimant is totally unable to carry out his full-time activities, and this is confirmed by the [APS] completed by Dr. Brown in which he said the claimant's symptoms are intermittent.[18]

3.  A diagnosis of fibromyalgia and chronic fatigue syndrome is supported.[19]

4.  I am unable to identify any specific event or significant change in the claimant's symptomatology other than the fact that he reached a point where he described to his physician that he could not work on a full-time basis.[20]

5.  As noted, issues regarding when and how he can work on a full-time basis are still open.  What is quite clear is that if he is given appropriate time to rest that he will be able to work on a part-time basis and work through this.  Dr. Brown has indicated that he is likely to improve over a 12-to-26-week period.  This statement was made in September [2014].  It is apparent to me that the claimant's condition should be reaching the point where he can return to full-time activity. . . .  [A

---

[14] AR at 370, 460.

[15] AR at 467.

[16] AR at 476–79.

[17] AR at 477.  Plaintiff had reported double vision beginning around May 2014 and was diagnosed with possible fourth nerve palsy; he wore prism glasses and took B12 and Folate; and by early July 2014, the symptoms resolved.  AR at 460.

[18] AR at 477–78.

[19] AR at 478.

[20] Id.

diagnosis for chronic Lyme disease] is not supported by the records . . . reviewed.[21]

Based on Dr. Fuhrmann's report, Defendant approved Plaintiff's request for LTD benefits for a specific period – July 15, 2014 through February 28, 2015. Defendant gave Plaintiff its written decision via a letter dated March 3, 2015.[22] In that letter, Defendant set forth the date of disability as April 7, 2014, calculated Plaintiff's benefits as $6,000 per month with accrual beginning on July 15, 2014, explained the first check represents benefits payable from July 15, 2014 through February 28, 2015, and future checks will be mailed around the twentieth of the month.[23] The letter stated, in pertinent part:

> Your claim for Long Term Disability has been approved under the diagnosis of Chronic Fatigue Syndrome and Fibromyalgia and is subject to [a 24-month limitation].[24]
>
> * * *
>
> [B]enefits are issued on a monthly basis subject to ongoing proof of Total or Partial Disability. Any benefits payable are issued at the end of each month of continued disability. To assist you with sending ongoing proof of loss, we commonly forward periodic attending physician's statements, statements of information, and activity questionnaires. These forms when completed fully and properly, generally will provide sufficient information to determine ongoing benefit eligibility. Please note, however, that sometimes this information may not be sufficient, and we may require further documentation to determine if you qualify for ongoing benefits.
>
> The policy provides a Long Term Disability benefit for a potential maximum benefit period to age 67. For the first 24 months of the benefit period, "total disability" is evaluated against your ability/inability to perform your own occupation as it existed immediately before any period of disability for which a claim is filed. After benefits have been paid for 24 months, "total disability" is

---

[21] AR at 478, 298.

[22] AR at 483–87.

[23] AR at 483.

[24] AR at 485.

evaluated against your ability/inability to perform any gainful occupation for which you are/become suited given your education, training and experience.[25]

Consistent with the above, on April 8, 2015, Defendant requested Plaintiff have his treating doctors submit statements for his ongoing claim. Drs. Michael Brown and Jude LaClaire submitted APSs on Plaintiff's behalf.

In a letter dated May 8, 2015, Defendant suspended Plaintiff's LTD benefits as of March 31, 2015, because the then current clinical data did not support total disability beyond that date. Defendant explained, in pertinent part:

> The Attending Physician Statement signed by Dr. Brown on 4/21/15; although indicated medium function, he also advised your condition is unchanged and that your physical restrictions and limitation[s] vary daily which is conducive (sic) with a diagnosis of Fibromyalgia and Chronic fatigue. Dr. Brown originally felt you were likely to improve over a 12-26 week period which it appears you have with the given opinion of Dr. Brown that you are capable of medium function[;] however we are aware of the Behavioral component that may impact your sustain (sic) function and therefore have requested your claim be reviewed by our medical consultant regarding the Behavioral component. We did not receive the documentation regarding Dr. LaClairs (sic) treatment from you until April 28, 2015 and we need to allow time for the review before making a determination of support of continued Total Disability.[26]

Defendant thereafter referred the matter for a psychiatric consultant review and another MD review. Defendant received a report from Lisa Jacobus, MSW, LICSW, and a second memorandum from Dr. Fuhrmann. On May 14, 2015, Jacobus wrote:

> Documentation in the file does not provide support for an incapacitating psychiatric disorder impacting the claimant's ability to function including ability to work. Records do not contain sufficient clinical information such as comprehensive mental status exam results or information on limitations in day-to-day functioning to support an incapacitating psychiatric condition. In fact, mental status exam findings that were provided from his primary care provider are mostly unremarkable.

---

[25] AR at 486.

[26] AR at 547.

Someone with an incapacitating psychiatric condition would be expected to be engaged in intensive psychotherapy and medication management with a specialist in psychiatric care. Although the claimant is engaged in psychotherapy, he is not engaged in medication management. Of note, the onset of treatment with a therapist, following his last day of work is not necessarily reflective of someone with an incapacitating psychiatric condition.[27]

On July 25, 2015, Dr. Fuhrman wrote, in pertinent part:

1. [Plaintiff] was seen and evaluated by Dr. Stephen Waller … [who] provided a very detailed analysis of [Plaintiff's] clinical findings. It was Dr. Waller's [conclusion] that [Plaintiff] did not have evidence of Lyme disease, he did not have evidence of infectious meningitis, and . . . clearly noted that [Plaintiff's] mental status was essentially normal… It is my considered opinion that [Plaintiff] had obviously shown significant improvement in his overall central nervous system issues with particular attention to his memory and that the other symptoms of muscle fatigue and weakness were not of the degree that would prevent him from carrying out his usual activities. . . Based on the recently received medical records, it is my considered medical opinion that the claimant does not have evidence of chronic Lyme disease, that his overall symptoms have improved from the point of view of his sinuses, and that there is nothing objective at the present time to corroborate his issues regarding cognitive dysfunction or so-called brain fog.

2. [Plaintiff] does have chronic sinus disease with evidence of functional abnormalities. The claimant has not been on standard therapy for sinusitis as noted and he is currently being followed by a naturopath with a list of apparently 21-plus medications and supplements that have been provided. It is my considered medical opinion that at the present time the claimant's condition has stabilized. He has undergone appropriate sinus surgery. He has been seen by an infectious disease specialist and a pulmonologist, and it is apparent that his condition is such that he would be capable of carrying out full-time sedentary activities.

3. Dr. Waller . . . noted [Plaintiff's] mental status had improved significantly to the point where he was able to relate in significant detail the various aspects of his past medical history, clearly demonstrating that his mental status was not impaired. It should be noted that the claimant was referred for neuropsychological testing and when this information is made available, it will shed further light on his condition. However, what is clear, and it is my considered medical opinion, is that the claimant at the current time is fit for duty.[28]

---

[27] AR at 564.

[28] AR at 604–07.

Based on these recent consultant reports, Defendant rendered its decision denying LTD benefits beyond March 31, 2015, in a letter dated July 30, 2015 (the "Denial Letter"), stating:

> We have determined that you are not eligible for Long Term Disability benefits under the terms and conditions of Group Policy No. 231948 issued to Garmin International Incorporated. In conclusion it is our medical staff's opinion that you have the ability to perform a sedentary level of activity on a sustained basis throughout the day and that based on the current clinical notes the medical documentation does not provide any objective evidence to support any restrictions or limitations from performing the material and substantial duties of your own occupation.
>
> We have determined that you have not satisfied the definition of Total Disability, as defined, to be eligible for continued Long Term Disability benefit consideration and we are formally denying your claim at this time. Benefits have been paid through March 31, 2015 and benefits beyond this date are denied.[29]

On October 1, 2015, Plaintiff requested an appeal of the July 30 decision. After receiving additional information, Defendant referred Plaintiff's claim for yet another independent medical and psychological records review. Kevin Trangle, M.D., did the medical records review, while Robert P. Odgers, PhD, ABPP, did the neuropsychological file review.

After reviewing their analyses, in a letter dated April 11, 2016, Defendant upheld its previous determination to terminate Plaintiff's claim effective March 31, 2015 (the "Appeal Denial Letter").[30] On August 11, 2016, Plaintiff filed the present lawsuit, claiming Defendant's denial of LTD benefits was arbitrary and capricious.[31]

---

[29] AR at 618.

[30] AR at 1004–12.

[31] AR at 1017–25.

## II.   Standards of Review

### A.   Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[32] A fact is only material if a dispute over it would affect the outcome of the suit.[33] An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[34]

"Where, as here, the parties file cross-motions for summary judgment, [the Court is] entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[35] The Court considers cross-motions separately: the denial of one does not require the grant of the other.[36] "To the extent the cross-motions overlap, however, the Court may address the legal arguments together."[37] The material facts are undisputed in this case, and the legal issues asserted with respect to both motions are identical. The Court will therefore address those issues together.

### B.   Review of Adverse Benefits Determination

ERISA gives Plaintiff, as plan beneficiary, the right to federal court review of the denial of his disability benefits.[38] "[I]n ERISA cases seeking review of a denial of ERISA benefits, the court's review is 'limited to the administrative record,' i.e., the materials compiled by the ERISA

---

[32] Fed. R Civ. P. 56(a).

[33] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[34] *Id.*

[35] *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[36] *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

[37] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (quotations omitted).

[38] 29 U.S.C. § 1132(a)(1)(B).

plan's administrator in the course of making its decision."[39]  This case is governed by the standards applicable to an appeal of an administrative decision, and "the court acts as an appellate court and evaluates the reasonableness of a plan administrator or fiduciary's decision based on the evidence contained in the administrative record."[40]

The Plan provides discretionary authority to Defendant to interpret its terms and conditions as well as to determine eligibility for benefits.  Because the Plan gives the administrator discretionary authority, "we employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[41]  Under this standard, "review is limited to determining whether the interpretation of the plan was reasonable and made in good faith."[42]  The decision of the plan administrator will be upheld "so long as it is predicated on a reasoned basis," and "there is no requirement that the basis relied upon be the only logical one or even the superlative one."[43]  "Consequently, the Tenth Circuit has observed that the arbitrary and capricious standard 'is a difficult one for a claimant to overcome.'"[44]  The Court looks for "substantial evidence" in the record to support the administrator's conclusion, meaning "more than a scintilla" of evidence "that a reasonable mind could accept as sufficient to support a

---

[39] *Berges*, 704 F. Supp. 2d at 1155 (quoting *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009) (citation omitted)).

[40] *Panther v. Synthes (U.S.A.)*, 380 F. Supp. 2d 1198, 1207 n.9 (D. Kan. 2005) (citing *Olenhouse v. Commodity Credit Corp.*, 42 F .3d 1560, 1579 & n.31 (10th Cir. 1994)).

[41] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1130 (10th Cir. 2011) (quotations omitted).

[42] *Id*. (quotations omitted).

[43] *Id*. at 1134 (quotations omitted).

[44] *Berges*, 704 F.Supp.2d at 1174 (quoting *Nance v. Defendant Assur. Co. of Can.*, 294 F.3d 1263, 1269 (10th Cir. 2002)).

conclusion."[45]  "The substantiality of the evidence must be evaluated 'against the backdrop of the administrative record as a whole.'"[46]

In *Metropolitan Life Insurance Co. v. Glenn*,[47] the Supreme Court held that when an ERISA fiduciary is responsible for determining, in its discretion, eligibility for benefits under an employer-sponsored plan and is also the party responsible for paying claims, a conflict of interest exists.[48]  The Supreme Court explained that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; but the significance of the factor will depend upon the circumstances of the particular case.[49]  The Supreme Court stated that:

> The conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. . . .  It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.[50]

It is undisputed that Defendant acted as both the insurer and administrator of the Plan, but Plaintiff has not presented evidence that Defendant has a history of bias.  Plaintiff simply points out that denying Plaintiff's claim would save Defendant approximately $300,000.  This alone is

---

[45] *Eugene S.*, 663 F.3d at 1134 (quotation omitted).

[46] *Berges*, 704 F. Supp. 2d at 1175 (quotation omitted).

[47] 554 U.S. 105 (2008).

[48] *Id*. at 114.

[49] *Id*. at 105.

[50] *Id*. at 117 (citations omitted).

insufficient.[51]  The Court will thus keep the dual-role conflict of interest in mind in determining

whether there is an abuse of discretion, but will give it limited weight in this case.[52]  The record

shows Defendant endeavored to discover the severity of Plaintiff's ailments, obtaining an

occupational analysis, two RN reviews, three MD reviews (albeit two were from one doctor),

and two psychiatric reviews.

## III.  Analysis

In its motion for summary judgment, Defendant argues that its decision was not arbitrary

and capricious, citing Plaintiff's own treating physicians' medical records and several

independent physicians' assessments of those records.  Plaintiff argues Defendant's termination

of his LTD benefits was arbitrary and capricious due to the following: 1) Plaintiff's condition did

not change nor improve between the initial approval and subsequent denial, thus it was

unreasonable for Defendant to change its decision; 2) Defendant improperly analyzed the

material and substantial duties of Plaintiff's own occupation; 3) Defendant selectively reviewed

the medical evidence and ignored Plaintiff's treating physicians' opinions; 4) Defendant required

Plaintiff to provide evidence of symptoms that cannot be objectively measured; 5) Defendant

denied benefits based on the difficulty in diagnosing his illnesses; and 6) the administrative

record supports Plaintiff's claim for benefits.  After due consideration of these arguments, the

Court concludes that substantial evidence in the record, when evaluated against the backdrop of

the administrative record as a whole, supports Defendant's denial of LTD benefits in this matter.

---

[51] *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (noting that there is no per se rule of significant economic impact, and that the long term disability costs amounted to a mere .3% of the company's operating expenses for the year); *Eugene S.*, 663 F.3d at 1133 (stating that a conflict based on generalized economic incentive is insufficient).

[52] *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009) (court gave conflict-of-interest limited weight because administrator hired two independent physicians and the record demonstrated that the administrator diligently endeavored to discover the nature of plaintiff's ailments).

### A. No Change or Improvement in Condition to Support Suspension of Benefits

Plaintiff essentially argues that after Defendant approved his LTD claim, it accepted that he was totally disabled, thus the burden shifted to Defendant to produce medical evidence that he was no longer disabled.[53] He also argues that because his condition did not change nor improve during the two month period between when his LTD request was first approved and then suspended, Defendant abused its discretion when it later terminated his benefits.[54] He further argues that Defendant's decision to terminate was an abuse of discretion in light of the fact that Defendant both approved and terminated Plaintiff's claim based on the same information.[55] The Court finds these arguments unpersuasive for four reasons.

First, Plaintiff's initial argument ignores that Defendant's approval for LTD benefits was for a specific time-frame. In the March 3 letter, Defendant accepted Plaintiff was disabled from April 7, 2014 through February 28, 2015 only. And under the Plan, Plaintiff bears the burden of providing proof of continued Total or Partial Disability.[56] That burden did not shift by virtue of the March 3 letter. Indeed, Defendant made it clear in the letter that "benefits are issued on a monthly basis subject to ongoing proof of Total or Partial Disability."[57]

Second, the "no change in condition" argument erroneously assumes the medical records predating the March 3 letter supported a Total Disability finding only. But Defendant's decision to suspend benefits was based in part on information it received prior to the March 3 letter. Specifically, Dr. Brown's initial APS dated September 26, 2014, and three medical records

---

[53] Doc. 44 at 55.

[54] *Id.* at 54–56.

[55] *Id.* at 57.

[56] AR at 127.

[57] AR at 486.

reviews. In the APS dated September 26, 2014, Dr. Brown indicated Plaintiff had the capacity to perform medium work and estimated his physical limitations will last approximately 12-26 weeks.[58] With respect to Plaintiff's mental limitations, Dr. Brown indicated Plaintiff's ability to sustain work performance, attention, and concentrations were severely impaired.[59] He estimated that Plaintiff would be able to return-to-work, full-time, in "3-6 months."[60] In a letter dated January 1, 2015, Dr. Brown clarified that "All of [Plaintiff's] symptoms significantly inhibit [Plaintiff] from adequately carrying out the daily requirements of his job at Garmin."[61]

The two RN reviewers, however, opined that there was insufficient objective evidence in the file to support finding Plaintiff incapable of sustaining light capacity work except for the limited period when he suffered from double vision and was recovering from sinus surgery. Dr. Fuhrmann, the MD reviewer, opined that Plaintiff's complaints were consistent with fibromyalgia and chronic fatigue and that these conditions could limit his ability to carry out full time activities; but because Dr. Brown described Plaintiff's symptoms as intermittent, Plaintiff would be able to work part-time if given periods of rest.[62] Dr. Fuhrmann thus did not fully endorse Dr. Brown's opinion. Instead of quibbling over when and how Plaintiff can work on a full-time basis, Dr. Fuhrmann agreed that Plaintiff should be able to return to full-time activity within Dr. Brown's estimated time-frame. Six months from the date of Dr. Brown's APS is March 27, 2015. Thus, Defendant's decision suspending LTD benefits as of March 31, 2015,

_____

[58] AR at 296.

[59] AR at 298.

[60] *Id.*

[61] AR at 396

[62] AR at 477.

was not arbitrary or capricious because Plaintiff's own treating physician's statement provided the basis for that decision.

Third, contrary to Plaintiff's argument, Defendant did not approve and suspend LTD benefits based on the exact same information. Defendant suspended LTD benefits after receiving Dr. Brown's APS dated April 21, 2015, and Dr. LaClaire's Behavioral APS and treatment notes on April 28, 2015. In his APS dated April 21, 2015, Dr. Brown indicated that Plaintiff still had the capacity to perform medium work, Plaintiff's progress was "unchanged," and "[Plaintiff] is overall about the same in regards to fatigue/mental fog/concentration."[63] In this APS, Dr. Brown did not include a behavioral assessment because Plaintiff was now under a psychiatric physician's care. Under these circumstances, Defendant had a reasoned basis to focus on Dr. Brown's opinion regarding Plaintiff's physical limitations and his conclusion that Plaintiff had the capacity to perform medium work. If Plaintiff could perform medium work, his physical impairments did not prevent him from performing the material and substantial duties of his own occupation, which indisputably was at a lower exertional level. It was thus reasonable for Defendant to suspend LTD benefits pending a review of Dr. LaClaire's APS and treatment records on the behavioral component of Plaintiff's limitations and restrictions.

Finally, even if Defendant inconsistently treated Dr. Brown's APSs, any error for the suspension would have been harmless because the final termination of benefits was supported by additional, substantial evidence as discussed in Section C. below.

## B. The Material and Substantial Duties of Plaintiff's Own Occupation

Plaintiff argues that Defendant erred in terminating his benefits based on its medical staff's opinion that he had the ability to perform sedentary work when Plaintiff's own occupation

---

[63] AR at 530–31.

as a Design Engineering Team Leader was light work.  The Court finds the issue of whether or not Plaintiff's own occupation was sedentary or light work a red-herring.  Plaintiff's treating physician indicated that Plaintiff has the capacity to perform medium work, which means he can do either sedentary or light work.  In any case, any error for denying LTD benefits based on Dr. Fuhrmann's opinion that Plaintiff had the ability to perform sedentary work was harmless because Plaintiff's restrictions and limitations after March 31, 2015, were not physical in nature, rendering the physical exertional level of Plaintiff's job irrelevant.

Plaintiff next argues that the ability to perform sedentary or light work does not render him able to perform the material and substantial duties of his own occupation.  He claims Defendant erroneously focused on his ability to perform "the functional aspects" of his own occupation, rather than his ability to perform the material duties of his own occupation, such as overseeing employees, mentoring and training employees, and assisting human resources with recruitment of new employees.[64]  The Court disagrees.

Defendant retained Kristin Esposito, a vocational expert, who identified the physical and mental components of Plaintiff's job as it is generally recognized in the national economy.  Esposito's analysis considered several sources of evidence, including the Dictionary of Occupational Titles definitions, as well as Garmin's job description.  Plaintiff did not dispute Esposito's analysis, which indicated the material and substantial duties of a design engineer supervisor are intellectual, rather than physical.

Even though he did not review Esposito's analysis, Dr. Fuhrmann knew Plaintiff was "a Team Leading Engineer."[65]  Defendant asked Dr. Fuhrmann to consider Plaintiff's physical and

---

[64] Doc. 44 at 59–64.  Plaintiff listed sitting, standing, walking, etc. as the functional aspects, thus the Court construes this argument as one challenging his ability to perform the mental components of his job.  *Id.* at 62.

[65] AR at 476.

mental limitations.  As to the latter, Dr. Fuhrmann found "nothing objective at the present time to corroborate [Plaintiff's] issues regarding cognitive dysfunction or so-called brain fog."[66] Dr. Furhmann noted that Dr. Waller, one of Plaintiff's treating physicians, had indicated that Plaintiff's mental status was essentially normal and did not support a diagnosis of significant cognitive dysfunction.[67]  Michelle Doucette, a LTD benefits analyst for Defendant, then connected the dots between Dr. Furhmann's and Espoito's analyses to conclude that Plaintiff had failed to satisfy his burden to prove he was unable to perform the material and substantial duties of his own occupation.

But even if Dr. Furhmann's report was insufficient by itself, when combined with Drs. Trangle and Odgers' reports, the Court cannot say Defendant failed to assess whether Plaintiff could perform the material and substantial duties of his own occupation pursuant to the Plan. Drs. Trangle and Odgers both indicated that they reviewed Esposito's Occupational Analysis. Dr. Trangle's report contains an educational and occupational history section that set forth the physical requirements of Plaintiff's Own Occupation.[68]  Dr. Trangle identified the only impairment that precluded Plaintiff from performing most if not all of his essential work duties was hypertropia in the left eye which caused double-vision.  That condition "restricted him from driving, operating hazardous machinery and working at unprotected heights," but had resolved by September 2014.[69]  He concluded that no further physical limitations or restrictions were

---

[66] AR at 606.

[67] AR at 605.

[68] AR at 941–42.

[69] AR at 975.

supported and deferred an analysis of Plaintiff's mental health conditions to an appropriate specialist.[70]

Dr. Odgers focused on the mental limitations and noted the following: 1) test scores across multiple cognitive domains, including attention and concentration, memory, and higher level processing of information, were normal; and 2) mild impairment on verbal fluency measures. He also concluded that "there was nothing in the record to support [brain fog] other than [Plaintiff's] subjective reports."[71] He further noted that Dr. Schuchardt, Plaintiff's PCP, consistently noted in mental status examination that Plaintiff was alert, oriented, and cognitively intact. Because there is substantial evidence supporting the conclusion that Plaintiff's symptoms did not impact his cognitive abilities, it is axiomatic that Plaintiff's ability to perform his material duties, such as reasoning, problem solving, talking, and coordinating with his subordinates, was not affected. The Court finds Defendant's assessment of the material duties of Plaintiff's own occupation was not arbitrary and capricious.[72]

## C.    Defendant's Review of the Medical Evidence

Plaintiff raises numerous arguments regarding Defendant's treatment of the medical evidence. The Court addresses them in random order.

### 1.    Objective Evidence Requirement

Plaintiff argues that Defendant erred by requiring him to provide objective evidence of symptoms that are entirely subjective in nature, such as: fatigue, pain, brain fog, or flu-like

---

[70] *Id.*

[71] AR at 1001.

[72] *Mayes v. Standard Ins. Co.*, No. 13-2111-JAR, 2014 WL 4725452, at *17 (D. Kan. Sept. 24, 2014) (finding Standard's assessment of the material duties of Plaintiff's occupation as electronics engineer not arbitrary and capricious because insufficient evidence supported plaintiff's claim of non-exertional impairments relating to fatigue and cognitive limitations).

symptoms.  The Court rejects this argument because Defendant did not require Plaintiff to provide objective evidence of his subjective symptoms.  Instead, Defendant wanted objective evidence regarding the restrictions and limitations that prevent Plaintiff from performing his Garmin job duties.[73]

As this Court noted in *Swanson*,[74] in cases where the disabling condition's symptoms are entirely subjective, such as chronic fatigue syndrome and fibromyalgia, the following general rule emerged: "while a plan administrator may not reasonably demand objective medical evidence of a condition which is incapable of objective diagnosis, it may reasonably require objective evidence that a claimant's diagnosed condition renders her unable to perform her occupational duties."[75]  Objective evidence of occupational limitations include, *inter alia*: 1) tests of physical strength or stamina, or mental ability; 2) psychiatric evaluations showing whether claimants struggle to concentrate or interact with others in a positive manner; and 3) functional capacity evaluations testing a person's actual ability to perform physical tasks such as sitting, standing , walking, lifting, and reaching.[76]

In this case, Plaintiff went through a battery of tests that could serve as objective evidence of his limitations and restrictions.  The results of these tests, however, did not support his claims.  In the Appeal Denial Letter, Defendant referenced a number of tests (or lack thereof) and noted their results.  The following represents a sampling of these notations: 1) no

---

[73] Denial Letter, AR at 680 ("based on the current clinical notes[,] the medical documentation does not provide any objective evidence to support any restrictions or limitations from performing the material and substantial duties of [his] own occupation.").

[74] *Swanson v. Unum Life Ins. Co. of Am.*, No. 13-CV-4107-JAR, 2015 WL 339313 (D. Kan. Jan. 26, 2015).

[75] *Id*. at *9 (citations omitted).

[76] *Id*. at *10 (citing *Karvelis v. Reliance Standard Life Ins. Co*., No. 03–3848, 2005 WL 1801943, at *15 (S.D. Tex. July 28, 2005) (finding that a psychiatric evaluation provided objective evidence of a claimant's ability to "concentrate, remember, and interact with coworkers and subordinates")).

comprehensive mental status exam in record; 2) mental status exam findings by treating physician were mostly unremarkable; 3) the brain MRI with and without contrast show no evidence of parenchymal, leptomeningeal, or cranial nerve involvement; 4) a plethora of diagnostic studies failed to reveal the presence of a readily accepted disease entity potentially responsible for his subjective complaints; 5) neuropsychological evaluation on December 9, 2015, indicated test scores across multiple cognitive domains, including attention and concentration, memory, and higher level processing of information were normal; the only significant finding was relatively mild impairment on verbal fluency measures; 6) no objective personality measures were administered; and 7) neuropsychological test findings generally did not correlate with the SPECT findings.[77]

The Court concludes that Defendant may require objective evidence of the restrictions and limitations that prevent Plaintiff from performing his Garmin job duties in light of his diagnosis for chronic fatigue and fibromyalgia. The Court agrees with Defendant that the record in this case contains no objective evidence of Plaintiff's asserted occupational limitations. Even if there was some objective evidence, it was insufficient. In light of the dearth of objective evidence in the record supporting Plaintiff's asserted occupational limitations, the record supplied a reasoned basis for Defendant's benefits determination.

### 2. Duty to Consider Treating Physicians' Opinions

Plaintiff argues that Defendant's complete disregard for his treating physicians' opinions was improper and an abuse of discretion.[78] But Defendant did not completely disregard or ignore Plaintiff's treating physicians' opinions. Indeed, Defendant relied upon several of

---

[77] AR at 1006–11.

[78] Doc. 44 at 74–75.

Plaintiff's treating physicians, namely Drs. Gierer, Waller, and Pearson in its final determination.[79]  As to the remaining treating physicians' opinions, Defendant concluded that their assessments appeared to be based wholly on Plaintiff's subjective descriptions of his pain and limitations and, thus, did not constitute objective evidence of his inability to sustain work performance, attention, or concentration.  Defendant's approval of LTD benefits from July 15, 2014 through March 31, 2015, further belies this particular argument.  The Court concludes Defendant did not wholly disregard or ignore Plaintiff's treating physicians' opinions.

### 3.      Difficulty in Diagnosis

Plaintiff argues that Defendant abused its discretion by terminating his claim due to the difficulty in his diagnosis.  He maintains that his symptoms of fatigue, headaches, body aches, muscle pains, and brain fog are totally disabling "regardless of whether the etiology of his symptoms is toxic mold exposure, Lyme Disease, Babesia infection, fibromyalgia, chronic fatigue, or something else his physicians have yet to ascertained (sic)."[80]  The Court rejects this argument as specious.  Defendant did not terminate benefits based on the difficulty in diagnosing his conditions and linking the symptoms to a certain illness.  Defendant does not dispute that Plaintiff had these symptoms.  Indeed, Dr. Fuhrmann agreed that Plaintiff's symptomology was compatible with fibromyalgia and chronic fatigue.  But as Plaintiff says, the etiology of these symptoms is irrelevant.  In any case, having these symptoms does not automatically entitle Plaintiff to LTD benefits because many people perform their job duties while suffering one or more of these symptoms.  Indeed, the record indicates Plaintiff worked while suffering from

---

[79] AR at 1009.

[80] Doc. 44 at 70.

these symptoms for a period of time.[81]  The severity of the symptoms is the determinative factor. Defendant denied benefits beyond March 31, 2015, because the medical record did not contain objective evidence that indicated the severity of Plaintiff's fatigue, headaches, body aches, muscle pains, and brain fog prevented him from performing the material and substantial duties of his own occupation.

### 4.    No Duty to Employ Independent Physician to Examine Plaintiff

Plaintiff argues that Defendant abused its discretion by failing to employ an independent medical examiner to evaluate him in person where Defendant's consultants disagreed with his treating physicians' opinions.  While such exams might be helpful, they are not required.[82]  The Court cannot say that Defendant's decision to forego an independent examination in this case was unreasonable, especially where the medical record is so detailed and includes exhaustive reports by other doctors.  With such comprehensive medical records available for review, it was not unreasonable for Defendant to rely on the independent specialists' analyses of the medical records rather than requiring Plaintiff to undergo an independent exam (or potentially a series of independent exams), given the multiple specialties of the reviewing doctors who reviewed Plaintiff's medical records.

---

[81] Employee's Statement, AR at 31 (first noticed symptoms in March 2012, but worked until April 4, 2014).

[82] *Blair v. Alcatel-Lucent Long Term Disability Plan*, 688 F. App'x 568, 577 (10th Cir. 2017) ("Although the Plan gives CIGNA the right to have a physician of its choice examine [plaintiff], it does not require CIGNA to personally examine the claimant."); *Fought v. UNUM Life Ins. Co. Of Am.*, 379 F.3d 997, 1015 (10th Cir. 2004) (noting independent medical examinations are often helpful, but they are not required), *abrogated in part on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116 (2008); *Smith v. Metro. Life Ins. Co.*, 344 F. Supp. 2d 696, 703 (D. Colo. 2004) (holding independent physical exams are not required and causing two reviews of Plaintiff's medical records to be performed was sufficient.).

## 5.    Substantial Evidence

Plaintiff argues that the reports of Drs. Furhmann, Trangle, and Odgers do not constitute substantial evidence.  Plaintiff faults Dr. Furhmann for: 1) failing to identify the records he reviewed; 2) not speaking to Plaintiff's treating physicians before issuing his report; 3) not personally examining Plaintiff; and 4) not evaluating the material and substantial duties of Plaintiff's own occupation.  Plaintiff faults Dr. Trangle for: 1) not discussing Plaintiff's job duties and/or his ability to perform those duties; 2) failing to consult with Plaintiff's treating physicians prior to issuing his report; 3) devoting the past 27 years as a consultant for employers and insurers; and 4) previously having been accused of being biased against claimants with fibromyalgia and chronic fatigue.  Finally, Plaintiff argues that Dr. Odgers' opinion is irrelevant because he did not file his claim based on a mental illness.

The Court finds it unnecessary to address each of these alleged faults because the question is not whether a certain doctor's opinion alone is substantial evidence.[83]  Instead, the Court asks whether there is substantial evidence in the record as a whole supporting Defendant's benefits.[84]  And the answer in this case is yes.  Plaintiff nitpicks each of these doctors' reports. He emphasizes the evidence in his favor, while ignoring evidence to the contrary.  The Court's review is not so narrow.  The Court looks to the record as a whole and defers to Defendant's decision if it is supported by substantial evidence.

Plaintiff's argument that Dr. Odgers' opinion is irrelevant lacks merit.  Plaintiff reported to Defendant that he began seeing a psychiatrist in January 2015, for depression, anxiety, and

---

[83] Some of these arguments are duplicative and have been rejected earlier in this opinion.  *See* Section III.B and III.C.4.

[84] *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002) ("Substantiality of the evidence is based upon the record as a whole.").

cognitive issues.[85]  Plaintiff even saw a neurologist, who ruled out dementia, a mental

impairment.[86]  Because Plaintiff claimed cognitive impairments (brain fog, confusion, anxiety,

etc.), sought psychiatric care, and provided those medical records, Defendant acted reasonably in

obtaining psychiatric reviews.  After reading Dr. Odgers' report, the Court finds it highly

relevant, easy to understand, and probative, making it substantial evidence supporting

Defendant's benefits determination.

Regarding Dr. Trangle's alleged long history as a consultant for plan administrators,

Plaintiff has failed to demonstrate bias on Dr. Trangle's part that requires the Court to conclude

that Defendant's reliance on his opinion was arbitrary and capricious.  "Undoubtedly, the

relationship between a plan administrator and its medical consultants is material to the Court's

determination of whether the administrator's decision was arbitrary and capricious, especially in

a case in which the consultants' opinions contradicted the opinion of the claimant's treating

physician."[87]  Certainly a history of biased opinions from a particular physician would be

relevant information for a reviewing court to take into consideration, but in the three cases cited

by Plaintiff, two courts found Dr. Trangle not biased.[88]  The third case is factually

distinguishable because it involved Dr. Trangle's theory of causation for a neck fusion

---

[85] AR at 533–54.

[86] AR at 13, 519, 605, 911.

[87] *Rizzi v. Hartford Life & Acc. Ins. Co.*, 613 F. Supp. 2d 1234, 1248 (D.N.M. 2009), aff'd sub nom. *Rizzi v. Hartford Life & Acc. Ins. Co.*, 383 F. App'x 738 (10th Cir. 2010).

[88] *Cooper v. Intel Corp. Long Term Disability Plan*, No. 3:13-CV-01852-HZ, 2014 WL 3895989, at *4 (D. Or. Aug. 8, 2014) ("Even viewing the abstracts and medical article in the light most favorable to Plaintiff, I decline to infer that Dr. Trangle is biased against or ignorant about fibromyalgia."), *aff'd*, No. 14-35745, 2017 WL 1960580 (9th Cir. May 11, 2017); *State ex rel. Hudson v. Ohio Pub. Emps. Ret. Sys.*, No. 10AP-904, 2011 WL 4924259, at *12 ("Dr. Trangle's opinion concerning the diagnosis of fibromyalgia does not demonstrate bias on his part.").

operation.[89]  Here, Dr. Trangle was asked to review a plethora of symptoms and purported

diagnosis.  And though he may have criticized some of Plaintiff's physicians' treatment plans, he

also agreed with "the general consensus among [Plaintiff's treating] physicians" that Plaintiff's

medical information did not support an infectious, autoimmune, autonomic, hematologic,

neurologic, nutritional, immunodeficiency mediated disease.[90]  The Court finds Dr. Trangle's

report constitutes substantial evidence supporting Defendant's benefits determination.

> As Judge Herrera succinctly noted in *Rizzi v. Hartford Life & Acc. Ins. Co.*:

> [T]he Court's role . . . is not to referee a battle of physicians or to decide whether
> Defendant's decision to terminate Plaintiff's LTD benefit payments was correct.
> It is simply to determine whether Defendant reasonably exercised its discretion
> and based its determination on substantial evidence.[91]

None of the alleged errors in Dr. Furhmann's report warrant its complete exclusion.  In

sum, the Court finds Defendant's reliance on the opinions of Drs. Fuhrmann, Trangle, and

Odgers as non-examining and non-treating physicians reasonable.  Defendant's benefits

determination was thus based on substantial evidence.

## IV.    Conclusion

Given the divergence of Plaintiff's treating physicians' opinions with respect to fatigue

and brain fog, the absence of clinical findings, and the reviewing physicians' unified conclusion

that he retained cognitive functions, the Court finds that Plaintiff has not met his burden of

proving that he lacked the physical capacity or mental acuity to perform the material and

substantial duties of his own occupation.  Thus, Defendant was justified in deciding to uphold its

---

[89].*State ex rel. Morton Int'l, Inc. v. Indus. Comm.*, No. 06AP-382, 2007 WL 944005, at *7 ("Dr. Trangle's opinion that the Injured Worker's current problems are merely the result of a progressive degenerative condition does not seem realistic.").

[90] AR at 978.

[91] *Rizzi*, 613 F. Supp. 2d at 1249.

determination that Plaintiff's limitations were such that he could perform his own occupation. The Court is sympathetic to Plaintiff's plight. However, after review of the entirety of the administrative record and consideration of the parties' arguments, it is clear that Defendant's benefits determination was supported by substantial evidence.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment is GRANTED (Doc. 40) and Plaintiff's Motion for Summary Judgment is DENIED (Doc. 43).

**IT IS SO ORDERED.**


Dated: September 22, 2017

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE